# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Glen Johnson, Timothy Gillen, Kyle Jones, Steven Hall, Clayton Johnson, Mark Hubbard, Steve Piper, and Bill Patt as Trustees of the Operating Engineers Local #49 Health and Welfare Fund, Michael R. Fanning as a Fiduciary of the Central Pension Fund of the International Union of Operating Engineers and Participating Employers, Joseph Ryan, Bruce Carlson, Glen Johnson, Frank Frattalone, Lee Hiller, Tony Phillippi, Greg Waffensmith, Mark Ryan, as Trustees of the Local #49 International Union of Operating Engineers and Associated General Contractors of Minnesota Apprenticeship and Training Program, the Operating Engineers Local #49 Health and Welfare Fund, the Central Pension Fund of the International Union of Operating Engineers and Participating Employers, and the Local #49 International Union of Operating Engineers and Associated General Contractors of Minnesota Apprenticeship and Training Program, | Court File No: 0:14-cv-02081 (RHK/LIB) |
| | **DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| Plaintiffs, | |
| vs. | |
| Charps Welding & Fabricating, Inc., Clearwater Energy Group, Inc. f/n/a C & G Holding Company of Clearbrook, Inc., C & G Construction Inc. of Clearbrook, Alpha Oil & Gas Services, Inc., and Kenneth Charpentier, individually, | |
| Defendants. | |

## **INTRODUCTION**

Kenneth Charpentier ("Charpentier") is a welder and business owner who founded Charps Welding & Fabricating, Inc. ("Charps") in 2001 as a small welding shop for local farmers and manufactures.   In time, Charps expanded into oil transmission line maintenance, working mostly for one large pipeline operator: Enbridge, Inc. ("Enbridge").   Over the next decade, Charpentier also teamed up with other partners (none of whom held any interest in Charps) to create two new companies that build field infrastructure for oil and gas producers: C&G Construction Inc. ("C&G") and Alpha Oil & Gas Inc. ("Alpha").   C&G's and Alpha's construction business is very different from Charps' maintenance business and, unlike Charps (which employs members of the Local #49 Union of Operating Engineers ("Local #49") and other unions), they do not have a unionized workforce or bid on union projects.

Today, these companies remain independent businesses providing different services for different purposes.   Plaintiffs, however, assert C&G and Alpha are hollow shells used by Charps to skirt its obligations under its collective bargaining agreements ("CBAs").   This theory profoundly mischaracterizes C&G and Alpha as double-breasted counterparts to Charps.   In reality, C&G and Alpha share very little with Charps – in fact, the Companies did not even always share a common owner.   They are not double-breasted and, a fortiori, are not alter-egos.[1]

Unlike a double-breasted outfit, wherein the owner of a union shop creates a non-union shop to do the same work, C&G and Alpha operate in an entirely different part of

---

[1] Collectively, Charps, C&G and Alpha are the "Clearwater Companies."

the oil and gas industry than Charps.  When this suit began, Charps worked in the transmission leg of the supply chain, primarily providing integrity testing and repair services for transmission line owners on large, steel pipelines.  On the other hand, C&G and Alpha worked primarily in the "production" leg, building oil field infrastructure – smaller (often polyethylene) pipelines that connect oil rigs to distribution lines – for producers.

Aside from their present ownership, the Clearwater Companies are distinct in virtually all relevant respects.  Functionally and geographically, they generally provide different services to different clients operating in different regions and supply chain segments.  Operationally, each of the Clearwater Companies is helmed by independent executives who are responsible for running, and have authority to act on behalf of, only their own respective companies.  Each of the Companies has its own offices in the different geographic regions it services, and purchases or enters into its own leases to secure the use of each property.  Administratively, each Clearwater Company, manages its own workforce, procures its own supplies, handles its own administrative tasks, and makes its own contracting decisions.

In short, then, the plaintiff Funds are seeking windfall contributions from two legitimate businesses whose non-union employees will never benefit from them.

There is little evidence suggesting the Clearwater Companies share more than ownership and nothing suggesting they committed fraud.  The Funds cannot line their own coffers at C&G's and Alpha's expense.  With discovery as to alter-ego and joint-venture liability closed, Defendants are entitled to summary judgment.

3

## FACTUAL BACKGROUND

**I.      Kenneth Charpentier Establishes Charps in 2001.**

Charpentier began his career in the 1980s providing fabrication services out of his small shop in Clearbrook, Minnesota.  Declaration of Kenneth Charpentier ("Charpentier Decl.") ¶ 2.  He first joined the Local #15 Plumbers and Gasfitters Union in 1996, switching later to the Local #126 (now Local #11) Plumbing and Steamfitters Union.  Id. ¶ 3.  He established Charps in 2001 as a small shop with one shop hand and added a few union welders as needed.  Id. ¶ 4 and Ex. 1.  Two years later, he hired operating engineers from the Local #49 to work on pumping station maintenance.  Id. ¶ 5.

Initially, Charps welded pipe fittings and provided related welding and fabrication services, generating less than $100,000 in annual revenues.  Id. ¶ 6; Declaration of Kris Munter ("Munter Decl.") ¶ 3.  In 2005 it shifted its core business to integrity digs – assessing and maintaining the large steel transmission lines that transport oil and gas across the country.  Declaration of Mark Olson ("Olson Decl.") ¶ 3.  Integrity testing involves digging around buried pipelines to evaluate their condition and allow for repairs. Id.; Declaration of Greg Todavich ("Todavich Decl.") ¶ 3.  By the end of 2006, Charps had increased its workforce from five to thirty union employees.  Olson Decl. ¶ 4. Charps' projects require union labor, including operating engineers to run its heavy machines.  Id. ¶ 5; Todavich Decl. ¶ 4.

In 2008, Charps hired Kris Munter ("Munter") as its Financial Manager.  Munter Decl. ¶ 4.  When he was hired, Munter told Charpentier he aspired to be more than

merely an employee.  Id.  Munter held this position until 2011, when he moved to Alpha. Id. ¶ 5.

During Munter's tenure, Charps worked mostly in Wisconsin with a few projects in Illinois, Kansas, and Minnesota.  Id. ¶ 6; Olson Decl. ¶ 6.  In 2011, it picked up more work in Pennsylvania.  Id. ¶ 6.  Today, Charps works primarily in Illinois, Minnesota, and Wisconsin, but does some integrity testing and welding work in Indiana, Michigan, Missouri, New York, North Dakota, Ohio, and Oklahoma.  Id. ¶ 7; Todavich Decl. ¶ 5.

Charps' primary (and sometimes only) client has always been Enbridge, a North American transmission line operator.  Munter Decl. ¶ 7; Olson Decl. ¶ 8; Todavich Decl. ¶ 6.  Enbridge provides Charps' largest projects and accounts for the overwhelming majority of its revenue.  Id. ¶ 7; Declaration of Joe Van Vynckt ("Van Vynckt Decl.") ¶ 4.  Overall, Charps generates considerably more revenue than the other Companies.  Id. ¶ 5 and Exs. 1-8.

Charps is the only Clearwater Company to sign any CBAs.[2]  Charpentier Decl. ¶ 7.  None of them prevent Clearwater or Charpentier from owning non-union companies. Id. ¶ 11; Pipeline CBA, ECF No. 25-5 at 7, 92; Distribution and Utilities CBA, ECF No. 25-6 at 3.  Initially, Charpentier signed the CBAs in his capacity as an officer of Charps.

_____

[2] Charps signed with the Builders Division of the Associated General Contractors of Minnesota and the International Union of Operating Engineers, Local No. 49 ("Builders CBAs") in May 2001, running through April 30, 2016.  Charpentier Decl. ¶ 8; ECF No. 25-4.  It signed with the International Union of Operating Engineers and the Pipe Line Contractors Association ("Pipeline CBAs") in February 2005, running through January 31, 2015.  Id. ¶ 9; ECF No. 25-5.  It signed with the International Union of Operating Engineers and the Distribution Contractors Association ("Distribution and Utilities CBA") in June 2008, running through May 31, 2015.  Id. ¶ 10; ECF No. 25-6 at 1-43.

Id. ¶ 12.  He never negotiated with the Local #49 or anyone else regarding a personal guarantee.  Id.  He also never agreed (or thought he was agreeing) to personally guarantee any CBA or fringe fund obligations.  Id.

## II.    **Charpentier and Greg Grensteiner Establish C&G in 2005.**

Between 2001 and 2005, Charpentier made annual visits to North Dakota, Montana, and Wyoming, canvassing oil fields for new construction opportunities. Charpentier Decl. ¶ 13.  However, unlike the work Charps was then performing, these jobs typically involved laying polyethylene pipelines (often called "poly" pipes) for oil and gas producers.  Id. ¶ 14.  Further, Charpentier could not be in two places at once to oversee them while running Charps.  Id.  As a result, in 2005 he and Greg Grensteiner ("Grensteiner"), an acquaintance who owned a small business unrelated to Charps, created C&G to work these poly-pipe jobs.  Id. ¶ 14 and Ex. 2.[3]  Grensteiner invested $160,000 in C&G and Charpentier invested an equal amount, with each of them owning an equal 50% share in the company.  Id. ¶ 19.

Initially, C&G exclusively built poly pipelines transporting gas produced by oil wells in North Dakota and Montana (where C&G also had an office).  Id.; Declaration of Ed Charpentier ("E. Charpentier Decl.") ¶ 5.  Broadly speaking, oil fields operate as follows: oil is harvested from the ground by a rig; oil from multiple rigs is then collected by a gathering; oil is piped from gatherings through lateral lines to mid-stream lines, and

---

[3] C&G was initially called C&G Construction Inc. of Clearbrook, but was renamed in 2014 to C&G Construction Inc.  Charpentier Decl. ¶¶ 14-15 and Ex. 3.  Also in 2005, Charpentier created C&G Holding Company of Clearbrook, Inc. (renamed Clearwater Energy Group, Inc. in 2014).  Id. ¶¶ 16-17 and Exs. 4-7.  Charps and C&G were both transferred into Clearwater 2007.  Id. ¶ 18 and Exs. 8-12.

then to a transmission line; finally, the transmission line carries the oil to a processing destination. E. Charpentier Decl. ¶ 6. Similarly, natural gas, which escapes when oil is harvested, is transported from the ground via polyethylene pipe to a separator (or treater); it is then piped via a lateral line to a mid-stream line, and then to a trunk (or transmission) line; finally, the trunk line carries the gas to a processing destination. Id. ¶ 7. Gas lines are typically made of polyethylene; oil lines are made of steel, because polyethylene cannot withstand oil transmission pressures. Id. ¶ 8.

Today, C&G primarily builds and lays fiberspar, gathering, lateral, and mid-stream lines for oil and gas producers like Oneok, Inc. ("Oneok") and Hess Corp. ("Hess"). Declaration of Jeremy Baker ("Baker Decl.") ¶ 3; E. Charpentier Decl. ¶ 9.

From 2005 to 2006, C&G grew its business in the western United States as its cold-calling strategy began to pay off. Charpentier Decl. ¶ 20. Grensteiner moved out to North Dakota in mid-2006 to manage C&G's operations and crews, but he did not work out. Id. ¶ 21. C&G repurchased his shares in a December 2006 settlement agreement. Id. and Ex. 13. Subsequently, Charpentier's brother, Ed ("Ed Charpentier") traveled to North Dakota to help manage C&G so Charpentier could focus on Charps. Id. ¶ 22; E. Charpentier Decl. ¶ 3. Ed Charpentier assumed primary responsibility for most of C&G's activities until Alpha was established in 2011. E. Charpentier Decl. ¶ 4.

### III.   Charpentier, His Brother, and Kris Munter Establish Alpha in 2011.

In 2011, C&G was shelved temporarily when Charpentier, his brother, and Munter created a new company to take its place: Alpha (so-named by Munter). Charpentier Decl. ¶ 24; E. Charpentier Decl. ¶ 10; Munter Decl. ¶ 8. In the preceding year, Munter

7

reiterated to Charpentier his interest in owning and running his own business. Charpentier Decl. ¶ 23.  Charpentier, who had never intended to be heavily involved in C&G, saw this as an opportunity to divest its business.  Id. ¶ 25; E. Charpentier Decl. ¶ 11; Munter Decl. ¶, 10.  Thus, the three of them created Alpha created in January 2011. Charpentier Decl. ¶ 26 and Ex. 14; E. Charpentier Decl. ¶ 11; Munter Decl. ¶ 8.

The original business plan was for Alpha to replace C&G, with Munter and Ed Charpentier owning it.  Charpentier Decl. ¶ 27; E. Charpentier Decl. ¶¶ 12-13; Munter Decl. ¶¶ 9-10.  However, before their bank would agree to finance Alpha, it insisted Charpentier be made a majority shareholder.  Charpentier Decl. ¶ 28; E. Charpentier Decl. ¶ 14.  As a result of the bank's requirement, Munter and Ed Charpentier (the "Minority Owners") ended up owning 24.5% each while Charpentier owned the remaining 51%.  Charpentier Decl. ¶ 28 and Exs. 15-17; E. Charpentier Decl. ¶ 14.  Still, as the Minority Owners developed more experience and relationships in the industry, they planned to buy out Charpentier so he could focus solely on Charps.  Charpentier Decl. ¶ 29; E. Charpentier Decl. ¶ 15; Munter Decl. ¶ 12.  The Minority Owners gave personal guarantees for Alpha's financing, mortgaged their homes to procure funds, and bought and paid the premiums for $1,000,000 life insurance policies naming Alpha as the beneficiary.  Charpentier Decl. ¶ 30 and Ex. 18; E. Charpentier Decl. ¶ 16; Munter Decl. ¶ 13.

Alpha had a number of offices in North Dakota – including an on-site trailer and a shop – where it did most of its work (including hirings and firings) and where Ed Charpentier managed its operations.  E. Charpentier Decl. ¶ 17.  Alpha, like C&G,

worked non-union jobs primarily laying field lines for producers like Oneok and Hess. Id. ¶ 18; Munter Decl. ¶ 14.  It did not work for transmission line owners or operators, including Enbridge.  E. Charpentier Decl. ¶ 19; Munter Decl. ¶ 15.  Because Alpha and C&G worked in a different industry segment than Charps, there was no concern they would compete against it.  Charpentier Decl. ¶ 31; E. Charpentier Decl. ¶ 20; Munter Decl. ¶¶ 16-18.

Although Alpha was supposed to replace C&G, it needed a three-year safety rating to secure most business.  E. Charpentier Decl. ¶ 21.  Since C&G had such a rating, the two companies ran side-by-side – with Alpha taking jobs when possible and C&G taking those it could not.  Id.  Alpha grew quickly and, in 2012, took a field job with BakkenLink Pipeline LLC requiring 500 employees (400 at one time) running lines from oil wells to a rail spur.  Id. ¶ 22.  Thereafter, Alpha dropped to roughly 30 employees.  Id.

As Alpha grew, so too did its need for credit.  The bank, however, conditioned additional credit on Alpha reducing itself to a single owner to eliminate the risk of shareholder disputes within the growing company.  Charpentier Decl. ¶ 32.  To meet this condition, the owners decided to move Alpha into Clearwater and grant the Minority Owners phantom stock commensurate with their ownership of Alpha.  Id. ¶ 33 and Exs. 19-21.  Alpha always kept separate bank accounts and books, and did not commingle funds with Charps.  E. Charpentier Decl. ¶ 23; Munter Decl. ¶ 19; Todavich Decl. ¶ 9; Van Vynckt Decl. ¶ 6.

In April of 2015, Jeremy Baker ("Baker"), Alpha's former superintendent, became its President.  Baker Decl. ¶ 2.  In January of 2016, C&G absorbed Alpha.  Thereafter, at

which point Baker became C&G's President (and Ed Charpentier, Alpha's Vice President, became C&G's Vice President).  Baker Decl. ¶ 2; E. Charpentier Decl. ¶ 2; Van Vynckt Decl. ¶ 8 and Exs. 9-12.

Despite C&G's and Alpha's success, Charps continues to bring in the vast majority of the Clearwater Companies' revenue, with Enbridge accounting for the lion's share.  Van Vynckt Decl. ¶ 8 Exs. 1-8.  Charps, as Charpentier's primary focus, is and always has been run apart from C&G and Alpha.  Baker Decl. ¶ 4; Charpentier Decl. ¶ 34; E. Charpentier Decl. ¶ 24; Munter Decl. ¶ 20; Todavich Decl. ¶ 10.  Indeed, the Clearwater Companies only ended up in the same holding company by an accident of history, not intentional design.  Charpentier Decl. ¶ 35.

## ARGUMENT

Federal Rule of Civil Procedure 56(c) requires summary judgment when there are no material fact issues and a party is entitled to judgment as a matter of law.  Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Although, on such motion, the court views the evidence in the light most favorable to the nonmoving party, that party may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. Cnty. Of Le Sueur, 47 F.3d 953, 957 (8th Cir.1995).

10

## I.   Plaintiffs' Alter-Ego Claim Fails Because The Clearwater Companies Are Not Even Double-Breasted, Let Alone Alter-Egos.

### A. The Clearwater Companies are not a double-breasted outfit because they differ fundamentally in purpose and operation.

Plaintiffs contend C&G, Alpha, and Clearwater are bound by Charps' CBAs because they are sham entities used to evade Charps' CBA obligations.  As a threshold matter, this wrongly presupposes the Companies are cohorts in a double-breasted venture.

Double-breasting occurs when "a company operating with a unionized work force establishes a second, nonunionized company performing the same work in the same market under the same control."  N.L.R.B. v. Fullerton Transfer & Storage Ltd., Inc., 910 F.2d 331, 336 (6th Cir. 1990).  "There is nothing in the NLRA which makes 'double-breasted' operations illegal per se."  Pipe Fitters Health & Welfare Trust, Pipe Fitters Pension Trust & Pipe Fitters Local Union No. 562 v. Waldo R. Inc., 872 F.2d 815, 818 (8th Cir. 1989).  Double-breasting is a threshold, but not a basis, for alter-ego liability; companies that are not double-breasted cannot be alter-egos.  See Trustees of Nw. Ohio Plumbers & Pipefitters Pension Plan v. Helm & Associates, No. 3:10 CV 739, 2011 WL 4688784, at *5 (N.D. Ohio Oct. 4, 2011) (granting summary judgment where defendant was "neither a successor corporation . . . nor part of a double-breasted operation").

Plaintiffs' attempt to characterize Clearwater as a double-breasted enterprise fails categorically.  First, the Clearwater Companies work in different regions for different customers.  C&G and Alpha mostly work in parts of the western and southern United States, where oil fields are located.  Baker Decl. ¶ 6; E. Charpentier Decl. ¶ 26.  C&G rarely worked for Enbridge during the audit period and Alpha did not at all.  Baker Decl.

11

¶ 7; E. Charpentier Decl. ¶ 27.  Charps does not work in oil fields; it works mostly on transmission lines in Illinois, Minnesota, and Wisconsin.  Olson Decl. ¶¶ 3, 7, 9-10; Todavich Decl. ¶¶ 5, 12.  It does most of its work for Enbridge.  Olson Decl. ¶¶ 8-9; Todavich Decl. ¶¶ 6-7; Van Vynckt Decl. ¶ 4.  Underscoring this geographic distinction is the fact the Clearwater Companies maintain offices in different states and enter into their own leases. During the relevant audit period these businesses are basically dissimilar in the work performed and where it was performed. See Declaration of Martin D. Kappenman ("Kappenman Decl.") ¶ 3, Ex. 1.

Second, each Company bids on and executes contracts only for itself using its own bidding process.  Baker Decl. ¶ 8; Charpentier Decl. ¶ 38; E. Charpentier Decl. ¶ 28; Olson Decl. ¶ 11; Todavich Decl. ¶¶ 13-14.  The Companies also separately purchase tools, equipment, and materials.  Baker Decl. ¶¶ 9-10; Charpentier Decl. ¶ 38; E. Charpentier Decl. ¶¶ 29-30; Munter Decl. ¶ 21; Olson Decl. ¶ 12; Todavich Decl. ¶ 15; Van Vynckt Decl. ¶ 9.

Third, the Clearwater Companies are helmed by independent leaders who have authority to sign contracts and write checks only for their respective Companies.  Baker Decl. ¶ 8; Charpentier Decl. ¶ 38; E. Charpentier Decl. ¶ 28; Todavich Decl. ¶¶ 13-14; Van Vynckt Decl. ¶ 10.  Prior to 2015, Charpentier was the nominal CEO of each Company, but he left management up to the Presidents of each Company.  Charpentier Decl. ¶ 39.  Initially, Grensteiner was to run C&G; after he failed, Charpentier and his brother took over briefly until they and Munter established Alpha.  Id.  Charpentier then intended to divest C&G's business once Alpha gained footing in the industry.  Id.

Meanwhile, Greg Todavich has served as Charps' President since November 2012; he has never worked for any other Clearwater Company, at any time. Todavich Decl. ¶ 2.

Fourth, the Clearwater Companies have full and final authority over their personnel. Charpentier Decl. ¶ 40. Among other things, they make their own hiring, firing, disciplinary, and management decisions; promulgate their own employee handbooks; process their own payrolls; and set their own wages and benefits. Baker Decl. ¶¶ 11-12; Charpentier Decl. ¶ 40; Munter Decl. ¶ 22; Todavich Decl. ¶ 16; Van Vynckt Decl. ¶ 11. Charps has always managed its own personnel decisions apart from the other Companies. Todavich Decl. ¶ 17.

Fifth, the Clearwater Companies manage their own administrative functions, including (for example) Human Resources, Tax, Finance, Accounting, and Procurement. Van Vynckt Decl. ¶ 12. Each Company maintains its own separate financial records (including accounts receivable, accounts payable, and general ledgers), payroll records, and bank accounts; files its own state and federal payroll tax returns; pays its own unemployment tax withholdings; and procures its own local, state, and federal licenses. Baker Decl. ¶ 13; Munter Decl. ¶ 23; Todavich Decl. ¶ 18; Van Vynckt Decl. ¶¶ 13-18 and Ex. 13. In addition, Charps makes Fringe Fund contributions from its own account. Todavich Decl. ¶ 19; Van Vynckt Decl. ¶ 19.

Sixth, the Clearwater Companies comply with all corporate formalities. Each Company is incorporated separately, holds its own board and shareholder meetings and takes its own written actions. Van Vynckt Decl. ¶ 21; see also Charpentier Decl. Exs. 1-12, 14-17, 19-21; Van Vynckt Decl. Exs. 9-12.

13

Finally, the Clearwater Companies are responsible for their own finances.  Van Vynckt Decl. ¶ 21.  The Companies disclose all related-party transactions in their separate ledgers and financial statements.  Id. ¶ 22; see also, e.g., Van Vynckt Decl. Ex. 1 at 16, Ex. 2 at 12, 16, Ex. 3 at 12, 18, Ex. 4 at 14-15, 23, Ex. 5 at 14-15, Ex. 6 at 17, Ex. 7 at 19-20, Ex. 8 at 19-20.  Finally, the Companies were sufficiently capitalized when formed and each is current with its bank loans, vendor payments and payroll commitments.  Van Vynckt Decl. ¶ 23.  Neither C&G nor Alpha ever siphoned money from Charps such that Charps could not pay its debts.  Id. ¶ 24.

Clearwater is not a double-breasted operation and its Companies cannot be alter-egos of Charps.

### B. Even if the Clearwater Companies are double-breasted, the CBAs do not prohibit Charpentier from owning them.

Double-breasting enables companies to compete for union and non-union work simultaneously.  See Reed v. Greenworks, Inc., No. 12-72JJK, 2015 WL 364602, at *2 (D. Minn. Jan. 27, 2015).  "It has become common practice for construction employers to establish separate companies, one working on union projects, and another to operate on a nonunion basis."  Waldo R. Inc., 872 F.2d at 818.  "The non-union company can bid competitively on jobs that do not require union contractors, while the union company continues to bid on jobs requiring union contractors.  This type of operation is not inherently illegal."  Carpenters' Local Union No. 1478 v. Stevens, 743 F.2d 1271, 1275 (9th Cir.1984).  Thus, holding companies can and often do own similar union and non-union businesses.  E.g., Greenworks, Inc., 2015 WL 364602, at *2; Brick Masons

14

Pension Trust v. Indus. Fence & Supply, Inc., 839 F.2d 1333 (9th Cir. 1988) (affirming decision subsidiaries were not alter-egos for labor law purposes). In such cases, only the union company is bound by its CBAs. See Crest Tankers, Inc. v. Nat'l Mar. Union of Am., 796 F.2d 234, 237 (8th Cir. 1986); Trustees of the Graphic Commc'ns Int'l Union Upper Midwest Local 1M Health & Welfare Plan v. Bjorkedal ("Bjorkedal II"), 516 F.3d 719, 727 (8th Cir. 2008).

None of Charps' CBAs prohibit double-breasting. The generic Coverage clauses in the Pipeline CBAs and the Distribution and Utilities CBAs merely prevent Charps from doing covered work under another entity's name. See Charpentier Decl. ¶¶ 8-11; Builders CBAs, ECF No. 25-4; Pipeline CBAs, ECF No. 25-5 at 7, 92; Distribution and Utilities CBA, ECF No. 25-6 at 3. They do not forbid Clearwater (or Charpentier) from owning C&G or Alpha.

### C. The Clearwater Companies are not alter-egos because Charps neither controls C&G and Alpha nor uses them to avoid its CBA obligations.

"Alter ego liability [permits] trustees to recover delinquent contributions from a sham entity used to circumvent the participating employer's pension obligations." Painters Dist. Council No. 2 v. Paragon Painting Co., LLC, No. 4:08CV1501-DJS, 2010 WL 455227, at *8 (E.D. Mo. Feb. 3, 2010). It provides a narrow exception to the rule that double-breasted businesses are not jointly bound by the union shop's CBA. Greater Kansas City Laborers Pension Fund v. Superior General Contractors, Inc., 104 F.3d 1050, 1055 (8th Cir. 1997). Here, C&G and Alpha are independently profitable companies. They are neither alter-egos of Charps nor subject to its CBAs.

15

In an alter-ego claim, the "seminal inquiry is whether two or more coexisting employers performing the same work are in fact one business, separated by form only." Roofers Local 149 Security Trust Fund v. Duane Smelser Roofing Co., 285 F.Supp.2d 936, 941 (E.D. Mich. 2003) (quotation omitted). Eighth Circuit courts evaluate ERISA claims "using the corporate law standard for alter ego liability, not the less stringent labor law standard." [4] Dakotas & W. Minnesota Elec. Workers Health & Welfare Fund v. All Cty. Elec. Co., No. CIV.A3-01-110, 2004 WL 231330, at *3 (D.N.D. Feb. 3, 2004) (citing Superior General, 104 F.3d at 1055)). In this circuit, a plaintiff must prove the alleged alter-ego "(1) is controlled by another to the extent that it has independent existence in form only and (2) is used as a subterfuge to defeat public convenience, to justify wrong, or to perpetuate a fraud." Superior General, 104 F.3d at 1055 (distinguishing corporate from "more lenient" labor law standard, holding "control by one company over its alleged alter ego is necessary under the corporate law standard").

Alter-ego cases require a holistic evaluation of many factors. See, e.g., Sheet Metal Workers Int'l Ass'n Local Union No. 67 v. Todd-Ford Mgmt. Co., No. CIV. A. SA03CA290XR, 2005 WL 354050, at *2 (W.D. Tex. Feb. 1, 2005) (noting NLRB test assesses whether "the two enterprises have substantially identical management, business

---

[4] Courts evaluate ERISA claims under federal common law, but "the test for 'alter ego' under ERISA does not differ significantly from the [Minnesota] test for piercing the corporate veil[.]" Trustees of Graphic Commc'ns Int'l Union Upper Midwest Local 1-M Health & Welfare Plan v. Bjorkedal ("Bjorkedal I"), No. CIV 04-3371 PJS/JJG, 2006 WL 3511767, at *16 n.6 (D. Minn. Dec. 6, 2006) (citation omitted), aff'd sub nom. Bjorkedal II, 516 F.3d 719.

purpose, operation, equipment, customers, supervision, and ownership" (quotation omitted)).  Eighth Circuit courts analyzing alter-ego claims often query:

- Whether the companies do the same work in the same line of business.

- Whether they operate in the same region or serve the same customers.

- Whether they jointly purchase or share tools, equipment, or materials.

- Whether they separately bid on and execute contracts.

- Whether they share the same ownership, management, and employees.

- Whether they engage in arms-length transactions with each other.

- Whether they comply with corporate formalities.

- Whether they have separate administrative or operational functions.

- Whether they maintain separate finances and financial records.

See Crest Tankers, 796 F.2d at 237-38; Superior General, 104 F.3d at 1055; Greenworks, 2015 WL 364602, at *3-5; Local #49 Operating Engineers Health & Welfare Fund v. Swenke, No. CIV.033475 (JRT/FLN), 2005 WL 1430315 (D. Minn. Mar. 7, 2005); Trustees of Resilient Floor Decorators Ins. Fund v. A&M Installations, 395 F.3d 244 (6th Cir. 2005); Helm & Associates, 2011 WL 4688784, at *4.  "No individual factor is determinative; they all must be considered together."  Id. (citation omitted).

Courts only disregard a company's corporate integrity when it truly is little more than a shell for another entity.  See Swenke, 2005 WL 1430315, at *1 (finding alter-ego where union company had no employees, tax ID number, assets, job bids, insurance, or offices, but simply borrowed from non-union company); Seipel v. Arrowhead Indus.

Serv., Inc., No. 07-CV-3864 PJS/RLE, 2010 WL 605722, at *2-3 (D. Minn. Feb. 11, 2010) (finding alter-ego where companies functioned as one entity, accounted for inter-company loans as officer/shareholder loans, and freely shared bookkeeper, office space, employees, and equipment); Waldo, 872 F.2d at 816 (finding alter-ego where one company received all its work from another and shared ownership, management, office space, personnel, funds, projects, and equipment with it).

On the other hand, courts have declined to find alter-ego status on closer-cut facts than those present here.  For example, in the seminal Superior General case, defendant Bonhert owned three construction firms: Superior General (union), and Old and New Bonhert (both non-union).  On summary judgment, the district court held the companies were not alter-egos even though (i) they shared ownership, accounting services, and office space, and (ii) they transacted extensively with each other.  104 F.3d at 1052-54.  It pointed to other indicia of corporate separation, such as their separate management, books, operations, and workforces, plus their arms-length separation in inter-company transactions.  Id. at 1054.  The Eighth Circuit affirmed, articulating the corporate alter-ego test as the proper legal standard and finding "control and management of Superior General and New Bonhert were distinct and separate and . . . transactions between the two companies were negotiated at arms-length." Id. at 1055-56.

Similarly, the Sixth Circuit affirmed summary judgment for defendants in Trustees of Resilient Floor Decorators Ins. Fund v. A&M Installations.  There, a union flooring installation company and a non-union carpet sales company were separately owned by family members, worked for the same customers, subcontracted with each other, and

shared office space, warehouse space, personnel, and administrative functions.  395 F.3d

at 245.  The court held all of these facts "still failed to demonstrate [the companies] have

substantially identical management, business, purpose, operation, equipment, customers,

supervision and ownership."   Id. at 248-49 (quotation omitted).   It further noted

"pervasive intermingling of funds and operations [is] necessary to support a finding that

two companies are alter-egos," and found a $5,000 startup loan fell short of this.  Id. at

249; accord Duane Smelser, 285 F.Supp.2d at 941-42 (denying summary judgment for

plaintiffs even though one company failed to repay informal $420,000 loan from another

and both shared managers and payroll services).

    Arrowhead and Swenke, on one hand, and A&M Installation and Superior

General, on the other, establish a spectrum highlighting the formidable factual showing

required for an alter-ego claim.   They set this high threshold because courts give

corporate integrity substantial deference.  See Superior General, 104 F.3d at 1055.  This

case comes nowhere near that threshold.

### 1.  Charps, C&G and Alpha do not share a common identity.

    Alter-ego status requires more than just moderate overlap between related

businesses – the alter-ego must have no "independent existence."  Superior General, 104

F.3d at 1055.  In fact, courts have held some overlap is permissible (indeed, inevitable) in

closely-held companies lacking robust corporate divisions.   Greenworks, 2015 WL

364602, at *5; accord Bjorkedal I, 2006 WL 3511767 at *15 ("it is a rare corporation –

especially a small corporation – that can pass every one of the [veil-piercing factors] with

flying colors").   Thus, they do not require defendants to prove total and complete

separation; summary judgment is appropriate if the companies are not "one business, separated by form only." Duane Smelser, 285 F.Supp.2d at 941-42 (quotation omitted); see also Superior General, 104 F.3d at 1055; A&M Installations, 395 F.3d at 249; Helm, 2011 WL 4688784, at *6; Greenworks, 2015 WL 364602, at *11; Indus. Fence & Supply, 839 F.2d at 1337.

Here, C&G and Alpha were not hollow shells; they were active independent businesses with different client bases working in different regions generating their own significant revenues. The same facts showing they are not double-breasted prove, a fortiori, they are not alter-egos. I.e., the Clearwater Companies generally (1) provide different services; (2) work in different supply chain segments; (3) operate in different regions; (4) work for different clients; (5) bid only for themselves; (6) use their own bidding systems; (7) buy their own tools, equipment, and materials; (8) rarely share tools, equipment, or materials; (9) employ different workers; (10) do not share employees; (11) are managed by different people; (12) have independent financial and contracting authority; (13) make their own hiring, firing, discipline, benefits, and compensation decisions; (14) manage their own administrative functions; and, (15) record and disclose all related-party transactions. See supra at 12-15.

In Reed v. Greenworks, a recent fringe fund suit brought by the same attorneys that brought this case, Magistrate Judge Keyes ruled against the plaintiff funds on facts even more favorable to them than the undisputed facts here. 2015 WL 364602, at *2-6, 10-11. There, a married couple split their landscaping business into two double-breasted entities – GWI (union) and GLCI (non-union) – and a nursery (GWN), all owned by a

holding company (GWM).  Id. at *2-4.  They did so because union work was declining and GWI could not compete for non-union jobs.  Id.  The funds had audited the business several times with no adverse findings against GLCI, and when GWI renewed its CBA there was no discussion of GLCI being subject to it.  Id.

Following a bench trial, the court held the companies were not alter-egos despite significant overlap.  It noted each company complied with corporate formalities, hired its own workforce, maintained its own payroll, kept its own books and records, filed its own tax returns, had its own office in the parent company's building, ran its own operations, bid on and executed its own contracts, and was always capitalized and solvent.  Id. at *4-5.  It also found "no evidence that GLCI . . . was operated as a ruse or mere façade to avoid paying fringe benefits to workers covered by the agreement," but rather was set up "for the legitimate business purpose of competing in the highly competitive market for landscaping jobs that did not require union labor."  Id. at *4, 11.

On the other hand, the court noted the companies transferred substantial funds between them without repayment schedules, used the parent company's shared services without agreements, paid little or no rent for their office space, had cross-collateralized loans, and shared employees and managerial expertise.  Id. at *5-6, 11.  However, the court found this entirely reasonable, explaining: "As might be expected in a small family enterprise, this was not run like a Fortune 500 company with separate divisions, independently managed subsidiaries, and firewalls keeping the various parts of the business apart."  Id. at *5; accord Bjorkedal II, 516 F.3d at 731 (declining to pierce veil despite inconsistent compliance with formalities).  Thus, the court assessed the facts

holistically and concluded "none of this amounts to a showing that GLCI lacked an independent existence and was used as a subterfuge to perpetuate a wrongdoing or fraud." Greenworks, 2015 WL 364602, at *11.

Plaintiffs cannot identify any material facts making their case stronger than the plaintiffs' case in Greenworks, which (unlike this one) involved a truly double-breasted outfit. Like the Greenworks companies, the Clearwater Companies are closely-held entities that maintain formal and substantive separations with some inevitable but outlier instances of overlap. No fact-finder could conclude C&G or Alpha have no independent existence; Plaintiffs' alter-ego claim fails.

### 2. C&G and Alpha Were Not Established and Are Not Being Used for Any Improper Purpose.

In addition to proving Alpha and C&G are identical to and controlled by Charps (they are neither), Plaintiffs also must prove they were used "as a subterfuge to defeat public convenience, justify a wrong, or to perpetuate a fraud." Superior General, 104 F.3d at 1055; Greater St. Louis Const. Laborers Welfare Fund v. Symmetry Landscaping, Inc., No. 4:09CV00401 ERW, 2012 WL 1070097, at *11 (E.D. Mo. Mar. 29, 2012) (rejecting alter-ego claim where plaintiffs proved "control" but not "subterfuge"). As Greenworks explained:

> [The alter-ego doctrine's] requirements of (1) loss of an independent existence to another's control, and (2) an element of wrongdoing, are best viewed together, with particular emphasis on the need to show some inequitable result from the arrangement between the two alter-ego entities. In this context, there is nothing wrong, in and of itself, with one company controlling another. It is only when the control of the puppet company by the puppet master is used as a subterfuge to defeat public convenience, to justify wrong, or to perpetuate a fraud that liability can arise.

2015 WL 364602, at *10 (quoting <u>Superior General</u>, 104 F.3d at 1055); <u>accord</u> <u>Interior</u>

<u>Finishes</u>, 425 F. Supp. at 53 (holding alter-ego is "an equitable doctrine [that] should not

be invoked in the absence of inequity").  Similarly, the First Circuit has stated:

> The doctrine is not a formalistic mechanism for reflexively regarding
> distinct jural entities as legally interchangeable whenever the entities'
> relationship is marked by a sufficient number of the doctrine's characteristic
> criteria[.]  . . . Rather, the doctrine is a tool to be employed when the
> corporate shield, if respected, would inequitably prevent a party from
> receiving what is otherwise due and owing from the person or persons who
> have created the  shield<u>.</u>

<u>A.A. Bldg. Erectors, Inc.</u>, 343 F.3d at 21-22 (affirming summary judgment where no

evidence showed defendant companies deceived union their relationship or caused it " to

receive less than that for which it bargained").  Here, as in <u>Greenworks</u>, the undisputed

evidence shows C&G and Alpha were created for legitimate business purposes, not as a

subterfuge for any wrongdoing.

The crux of the "wrongdoing" inquiry is "whether an employer is using a non-

union company in a sham effort to avoid collective bargaining obligations."  <u>Indus. Fence</u>

<u>& Supply</u>, 839 F.2d at 1336 (discussing labor law standard); <u>see also</u> <u>Slack v. Int'l Union</u>

<u>of Operating Engineers</u>, 83 F. Supp. 3d 890, 899 (N.D. Cal. 2015) (same).  In labor law

cases, the "Eighth Circuit[] [has] clearly stated that 'the focus of the alter ego doctrine . . .

is on the existence of a disguised continuance of a former business entity or an attempt to

avoid the obligations of a collective bargaining agreement[.]'"  <u>Todd-Ford Mgmt</u>, 2005

WL 354050, at *3 (citing <u>Iowa Exp. Distribution, Inc. v. N.L.R.B.</u>, 739 F.2d 1305, 1311

(8th Cir.), <u>cert. denied</u>, 469 U.S. 1088 (1984)); <u>see also</u> <u>Crest Tankers</u>, 796 F.2d at 237

("A critical part of the inquiry into alter ego status . . . is whether the employers acted out of anti-union sentiment or to avoid a labor contract."); Interior Finishes, 425 F. Supp. 2d at 51 ("The alter ego doctrine was developed to prevent employers from evading their obligations under collective bargaining agreements[.]").

Plaintiffs cannot prove C&G and Alpha were used as a subterfuge for an improper purpose.  First, there was no deception here.  The Local #49 always knew C&G and Alpha existed and worked in the same industry as Charps; it just did not care because they do not steal work from Charps.  See Charpentier Decl. ¶ 41; see also Todd-Ford Mgt., 2005 WL 354050, at * 4 ("it is difficult to comprehend that [a company] 'engaged in sham transactions by holding itself out as a separate entity,' when the Union agreed to the reorganization" releasing it from CBA); A.A. Bldg. Erectors, 343 F.3d at 22.  In addition, Charps' CBAs were renewed multiple times after C&G was established.  The unions had ample opportunity to add anti-double-breasting clauses, and the Funds to challenge C&G's and Alpha's status, yet neither did anything.  Thus, no deception justifies an alter-ego finding in this case.  See id. at 20-22; Todd-Ford Mgt., 2005 WL 354050, at * 4; Greenworks, 2015 WL 364602, at *2-3 (noting funds audited but made no adverse findings as to non-union company).

Second, there was no wrongdoing here.  C&G and Alpha pursue legitimate business objectives: they bid on non-union contracts to build new oil field pipelines.  See id. at *11; accord Bjorkedal I, 2006 WL 3511767, at *15 (declining to pierce veil because entity was a "real corporation" rather than a "façade," noting "[i]t is important in . . . veil piercing cases not to lose sight of the forest for the trees").  Neither has ever siphoned

24

money from Charps such that it could not meet its obligations. See id. at *14-15 ("[f]ar from siphoning corporate money that could have been used to pay the Funds," owner used personal funds to support union company). Indeed, the "forest" of Clearwater's history shows C&G and Alpha were not intended to and did not serve as fronts for Charps. Charpentier never even wanted to closely manage them; he wanted to focus on Charps. C&G was supposed to be run by Grensteiner and, when he did not succeed, Charpentier's brother helped run it until Munter proposed to replace it entirely with Alpha. In fact, but for bank requirements, the Companies never even would have ended up in Clearwater together.

Plaintiffs cannot shoehorn C&G and Alpha into Charps' CBAs without showing they were used as a subterfuge to avoid using union workers and paying union benefits. Cf. Laborers' Pension Fund v. Green Demolition Contractors, Inc., No. 15 C 5633, 2016 WL 74682, at *3 (N.D. Ill. Jan. 7, 2016) ("More importantly for the alter ego inquiry, they allege that the two companies used the same employees for their projects, and that [e]mployees who have worked on projects for [one] have been paid through the accounts of [the other] to avoid the payment of wages and benefits required to be paid under the terms of the [CBA]." (quotation omitted)). Plaintiffs have made no such showing; their alter-ego claim fails on this element too.

II.   **Plaintiffs' Joint Venture Claim Fails Because the Clearwater Companies Did Not Contribute To, Contract For, Jointly Control, or Share Profits From Projects.**

Plaintiffs cannot prove the Clearwater Companies created any sort of joint venture. From the start, the claim was doomed by vagueness.

To prove the existence of a joint venture, Plaintiffs must prove: "(1) contribution by all parties; (2) joint proprietorship and control; (3) sharing of profits; and (4) a contract." Arrowhead Indus. Servs., 2010 WL 605722, at *3 (citing Rosenberg v. Heritage Renovations, LLC, 685 N.W.2d 320, 332 (Minn. 2004) and Bjorkedal, 2006 WL 3511767, at *8).  Arrowhead highlights the extent of cooperation required to prove a joint venture:

> The work CSI and Apex did together for the London Road construction project satisfies this four-factor test. CSI contributed equipment, personnel, and wage-and-benefit money, while Apex contributed workers-compensation costs and provided bonding for the project. … The two companies shared control, with Apex performing administrative tasks such as signing the government contract and handling paperwork for the project, while CSI provided day-to-day supervision on the site. … Apex and CSI agreed to share the profits of their work together, and when expenses exceeded revenues they apportioned the losses between themselves. … All of these arrangements were part of CSI's verbal agreement with Apex. Because CSI and Apex acted as a joint venture, and because CSI was an alter ego of Arrowhead, Arrowhead was required to remit contributions for work done by Arrowhead/CSI employees as part of the joint venture, even though those employees were nominally placed on Apex's payroll.

Id.

In this case, Plaintiffs do not allege the Clearwater Companies joined forces on any particular venture.  Instead, they theorize the Companies acted as a joint venture at all times and on all projects.  They broadly claim the Companies "contributed common

resources to," "shared joint proprietorship and control over," "shared profits from," "had express or implied contracts covering," "and had a mutual understanding for a common purpose on projects involving work covered by the CBAs," and "shared a right to a voice in the direction and control of the means used to carry out the common purpose of the joint enterprise on projects work covered by the CBAs."  (ECF No. 1, ¶¶ 55-60.)  These sweeping assertions are far more expansive (and require far more proof) than a discrete joint venture allegation.  No evidence supports them.

First, the Clearwater Companies never expressly or implicitly agreed to cooperate on even a single project, let alone to function as an integrated enterprise.  Charpentier Decl. ¶ 42.  Second, relatedly, no evidence suggests the Companies influence or control each others' business; they are managed and administered separately, see supra at 12-16. Third, the Companies do not contribute jointly to projects; each bids and works on its own contracts with its own resources.  See id.  Fourth, the Companies do not share profits from their projects; each is responsible for its own finances.  See id.

Dissimilar companies working for different clients in different regions serving different parts of the supply chain would hardly benefit from a joint venture.  The claim defies facts and logic.  It fails for many reasons.

### III.   **Plaintiffs' Right-to-Audit and ERISA Damages Claims Fail Because They Hinge on the Alter-Ego and Joint Venture Claims.**

Plaintiffs cannot audit C&G's or Alpha's records, or recover ERISA damages from them, unless they are alter-egos of or a joint venture with Charps.  Because the latter claims fail, the former fail with them.

In a series of discovery orders, the Magistrate and this Court agreed Plaintiffs could not compel C&G and Alpha to produce audit documents until they established C&G's and Alpha's liability to the Funds.  (See ECF No. 31 at 8-9; ECF No. 35 at 1; ECF No. 59 at 8-11.)   Accordingly, the Magistrate ordered Defendants to produce documents sufficient to determine whether Plaintiffs' had a right to audit, i.e., whether the Clearwater Companies were alter-egos or a joint venture.  See id.  Months ago, Defendants produced documents as ordered, and Plaintiffs have had ample time to review them.  Had they wanted to, Plaintiffs also could have deposed Defendants' personnel as to facts relating to the alter-ego or joint venture claims; they did not.

Discovery relating to the issues raised in this Motion – alter ego or joint venture liability – is closed.  The record regarding C&G's and Alpha's liability is complete. Defendants are entitled to judgment on the alter-ego and joint venture claims, and on the right-to-audit claim along with them.

## IV.   All Claims Against Charpentier Fail Because the Personal Liability Clause of the Local #49 Fund Participating Agreements is Unenforceable.

Plaintiffs also claim Charpentier is personally liable for Funds contributions because he agreed to the following clause in the Operating Engineers Local #49 Health and Welfare Fund Participating Agreements ("H&W Fund Participating Agreements") executed in 2001, 2005, and 2008:

> The undersigned employer agrees to contribute to the Fund established under said Agreement.  The amount of contributions to the said Trust Fund shall be in the same amount and under the same terms and conditions as are provided for in the collective bargaining agreement existing between the AGC and Local #49.  The amount of contributions specified herein shall be in effect for the period stipulated in said collective bargaining agreement

28

and any renewal or extension thereof.  The undersigned Employer hereby acknowledges receipt of copy of said collective bargaining agreement.

* * * *

If this Agreement is signed for and in [sic] behalf of a corporation, the officer or officers signing for such corporation by the execution of this Agreement not only binds the corporation but individually binds himself to the full and faithful performance of the Agreement stated herein.

Kappenman Decl. ¶¶ 4-6, Exs. 2-4.

Charpentier is not liable under the H&W Fund Participating Agreements because there is no evidence he understood and intended to be personally bound by them. Trustees of Minnesota Ceramic Tile & Allied Trades Ret. Fund v. His & Hers Ceramic Tile, No. CIV.01-978(MJD/JGL), 2002 WL 507018, at *2 (D. Minn. Apr. 1, 2002) (citing Salzman Sign Co. v. Beck, 176 N.E.2d 74 (N.Y. 1961)).  Ceramic Tile involved a personal liability clause like the one in the H&W Fund Participating Agreements.  There, the officer neither intended to nor understood she would be personally liable; her name was not mentioned in the clause; the parties did not negotiate for the clause; the signature block only indicated she was signing on behalf of the company; and, she only signed the agreement once, rather than twice (for herself and the company).  Id. (citing Salzman, 176 N.E.2d 74).  The court denied her motion for summary judgment, but only as premature (and without prejudice) because discovery was still open.  It explained an officer is not bound by a personally liability clause absent evidence showing a "clear intent that [the officer] fully understood and intended to assume personal liability for the obligations arising [thereunder]."  Id.; see also City of Millville v. Rock, 683 F. Supp. 2d

29

319, 328 n.6 (D.N.J. 2010) (noting Minnesota has "adopted the New York Salzman rule regarding the validity of personal guaranties of corporate promises")

The facts in this case are virtually identical to Ceramic Tile's, except here discovery is closed as to liability.  Thus, the facts Ceramic Tile would have found dispositive (but for timing) are established conclusively here: Charpentier did not intend to or understand he would be personally bound by the H&W Fund Participating Agreements; his name was not mentioned in the personal liability clauses; the parties did not expressly negotiate for those clauses; the signature block only indicated he was signing on behalf of Charps; and, he only signed the agreement once, for Charps. Charpentier Decl. ¶ 12.  The Funds cannot hold Charpentier personally liable for any contributions.

## CONCLUSION

For the foregoing the Court should grant summary judgment for the Defendants on all claims.

Date: April 14, 2016

By:___s/Martin D. Kappenman_____
Thomas R. Revnew (#295620)
Martin D. Kappenman (#320596)
SEATON, PETERS & REVNEW, P.A.
7300 Metro Boulevard, Suite 500
Minneapolis, Minnesota 55439
Tel. (952) 896-1700
Fax (952) 896-1704
trevnew@seatonlaw.com
mkappenman@seatonlaw.com

ATTORNEYS FOR DEFENDANTS, CHARPS
WELDING & FABRICATING, INC.,
CLEARWATER ENERGY GROUP, INC.
F/N/A C & G HOLDING COMPANY OF
CLEARBROOK, INC., C & G
CONSTRUCTION INC. OF CLEARBROOK,
ALPHA OIL & GAS SERVICES, INC., AND
KENNETH CHARPENTIER