UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

Glen Johnson, Timothy Gillen, Kyle Jones, Steven Hall, Clayton Johnson, Mark Hubbard Steve Piper, and Bill Patt as Trustees of the Operating Engineers Local #49 Health and Welfare Fund, Michael R. Fanning as a Fiduciary of the Central Pension Fund of the International Union of Operating Engineers and Participating Employers, Joseph Ryan, Bruce Carlson, Glen Johnson, Frank Frattalone, Lee Hiller, Tony Phillippi, Greg Waffensmith, Mark Ryan, as Trustees of the Local #49 International Union of Operating Engineers and Associated General Contractors of Minnesota Apprenticeship and Training Program, the Operating Engineers Local #49 Health and Welfare Fund, the Central Pension Fund of the International Union of Operating Engineers and Participating Employers, and the Local #49 International Union of Operating Engineers and Associated General Contractors of Minnesota Apprenticeship and Training Program,

       Plaintiffs,

vs.

Charps Welding & Fabricating, Inc., Clearwater Energy Group, Inc. f/n/a C & G Holding Company of Clearbrook, Inc., C & G Construction Inc. of Clearbrook, Alpha Oil & Gas Services, Inc., and Kenneth Charpentier, individually,

      Defendants.

Civil File No: 14-cv-02081(RHK/LIB)

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

1

## SYNOPSIS

One of the Defendant companies (Charps Welding) is signatory to a number of collective bargaining agreements of which Plaintiffs are third-party beneficiaries.  Those collective bargaining agreements, their underlying trust agreements, and ERISA, provide Plaintiffs a right to audit books and records when necessary for proper administration of the Funds.

After the Union presented the Plaintiffs with information suggesting that all of the Defendant companies are commonly owned, share common employees and management, share equipment, share addresses, perform common work on common projects or work-sites, the Plaintiffs requested the following records from the Defendants: time cards, tax records, check registers, cash disbursement journals, and individual earnings records.  The reason for the request was to determine whether Defendants were using the corporate form to circumvent the applicable CBAs, Trust Agreements, and ERISA.

In response, Defendants denied the audit request, alleging that the non-signatory Defendants are strangers to the collective bargaining agreements, trust agreements, and related ERISA audit protections to Defendants' employees. Plaintiffs, believing there to be sufficient commonalities to allow an audit, and inferring negatively from Defendants refusal to disclose even basic documentation that is required to be maintained for a number of governmental entities, filed the present suit.

2

The present suit alleges a breach of the right to audit under contract and ERISA, alter-ego, and ERISA damages for underpaid contributions. Defendants answered, denying Plaintiffs' claims, but did not make a motion to dismiss or other dispositive motion, thus preserving Plaintiffs' claims as well-plead. In discovery, Plaintiffs sought production of those documents previously requested as part of the initial audit-request, amongst others, and again Defendants refused to produce them. On motion to compel, Magistrate Brisbois, citing Plaintiffs alleged right of audit to be the "ultimate issue" in the case, denied Plaintiffs access to all requested documents until they established their right of audit by dispositive motion. This motion follows.

In discovery thus far, Plaintiffs obtained evidence showing that Defendants are commonly owned, file consolidated financial statements, make significant undocumented loans to each other, share common employees, share common management, perform common work, and share equipment, amongst other indicia of commonality. Under these circumstances, Plaintiffs believe that Defendants audit refusal breaches contract and ERISA, and therefore request that this Court allow completion of the audit and discovery. Indeed, until basic documents such as timecards are produced and reviewed, Plaintiffs have no way of measuring damages or completing discovery into the second prong of the applicable alter-ego test. Accordingly, Plaintiffs request an Order finding that the Defendants breach the audit provisions of the CBA and Trust Agreements, violated Plaintiffs' right to audit under ERISA and compelling audit cooperation

3

and production of all documents related to all properly plead causes of action under the Federal Rules of Civil Procedure.

## STATEMENT OF THE LEGAL ISSUE

1.     Did Defendants Charps Welding & Fabricating, Inc. and Kenneth Charpentier breach the pertinent collective bargaining agreements and trust agreements by refusing to provide the payroll and employment records of the other three corporate Defendants.

2.     Irrespective of the contracts, did Defendants violate ERISA by refusing the requested audits?

## STATEMENT OF THE RECORD

1.     Complaint (Court Docket 1)

2.     Answer (Court Docket 8)

3.     Rule 7.1 Disclosure Statements (Court Docket 9-12)

4.     Plaintiffs' Motion to Compel Discovery (Court Docket 22)

5.     Plaintiffs' Memorandum of Law in Support of Their Motion to Compel (Court Docket 24)

6.     Affidavit of Amy L. Court with Exhibits (Court Docket 25)

7.     Order granting in part and denying in part the Motion to Compel Discovery Responses (Court Docket No. 31)

8.     Plaintiffs' Motion for Discovery Sanctions.  (Court Docket 41).

9.     Affidavit of Craig Siiro (Court Docket 44)

10.    Order granting in part and denying in part the Motion for Discovery
       Sanctions (Court Docket 59)

11.    Affidavit of Glen Johnson with Exhibits

12.    Affidavit of Craig Siiro with Exhibits

13.    Affidavit of Amy L. Court with Exhibits

## STATEMENT OF FACTS

**The Parties**

Plaintiffs are the Trustees and Fiduciaries of the Operating Engineers
Local #49 Health and Welfare Fund, the Central Pension Fund of the
International Union of Operating Engineers and Participating Employers, and the
Local #49 International Union of Operating Engineers and Associated General
Contractors of Minnesota Apprenticeship and Training Program ("Trustees") and
the benefit funds themselves ("Funds").  Complaint (Court Docket 1).  The Funds
are multi-employer jointly-trusteed fringe benefit plans created by an Agreement
and Declaration of Trust pursuant to the Labor Management Relations Act and
administered in accordance with the provisions of the Employee Retirement
Income Security Act ("ERISA").  *Id.*, Affidavit of Amy L. Court ("Court Aff.") Exs.
A-C.

Defendant Kenneth Charpentier ("Charpentier") is an individual who at
relevant times has been an officer of, and possesses an ownership interest in, all
of the corporate Defendants.  *Id.*, Exs. D-G.  Defendants Charps Welding &
Fabricating, Inc. ("Charps Welding"), C & G Construction Inc. f/k/a as C & G

Construction Inc. of Clearbrook ("C & G Construction") and Clearwater Energy Group, Inc. f/n/a C & G Holding Company of Clearbrook, Inc. ("Clearwater Energy") are all Minnesota business corporations. *Id.*, Exs. E-G. Defendant Alpha Oil and Services, Inc. ("Alpha Oil") was a North Dakota business corporation until its merger with C & G Construction. *Id.*, Ex. H.

**The Collective Bargaining Agreements.**

At all times relevant to this litigation, Charps Welding was bound to a series of three of collective bargaining agreements. Complaint ¶¶ 11-13; Affidavit of Glen Johnson ("Johnson Aff.") ¶ 2. The first series was negotiated between the Builders Division of the Associated General Contractors of Minnesota and the International Union of Operating Engineers, Local No. 49 ("Builders CBAs"), the second series was negotiated between the International Union of Operating Engineers and the Pipe Line Contractors Association ("Pipeline CBAs"), and the third series was negotiated between the International Union of Operating Engineers and the Distribution Contractors Association ("Distribution and Utilities CBA") (the three series of collective bargaining agreements will be collectively referred to as "CBAs"). *Id.*

All of the CBAs require Charps Welding to submit contributions every month to the Funds for each hour worked by its employees that are covered by the CBAs. *Id.*, Exs. A-C, p. 21; D-E, pp. 18-19; F, p. 4. With respect to health and welfare and pension contributions, the Pipeline CBAs provide that when performing work in an area under the jurisdiction of a Local Union which has

negotiated for a health and welfare or pension fund, the employer shall make contributions to that fund. *Id.*, Exs. D-E, pp. 18-19. The Pipeline CBAs further provide that with respect to pension contributions, if the Local Union has not negotiated for such a pension fund, contributions shall be made to the Central Pension Fund regardless of whether the employee is a member of the Local Union in whose jurisdiction the work is being performed. [1] *Id.* Currently, more than 80 Local Unions participate in the Central Pension Fund, including Local 49. *Id.* ¶ 10; Court Aff., Ex. I.

With respect to audits, the Pipeline and Builders CBAs incorporate the terms of the Trust Agreements. Johnson Aff., Exs. A-C, p. 21, D-E, p. 24, D-E, p. 24. In addition, the Builders CBAs provide as follows:

> Each Employer who is required to make payments to the Trust Funds shall promptly furnish to the Trustees…or their authorized agents, on demand all necessary employment and payroll records relating to its employees covered by this Agreement, including any other relevant information that may be required in connection with the administration of the Trust Funds. The Trustees, or their authorized agents, may examine such employment or payroll records whenever such examination is deemed necessary by the Trustees…or their authorized agents in connection with the proper administration of the Trust Funds. If any Employer fails or refuses to furnish its payroll records to the Trustees….or their authorized agents upon demand or refuses to afford the Trustees, or their authorized agents reasonable opportunity to examine the same in accordance with standard auditing procedures, the Trustees…may enforce such rights by legal action.

Johnson Aff., Exs. A-C, p. 25.

---

[1] Local 49 has negotiated a jointly administrated health and welfare fund but not a pension fund. Johnson Aff. ¶ 10.

The Pipeline and Distribution CBAs cover work performed in the United States.  Johnson Aff., Exs. D-E, p. 1; F, pp. 1, 11-35.  The Builders CBAs cover work performed in Minnesota.  *Id.*, Exs. A-C, p. 36.  Further, both the Pipeline and Distribution CBAs provide as follows:

> If and when Employer shall perform work covered by this Agreement under its own name, under the name of another, as a corporation, company, partnership, enterprise, or any combination, including a joint venture, this Agreement shall be applicable to all such work performed under the name of the Employer or the name of any other corporation, company, partnership, enterprise, combination or joint venture.

*Id.*, Exs. D-E, p. 2; F, p. 1.  And the Builders and Pipeline CBAs prohibit signatory employers from subcontracting work to subcontractors who have not agreed to comply with the fringe benefit provisions set forth in the CBAs.  *Id.*, Exs. A-C, p. 15; D-E, p. 7; F, p. 1.

**The Participating Agreements**

Charpentier executed Participant Agreements on behalf of Charps Welding to the Operating Engineers Local #49 Health and Welfare Fund and the Central Pension Fund of the International Union of Operating Engineers and Participating Employers.  Johnson Aff., Ex. G.  Both the Health and Welfare and Pension Fund Participating Agreements provide that Charps Welding is bound to the terms of the Trust Agreements for the Health and Welfare Fund and the Central Pension Fund.  *Id.*  In addition, the Participating Agreement for the Health and Welfare Fund provides as follows:  "if this Agreement is signed for and in behalf of a corporation, the officer or officers for such corporation by the execution of this

Agreement not only binds the corporation but individually binds himself to the full and faithful performance of the [Trust Agreement].  *Id*.

**The Trust Agreements**

The Funds' operations are governed by their Trust Agreements.  With respect to the submission of contributions to the Funds by signatory employers, the Trust Agreements provide as follows:

- Each employer shall make prompt contributions or payments to the Trust Fund in such amount and under the terms as are provided for in the applicable collective bargaining agreement in effect from time to time between the Employer and the Union.

- The payment of contributions shall be made periodically at such times as the Trustees shall specify or as may be provided in the applicable collective bargaining agreement.

- In the event an Employee performs work outside of the geographical scope of the Union, the Employer may continue to make payments to the Trust Fund and the Trustees may accept such payments.

- The Trustees shall have the power to demand, collect and receive Employer payments and all other money and property to which the Trustee may be entitled.

- The Trustees shall take steps, including the institution and prosecution of such legal or administrative proceedings as the Trustees in the their sole discretion determine to be in the best interest of the Trust Fund for the purpose of collecting such payments, money, and property.

- Any failure to make payment by an employer of any monies due and owing to the Trustees shall create an immediate non-discretionary duty upon the Trustees to make immediate demand for said monies and upon non-compliance with their demand the Trustees may institute appropriate legal proceedings, equitable or otherwise to enforce payment.

Court Aff., Exs. A pp. 17-20; B pp. 11-12; C pp. 4-5.

The Trust Agreements further permit the Trustees to conduct audits of contributing employers to police employer's self-reporting of contributions and to that ensure all contributions are being submitted.  Specifically, with respect to audits, the Trust Agreements contain the following provisions:

- Each Employer shall promptly furnish to the Trustees, on demand, the names of his Employees, their Social Security numbers, each Employees Earnings Records, the hours worked by each Employee and all Federal and State payroll tax returns, and such other information as the Trustee may reasonably require in connection of the administration of the Trust Fund.

- Trustees may, by their respective representatives, examine the pertinent employment and payroll records of each Employer at the Employer's place of business whenever such examination is deemed necessary or advisable by the Trustees in connection with the proper administration of the Trust Fund.

*Id.*, Exs. A p 20; B. p. 12.   Moreover, the Trust Agreement for the Central Pension Fund provides:

In the event the Employer does not maintain or otherwise does not have in his possession records of the number of hours worked by each Employee, the Employer agrees that in order to determine the number of hours for which contributions are require to be submitted to the Trust Fund, the Employee's gross wages shall be divided by the hours wage scale set forth in the applicable collective bargaining agreement.

*Id.*, Ex. B. p. 12.

Finally, the Trust Agreements provide that all questions or controversies, of whatsoever character, arising in any manner between any parties or persons in connection with the Trust Fund or the operation thereof, shall be submitted to the

Trustees and the decision of the Trustees shall be binding on all persons dealing with the Trust Fund.  *Id.* Exs. A pp 41-42; B p. 23.

**Charps Welding**

Charps Welding was incorporated on April 12, 2001.  Court Aff., Ex. E.  At the time Charps Welding was incorporated, Charpentier and his wife jointly owned the company, with each holding 50% of its stock.  *Id.*, Ex. D.  On August 10, 2007, Charps Welding became a wholly owned subsidiary of Clearwater Energy.  *Id.*; Rule 7.1 Disclosure Statement (Court Docket 10).  Since at least 2008 and until after the filing of this lawsuit, Charpentier has been Charps Welding's Chief Executive Officer.  Court Aff., Ex. E.

Charps Welding performs work throughout the United States.  Court Aff., Ex. E.  Specifically, Charps Welding performs the following types of work: mainline and lateral pipeline installation, gathering systems, fabrication, station and facility construction, pumping/compressor stations modifications, terminal systems pipe fabrication, horizontal directional drilling, boring, pipeline maintenance work, hydro vacuuming, right of way clearing, restoration services, dewatering, pipe coating, hydrostatic testing, emergency response work, integrity digs, facility and systems maintenance, valve replacements, and project management.  *Id.*, Exs. E, K.  Most of this work is covered by the Pipeline CBAs and the station work may be covered by the Builders CBAs.  Johnson Aff. ¶ 11.  Charps Welding regularly subcontracts its work to other companies but has not

11

provided information as to whether such companies have agreed to comply with the Builders CBAs. Court Aff., Exs, V-Y, AA.

**C & G Construction**

C & G Construction was incorporated November 1, 2005 as C & G Construction of Clearbrook, Inc.  Court Aff. Ex. F.  At the time C & G Construction was incorporated, Charpentier and his wife jointly owned the company, with each holding 50% of its stock.  *Id.*, Ex. D.  On August 10, 2007, C & G Construction became a wholly owned subsidiary of Clearwater Energy.  *Id.*; Rule 7.1 Disclosure Statement (Court Docket 12).  On October 1, 2014, C & G changed its name to C & G Construction, Inc.  *Id.*, Ex. F.  Since at least 2008, and until the filing of this lawsuit, Charpentier has been C & G Construction's Chief Executive Officer.  *Id.*

C & G Construction performs work throughout the United States.  Court Aff., Ex. F.  Specifically, C & G Construction performs the following types of work: mainline pipeline construction, right of way clearing, fabrication, valve replacements, emergency response work, facility and systems maintenance, stations and facility construction, roustabout services, construction of natural gas distributions systems, gathering systems, integrity digs, consulting, restorations services, hydrostatic testing, welding services, and environmental services.  *Id.*, Exs. F, I.  Most of this type of work is covered by the Pipeline CBAs, the station work may be covered by the Builders CBAs, and the natural gas distribution work is covered by the Distribution CBAs.  Johnson Aff. ¶ 11.

12

**Alpha Oil**

Alpha Oil was incorporated on January 19, 2011.  Court Aff., Ex. G.  At the time of Alpha Oil's incorporation, 51% was owned by Charpentier, and 24.5% was owned by both Ed Charpentier and Kris Munter.  *Id.*, Ex. D.  At some point in 2011, Charpentier became the sole owner of Alpha Oil.  *Id.*  In 2012, Charpentier gifted 50% of his stock in Alpha Oil to his wife.  *Id.*  On December 30, 2012, Charpentier and his wife performed a tax free exchange of Alpha Oil's stock for Clearwater Energy stock and Clearwater Energy became the parent company of Alpha Oil.  *Id.*; Rule 7.1 Disclosure Statement (Court Docket 11).  In late 2015, Alpha Oil and C & G Construction merged, with C & G Construction being the surviving entity.  Court Aff., Ex G.

Alpha Oil performs the following types of work: mainline pipeline construction, gathering line construction and tie-ins, pumping/compression station modifications and maintenance, fabrication, roustabout services, hydrostatic testing and pigging, valve replacements, and polyethylene pipe fusion.  *Id.*, Ex. M.  Most of this type of work is covered by the Pipeline CBAs and the station work may be covered by the Builders CBAs.  Johnson Aff. ¶ 11.

**Clearwater Energy**

Clearwater Energy was incorporated as C & G Holding Company of Clearbrook, Inc. on November 8, 2005.  Court Aff., Ex F.  At the time C & G Holding Company was incorporated, Charpentier and his wife jointly owned the company, with each holding 50% of its stock.  *Id.*, Ex. D. In 2013, C & G Holding

Company merged with K & S Rentals, LLC, with C & G Holding Company the surviving entity. *Id.*, Ex. F. On January 1, 2014, C & G Holding Company changed its name to Clearwater Energy. *Id.*, Ex. F. Since at least 2008, Charpentier has been Clearwater Energy's Chief Executive Officer. *Id.* Currently, Charpentier and his wife equally own all of the voting stock of Clearwater Energy. *Id.*, Ex. D. In addition, Charpentier, his wife, and trusts controlled by them own almost all of Clearwater Energy Group's non-voting stock. *Id.* Clearwater Energy serves as the holding company for Charps Welding, C & G Construction, and Alpha Oil and provides management and administrative services for these three companies. *Id.*, Ex. N.

**Audit Demand and Commencement of this Action**

In early 2013, an individual who was employed by Alpha Oil requested a meeting with Union business agents. Court Aff., Exs. P p. 54. This employee met with a business agent on February 18, 2013. *Id.*, Exs. Q pp. 33-34. Thereafter, this employee had several other discussions with the business agents. *Id.*, Exs. P-Q. This individual informed the business agents that he worked on jobs for Alpha Oil and Charps Welding, reporting to work wherever he was told by his supervisor. *Id.* Ex. R pp. 6-9. This employee informed the business agents that that if Charps Welding, C & G Construction, or Alpha Oil needed additional workers, they would transfer employees between the companies. *Id.* And this employee informed the business agents that the same person was the equipment manager for Charps Welding, C & G Construction,

and Alpha Oil.  *Id.*, Exs. P pp. 100-01; R p. 3.  Finally, this employee provided copies of his paystubs from Alpha Oil, his safety card issued by Charps Welding, and copies of credit cards issued to him by Charps Welding and Alpha Oil.  *Id.*, Exs, R p. 4, 11-12; S p 580, 707.

In March 2013, a union steward for Charps Welding had a discussion with another one of the business agents regarding one of Charp Welding's superintendents.  Court Aff., Exs. P pp. 70-74; R p. 10.  The steward informed the business agent that one of Charps Welding's superintendents was working on a pipeline project for Charps Welding but his Union dues were being withheld under the Builders CBAs.  *Id.*  The steward further informed the business agent that the superintendent also worked for Alpha Oil.  *Id.*

The business agents continued to investigate the information obtained from the Defendants' employees.  In this regard, the business agents further determined that employees on Charps Welding projects were receiving different wage packages than those required by the CBAs, that employees classified as salaried supervisors were performing work covered by the CBAs, and that contributions were being paid under the Builders CBAs for work covered by the Pipeline CBAs.  Exs. P pp. 42, 79-84, 94-98; R pp. 104, 15-18, 49; S p. 707.  The business agents reported all of the information obtained from the Defendants' employees and their findings to their supervisor who is also a Trustee.  *Id.* Exs. P pp. 49-50; Q p. 39.

As a result of the information obtained by the business agents, on December 19, 2013, the third party administrator for the Funds requested an audit of Charps Welding, C & G Construction, and Alpha Oil covering the period of January 1, 2008 through the present.  Court Aff., Exs. T pp. 43-47, 77-79, Ex. 7.  On January 21, 2014, a representative of the Defendants contacted the third party administrator for the Funds and advised that Charps Welding was willing to schedule the requested audit but that the other companies would not provide any of the requested information.  *Id.*, pp. 50-54, Ex. 7.  As such, the Trustees initiated this lawsuit.

**Discovery**

On October 31, 2014, the Trustees served all Defendants with Interrogatories and Requests for the Production of Documents ("Discovery Requests").  Court Aff. ¶ 11, Ex. J.  The Defendants objected to almost all of the Trustees' Discovery Requests alleging they were overbroad and unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, vague and ambiguous, and sought information and documents outside the applicable statute of limitations and the geographic scope of the CBAs and that was protected by the attorney client and work-product privilege.  *Id.*; Plaintiffs' Memorandum of Law in Support of Their Motion to Compel (Court Docket 24); Ex. D to Affidavit of Amy L. Court (Court Docket 24).  As such, the Trustees filed a Motion to Compel Discovery seeking an Order overruling the

Defendants' objections and requiring them to provide complete and accurate answers and responses.  (Court Docket 22).

Magistrate Brisbois granted in part and denied in part the Trustees' Motion to Compel.  (Court Docket 31).  Specifically, Magistrate Brisbois determined that the Trustees must first establish, through dispositive motion, their right to conduct the requested audit before any discovery could be had with respect to the audit itself, holding "at this juncture, Plaintiffs are *only* entitled to the limited universe of information relevant to proving Plaintiffs' claims that they are entitled to perform the requested audits in the first instance."[2]  *Id.*, p. 13.  Based on this holding, Magistrate Brisbois limited discovery as follows:

> With respect to Defendant Charps and Defendant Charpentier, at this juncture Plaintiffs are entitled to discovery of information and documents relevant to [their breach of contract claim]. In addition, because Plaintiffs have alleged that all of the Defendants are alter egos of each other or, in the alternative, form a joint venture, Plaintiffs' are also entitled to discovery from Defendant Charps and Defendant Charpentier of information and documents relevant to the factors courts consider when deciding whether alter egos or joint venture status exist.

*Id.*, p. 10.  Magistrate Brisbois further limited discovery to work performed within the State of Minnesota, finding that the only CBAs in the record before the Court

---

[2] The Trustees filed an Objection to this Order which was overruled by the Court. (Court Docket 35).

17

were the Builders CBAs which only cover work performed in the State of Minnesota.[3]  *Id.*, p. 12.

Moreover, as part of his Order compelling discovery, Magistrate Brisbois ordered the Defendants to produce a data export of general ledger transactions from January 1, 2008, to present, finding such documents relevant to the Trustees' alter ego and joint venture claims "to the extent the requested documents would show the presence or absence of capitalization for corporate undertakings…and evidence of contribution and sharing of profits."[4]  *Id.*, pp. 31-33.  The Defendants then produced two reports entitled Journal Entry History Reports and General Ledger Transactions Reports which contained summaries of general ledger transactions but not the complete general ledger transactions themselves.  Affidavit of Craig Siiro (Court Docket 44).  Accordingly, the Trustees filed a Motion for Discovery Sanctions.  (Court Docket 41).  Magistrate Brisbois granted in part and denied in part this Motion, which he characterized as second Motion to Compel, ordering the Defendants to supplement its production to

---

[3] The Trustees disagree that only the Builders CBAs were in the record before the Court on the Motion to Compel.  The Pipeline and Distribution CBAs were attached as Exhibits G and H to the Affidavit of Amy L. Court and referenced in the Trustees' Memorandum. (Court Docket 24-25).

[4] Magistrate Brisbois based this holding on the factors set forth in *Minnesota Power v. Armco, Inc.*, 937 F.2d 1363, 1367 (8th Cir. 1991) for establishing a claim for piercing the corporate veil.  Order, p. 10.  Here, the Trustees seek a determination that the corporate defendants are alter-egos of one another.  Complaint.  As set forth herein, the legal standard applied in the Eighth Circuit to alter-ego claims brought pursuant to §515 of ERISA like this one is more broad than the standard applied by Magistrate Brisbois.

18

include all "financial records tending to show evidence of sufficient or insufficient capitalization for corporate undertakings, profit sharing amongst Defendants, and financial contributions between Defendants." Order, p. 7, 11 (Court Docket 59).

**Relationship Between the Corporate Defendants**

All of the corporate Defendants share office space, and each operate out of 453 Tower Street in Clearbrook and Highway 5 N Lot # 4 Industrial Park in Clearbrook, Minnesota. Court Aff., Exs. E-H, K-N, V-Y. All have an account at Associated Bank in St. Paul that each uses for all business and payroll purposes with the same five individuals, including Charpentier and Mrs. Charpentier as authorized signors on all of the accounts. *Id.*, Exs. K-N. All share a common workers' compensation insurance policy and have one policy of insurance covering all vehicles. *Id.*, Exs. K-N, R. p. 1-2. All use the same auditors, advisors, tax preparers, attorneys, HR consultants, financial advisors/valuation services, 401k investment advisors, health and dental insurance agents/advisors, and insurance agents. *Id.*, Ex. D.

Moreover, it is undisputed that the corporate Defendants all have common employees, including supervisory and management employees, and that they do not maintain written agreements relating to all of the transfers of employees between the corporate Defendants. Court Aff., Exs.O, V-Y; Affidavit of Craig S. Siiro ("Siiro Aff.") ¶ 6, Ex. E. Indeed, administrative employees of one corporate Defendant perform the same services for all of the others. Court Aff., Exs. E-H. It is undisputed that the corporate Defendants regularly share office equipment

19

and related supplies that are located at their shared space.  *Id.*, Exs. V-Y, AA.  It is undisputed that the corporate Defendants regularly transfer assets between themselves, and that they do not maintain written agreements setting forth the terms of all of these transfers.  *Id.*, Exs. V-Y, BB; Siiro Aff. ¶¶ 6, 8, Exs. C and E.  And it is undisputed that the corporate Defendants share customers.  Court Aff., Exs. V-Y, CC.

Finally, in 2008, which is the beginning of the Audit Period, Charps Welding had a debt-to-equity ratio suggesting it was thinly capitalized.[5]  Siiro Aff., ¶5, Ex. B.  At this time, C & G Construction and Clearwater Energy, the only two other corporate Defendants in existence at this time had significantly healthier debt to equity ratios.  *Id.*  However, in 2014, Charps Welding was the only corporate Defendant whose assets exceeded its liabilities.  *Id.*  In addition, over this period Charps Welding's equity increased almost 8,000% while all other corporate Defendants' equity decreased to negative amounts.  *Id.*  Similarly, in 2008, C & G Construction and Clearwater Energy operated at a profit while Charps Welding operated at a loss.  *Id.*, Ex. D.  But in 2014, only Charps Welding operated at a profit while the other corporate Defendants operated at a loss.  *Id.*

---

[5]*See J.S. Biritz Const. Co. v. C.I.R.*, 387 F.2d 451, 459 (8th Cir. 1967) (debt to equity ratio of 2 to 1 is patently not so inordinately high as to qualify this as a 'thin capitalization' case).

**Audit Status**

Based on the information and documents produced to date by the Defendants in discovery, the Trustees' auditor has been unable to complete an audit or render any final conclusions with respect to the degree to which the corporate Defendants operate as one because all relevant information requested by the Auditor in his professional judgment has not yet been produced.  Siiro Aff., ¶ 3.  In addition to the records and documents specified in the Trustees' initial audit demand, the Auditor requests the following information from the corporate Defendants: complete detailed general ledger showing all of the accounts and all of the activity in the accounts, notes for intercompany debt, job cost detail, and payroll journals and master file.  *Id*.  In addition, a list of equipment owned by K&S Rentals and a list of properties owned by K&S Real Estate LLC together with any written lease agreements.  *Id*., Court Aff., Ex. T.

## ARGUMENT

## I.   LEGAL STANDARD

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Ricci v. DeStefano*, 557 U.S. 557, 586, 129 S. Ct. 2658 (2009).  The moving party bears the burden of showing that the material facts in the case are undisputed.  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*).  A court considering a motion for summary judgment must view the

facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Beard v. Banks*, 548 U.S. 521, 529–30, 126 S. Ct. 2572 (2006); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986); *Weitz Co. v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009).   In responding to a motion for summary judgment, a party with the burden of proof must submit and cite specific evidence in support of its claims.  *See Ince v. Aetna Health Mgmt., Inc.*, 173 F.3d 672, 677 (8th Cir. 1999) ("A party opposing summary judgment who will bear the burden of proof at trial must come forward with evidence substantiating his position to avoid summary judgment."); *cf. Rodgers v. City of Des Moines*, 435 F.3d 904, 908 (8th Cir. 2006) ("Without some guidance, we will not mine a summary judgment record searching for nuggets of factual disputes to gild a party's arguments").

## II.   THE TRUSTEES ARE ENTITLED TO AN ORDER FINDING CONTRACT AND ERISA BREACH AND COMPELLING THE REQUESTED AUDIT.

Section 515 of ERISA provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of a…collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such…agreement.

29 U.S.C. § 1145. In addition, Section 502(g)(2)(E) of ERISA provides that in addition to delinquent contributions, a court shall award "such other legal or equitable relief as the court deems appropriate." 29 U.S.C. § 1132(g)(2)(E).  An

audit constitutes an appropriate element of relief in an ERISA case where the amount of the delinquency is not known.  *Local 513, Int'l Union of Operating Eng'rs, AFL-CIO v. Weider Excavating, L.L.C.*, 2009 WL 1138037, at *1 (E.D. Mo. 2009)(*citing Int'l Painters & Allied Trades Indus. Pension Fund v. R.W. Amrine Drywall Co., Inc.,* 239 F. Supp. 2d 26 (D.D.C. 2002); *see also Carpenters Fringe Benefit Funds of Illinois v. McKenzie Eng'g*, 217 F.3d 578, 582 (8th Cir. 2000) (ERISA plan trustees may audit an employer's payroll records to verify that required contributions have been paid).

It is well established that benefit fund trustees have the right to conduct an audit of contributing employers.  *Central States, Southeast and Southwest Areas Pension Fund v. Central Transp., Inc.*, 472 U.S. 559, 569 (1985). In *Central States,* the Supreme Court held that "one of the fundamental common law duties of a trustee is to preserve and maintain trust assets, ... and this encompasses determin[ing] exactly what property forms the subject-matter of the trust [and] who are the beneficiaries....The trustee is thus expected to use reasonable diligence to discover the location of trust property and to take control of it without unnecessary delay." *Id.* at 572.  The Supreme Court went on to note that

> "[t]he provisions of ERISA make clear that a benefit plan trustee is similarly subject to these responsibilities, not only as a result of the general fiduciary standards of loyalty and care, borrowed as they are from the common law, but also as a result of more specific trustee duties itemized in the Act."

*Id.*  In carrying out these responsibilities trustees have a range of options—including suing the delinquent employer and randomly auditing the employer's

records.  *Diduck v. Kaszycki & Sons Contractors, Inc.*, 874 F.2d 912, 916-17 (2d Cir. 1989).  However, trustees can face liability for breaching their fiduciary duties in this regard by failing to collect contributions where they know or should know upon reasonable investigation that such contributions were due and owing.  *Id*.

In general, only a party to a collective bargaining agreement is bound by its terms; however, in some instances, an employer which has not signed a labor contract may be so closely tied to a signatory employer as to bind them both to the agreement.  *Crest Tankers, Inc. v. Nat'l Mar. Union of Am.*, 796 F.2d 234, 237 (8th Cir. 1986).  In the ERISA context, if a signatory employer has one or more alter-egos, then all companies are bound to the collective bargaining agreement and fringe benefit contributions are due and owing on behalf of all the companies' employees.  *Moore v. Advantage Office Services, Inc.*, 2011 WL 2193848, at *2 (D. Minn. 2011)(citing *Trustees of the Graphic Commc'ns Int'l Union Upper Midwest Local 1M Health & Welfare Plan v. Bjorkedal*, 516 F.3d 719, 727 (8th Cir. 2008); *see also Seipel v. Arrowhead Indus. Serv., Inc.*, 2010 WL 605722, *2–3 (D. Minn. 2010)(alter egos functioning as a single entity so both companies are jointly and severally liable for unpaid contributions due under the CBA for work done by either, or by both); *Painters Dist. Council No. 2 v. Paragon Painting Co., LLC*, 2010 WL 455227, at *8 (E.D. Mo. 2010)(Alter ego liability under section 515 of ERISA protects the federal interest in the solvency of multiemployer benefit plans by enabling ERISA trustees to recover delinquent contributions from a sham entity used to circumvent the participating employer's

24

pension obligations); *Mass. Carpenters Central Collection Agency v. Belmont Concrete Corp.,* 139 F.3d 304, 307 (1st Cir. 1998)(the purpose of alter-ego liability is "to prevent employers from evading their obligations under labor laws and collective bargaining agreements).

In the Eighth Circuit, courts apply principles of corporate law to determine whether a non-signatory employer is liable for unpaid contributions as the alter-ego of a signatory employer.   *Greater Kan. City Laborers Pension Fund v. Superior Gen. Contractors, Inc.,* 104 F.3d 1050, 1055 (8th Cir. 1997).   Pursuant to this standard, the legal fiction of separate corporate entities may be rejected in the case of a corporation that, (1) is controlled by another to the extent that it has independent existence in form only and, (2) is used as a subterfuge to defeat public convenience, to justify wrong, or to perpetuate a fraud.   *Id*.   The essence of this test is whether or not under all of the circumstances of the transaction carries the earmarks of an arm's length bargain. *Id.; see also In re B.J. McAdams, Inc.*, 66 F.3d 931, 937 (8th Cir. 1995)("[u]nless the left hand is independent of the right hand, there [was] no arms-length bargaining"*)*.   If it does not, equity will set it aside.   *Superior Gen. Contractors, Inc.,* 104 F.3d at 1055; *see also B.J. McAdams, Inc.*, 66 F.3d at 936 (The heart of the issue is whether one company is so dominated by others that its corporate form must be disregarded).   Determination of alter ego status involves a mixed question of law and fact. *Superior Gen. Contractors, Inc.,* 104 F.3d at 1054.

With respect to the first prong of the alter-ego test, courts in Eighth Circuit look to a number of factors including, commingling of funds, payments made by one entity on the other's behalf, common use office supplies, use of tools and equipment, employees, and office space, ownership and creation of the entities, management of the entities, shared insurance policies, joint tax filings, undocumented transactions or lack of evidence that such transactions are at arm's length, lack of billing or contribution for shared services, type of services performed, and failure to charge a mark-up for services provided by one entity to another. *Greater St. Louis Const. Laborers Welfare Fund v. Mertens Plumbing & Mech., Inc.*, 552 F. Supp. 2d 952, 955-56 (E.D. Mo. 2007); *Reed v. EnviroTech Remediation Services, Inc.*, 834 F. Supp. 2d 902, 908-09 (D. Minn. 2011); *Operating Eng'rs Local No. 101 Pension Fund v. K.C. Excavating & Grading, Inc.*, 2002 WL 1492103 (W.D. Mo. 2002); *Carpenters & Joiners Welfare Fund v. Wayne*, 2003 WL 21730105, *2-3 (D. Minn. 2003); *Brady v. Borchart Indus., Inc.*, 2006 WL 3043138, *1–2 (D. Minn. 2006); *Seipel v. John Heinlein Constr., Inc.*, 2009 WL 1405223 (D. Minn. 2009); *Arrowhead Indus. Serv., Inc.* 2010 WL 605722 at *2–3 (D. Minn. 2010); *Advantage Office Services, Inc.*, 2011 WL 2193848 at *2-3 (D. Minn. 2011); *See also, Carpenters Dist. Council of Kansas City Pension Fund v. JNL Const. Co., Inc.*, 596 F.3d 491, 495-96 (8th Cir. 2010)(evidence of commingling of funds established as a matter of law the first part of the alter-ego test); *Twin City Pipe Trades Serv. Ass'n, Inc. v. S & S Thermo Dynamics, Inc.*, 2013 WL 3989945, at *5 (D. Minn. 2013)(finding alter-

ego where corporations observed corporate formalities except for with respect to transfers between the corporations).

With regard to the second prong of the alter-ego test, the Court considers whether the employers acted to avoid a labor contract." *Crest Tankers,* 796 F.2d at 237. However an employer must do more than merely denying it was seeking avoid its contractual obligations to avoid summary judgment. *Operating Engineers Local No. 101 Pension Fund v. K.C. Excavating & Grading, Inc.*, 2002 WL 1492103 *6 (W.D. 2002) *aff'd,* 57 Fed. Appx. 273 (8th Cir. 2003). Otherwise, every alter-ego case would have to proceed to trial. *Id.* The use of multiple corporate structures is one such way for employers to circumvent a collective bargaining agreement. *Brady v. Swenke*, 2004 WL 2697282, at *3-4 (D. Minn. Nov. 24, 2004). To hold otherwise would open the door for any signatory employer to perform an end run around of a collective bargaining agreement's fringe benefit contribution requirements. *Id.*

In addition to alter-ego liability, an employer who forms a joint venture with a signatory employer may be held jointly liable for unpaid contributions related to work performed by either company. *Seipel v. Arrowhead Indus. Serv., Inc.*, WL 605722, at *3 (D. Minn. 2010). Under Minnesota law, four requirements must be met to create a joint venture: (1) contribution by all parties; (2) joint proprietorship and control; (3) sharing of profits; and (4) a contract. *Id.* (citing *Rosenberg v. Heritage Renovations, LLC,* 685 N.W.2d 320, 332 (Minn. 2004)).

**A.      Under the Facts of this Case, the Collective Bargaining Agreements and Trust Agreements Allow the Requested Audit.**

As set forth above, all of the CBAs require contributions to be submitted for each hour of covered work performed.  Johnson Aff., Exs. A-C, p. 21; D-E, pp. 18-19; F, p. 4.  In addition, both the Pipeline and Distribution CBAs provide as follows:

> If and when Employer shall perform work covered by this Agreement under its own name, under the name of another, as a corporation, company, partnership, enterprise, or any combination, including a joint venture, this Agreement shall be applicable to all such work performed under the name of the Employer or the name of any other corporation, company, partnership, enterprise, combination or joint venture.

*Id.*, Exs. D-E, p. 2; F, p. 1.

Courts interpret collective bargaining agreements according to the general rules of contract law unless federal labor law provides contrary rules. *See Sheet Metal Workers Local 19 v. Keystone Heating & Air Conditioning*, 934 F.2d 35, 40-41 (3d. Cir. 1991).  Moreover, courts recognize that contributing employers cannot have it both ways with its employees receiving the benefits of the Fund yet escaping its attendant burdens such as audits of books and records.  *C.f. Santa Monica Culinary Welfare Fund v. Miramar Hotel Corp.*, 920 F. 2nd 1491, 1494 (9th Cir. 1990), cert denied, 501 U.S. 1232 (1991); *see also Plumbers and Steamfitters Local No. 150 Pension Fund v. Vertex Const.*, 932 F. 2d 1443, 1451 (11th Cir. 1991)(in light of the independent nature of trusts, if employers and unions collectively bargain for contributions to an ERISA-covered plan, they may

28

not limit the rights of the trustees in conducting audits authorized by that collectively bargained agreement).

Given all of the commonalities (ownership, management, employees, accounting, etc.) shown above, the Trustees must necessarily have the right to access relevant documentation of all corporate Defendants under this contract language.  Specifically, the Trustees have the right to make basic determinations regarding, (a) whether signatory Charps Welding and its related entities are distinguishable "Employers" as a matter of fact and law, (b) whether "work covered by this Agreement" is being performed by the related entities "under the name of another", (c) how much "work covered by this Agreement" is being performed by the related entities "under the name of another", (d) if not performed "under the name of another", whether "work covered by this Agreement" is being performed in "any combination" of the related entities, (e) whether (and how much) Charps Welding employees performing covered work also performed the same type of work for related entities during the same pay periods, etc.

Indeed, "work covered by this agreement" broadly refers to *the type of work being performed by both a signatory employer and its related entities*—not merely the *type of work being performed under contract by the signatory employer*.  Indeed, to read the plain language of the agreement to not include the Charps-related entities would render the above-block-quoted language mere surplusage. Johnson Aff., Exs. A-C, p. 21; D-E, pp. 2, 18-19; F, p. 1, 4.

Accordingly, Defendants' assertion that they only agreed to be subject to audit for Charps Welding, but not other wholly owned entities performing covered work, under any combination, utilizing the same employees, overreaches.

Moreover, even absent such broad contract language, in a situation where all of the above-stated commonalities exist, prohibiting Trustees from having an auditor render conclusions about whether an employer is using the corporate form to harm the Funds and their beneficiaries, *i.e.*, police the Employer's potentially self-serving use of the term "Employer" in the agreement, would prevent the Trustees from performing their Trust-fiduciary functions.

**B.      Under the Facts of this Case, ERISA Allows the Requested Audit.**

In *Central States*, 472 U.S. 559 (1985), the Supreme Court reversed the Sixth Circuit, which had denied trustee audit requests to an employer, holding that the trustees had to show "reasonable cause" to believe that a specific employee was covered by the plans before gaining a right of access to that employee's records.   In its holding, the Supreme Court examined the policy concerns behind ERISA and noted that in enacting ERISA, Congress invoked the common law of trusts to define the general scope of trustees' authority and responsibility and that under the common law of trusts, trustees are understood to have all "such powers as are necessary or appropriate for the carrying out of the purposes of the trust." *Id.* at 570.

Within this framework, the Supreme Court concluded that the requested audit was relevant to legitimate trustee concerns and that there could be no

30

doubt as to the validity and weight of the goals of such an audit. *Central States*, 472 U.S. at 569-572. Moreover, the Supreme Court held that ERISA clearly assumes that trustees will act to ensure that a plan receives all funds to which it is entitled, so that those funds can be used on behalf of participants and beneficiaries, and that trustees will take steps to identify all participants and beneficiaries, so that the trustees can make them aware of their status and rights under the trust's terms. *Id*. at 572.

Every fact situation giving rise to a requested ERISA audit is different, but the significant policies necessitating such requests are the same. Just as in *Central States*, ERISA provides the Trustees a right of audit under the circumstances of this case because it is a reasonable request.  Where, as here, it is alleged that a group of companies are jointly-owned, jointly-managed, share joint employees, and commonly perform collective-bargaining-agreement-covered work, amongst the other indicia of commonality, the Trustees believe that they have, not only, the right, but also the obligation, to take steps to identify all potential beneficiaries of the collective bargaining agreements and trust agreements, and to investigate whether all required employee benefits have been paid.

## <u>CONCLUSION</u>

The Trustees request judgment in their favor as set forth in the Proposed

Order served contemporaneously herewith, and for such other and further relief

the Court deems just and equitable.

Date: April 14, 2016                    MCGRANN SHEA CARNIVAL
                                        STRAUGHN & LAMB, CHARTERED


                                        By   s/ Amy L. Court
                                             Carl S. Wosmek #300731
                                             Amy L. Court #319004
                                             Christy E. Lawrie #388832
                                        800 Nicollet Mall, Suite 2600
                                        Minneapolis, MN 55402
                                        Telephone: (612) 338-2525
                                        Facsimile: (612) 339-2386
                                        csw@mcgrannshea.com
                                        alc@mcgrannshea.com
                                        cel@mcgrannshea.com

                                        *Attorney for Plaintiffs*


835639