**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| Glen Johnson, Timothy Gillen, Kyle Jones, Steven Hall, Clayton Johnson, Mark Hubbard, Steve Piper, and Bill Patt as Trustees of the Operating Engineers Local #49 Health and Welfare Fund, Michael R. Fanning as a Fiduciary of the Central Pension Fund of the International Union of Operating Engineers and Participating Employers, Joseph Ryan, Bruce Carlson, Glen Johnson, Frank Frattalone, Lee Hiller, Tony Phillippi, Greg Waffensmith, Mark Ryan, as Trustees of the Local #49 International Union of Operating Engineers and Associated General Contractors of Minnesota Apprenticeship and Training Program, the Operating Engineers Local #49 Health and Welfare Fund, the Central Pension Fund of the International Union of Operating Engineers and Participating Employers, and the Local #49 International Union of Operating Engineers and Associated General Contractors of Minnesota Apprenticeship and Training Program, | Court File No: 0:14-cv-02081 (RHK/LIB) |
| | |
| | **DEFENDANTS' JOINT MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| Plaintiffs, | |
| vs. | |
| Charps Welding & Fabricating, Inc., Clearwater Energy Group, Inc. f/n/a C & G Holding Company of Clearbrook, Inc., C & G Construction Inc. of Clearbrook, Alpha Oil & Gas Services, Inc., and Kenneth Charpentier, individually, | |
| Defendants. | |

---

1

## INTRODUCTION

Plaintiffs must prove there are no genuine issues of material fact in dispute and that the alleged alter-ego entity is controlled by another to the extent that it has independent existence in form only and is used as a subterfuge to defeat public convenience, to justify wrong, or to perpetuate a fraud.  The Plaintiffs' Motion at most, identifies fact dispute after fact dispute, some interconnections between the Defendants or one off imperfections in record-keeping, employment or administration.   The record provides overwhelming evidence that these entities are legitimate businesses operating with separate workforces working on their projects generally in geographically distinct areas.  There is no evidence to suggest Defendants were engaged in an effort to perpetuate a fraud.[1]

## FACTS

The Defendants' histories are significant for the Motion and the Defendants refer the Court to Defendants' prior Memorandum of Law in Support of Motion for Summary Judgment.  (ECF No. 74).

In 2016, the two non-union entities, C&G and Alpha merged into C&G.  (ECF No. 82-2 at Ex. 12).

In February 2017, the assets of the Defendants were sold and the Defendant entities no longer perform operations or employ any workers.  (Declaration of Kenneth Charpentier "K. Charpentier Decl." ¶¶ 2-4).

---

[1] Plaintiffs begin their Memorandum of Law with a mischaracterization of the Magistrate's Order dated March 3, 2017.  (*See* ECF No. 170 (citing ECF No. 149)).  The Court is well aware that the Magistrate's determination regarding the Audit Period was limited to the purposes of discovery.

## I.     The Customer Bases of and Work Performed by Each Company.

The revenue figures (which necessarily temporally trail the projects since payment follows the work) for the year ending 2013 with corresponding locations of the projects are provided as examples of the differences between the customers and types of work performed by the Defendants.[2]

### A.     Charps Welding & Fabricating, Inc. Year Ended December 31, 2013.

|  | Revenues Earned |
|---|---|
| Enbridge Energy-Plummer  (MN) | 130,010 |
| Enbridge Energy-L5 Unit Valve (Wisc.) | 523,692 |
| Enbridge Energy-New Lenox Reroute (Illinois) | 886,907 |
| Enbridge Energy-Mokena (Illinois) | 1,335,319 |
| Enbridge Energy-North Branch (Michigan) | 996,047 |
| Enbridge Energy-L14 Hydro Test (Wisc.) | 1,745,130 |
| Enbridge Energy-L4 MN Integrity Digs (MN) | 21,852 |
| Enbridge Energy-L2 MN Integrity Digs (MN) | 616,033 |
| Enbridge Energy-L2 MN Integrity Digs  (MN) | 446,057 |
| Enbridge Energy-L13 MN Integrity Digs  (MN) | 965,064 |
| Enbridge Energy-L13 MN Integrity Digs  (MN) | 5,736 |
| Enbridge Energy-L6A IL Integrity Digs     (IL) | 1,752,960 |
| Enbridge Energy-L6A IL Integrity Digs     (IL) | 387,258 |
| Enbridge Energy-L17 MI Integrity Welding (MI) | 169,668 |
| Enbridge Energy-L6A IL Integrity Digs (IL) | 355,817 |

[2] The nature of work typically performed by each Defendant entity through different periods in their history is distinct on the union to non-union side.  This distinction is described and supported in Defendants' previous Memorandum and Supporting Documents.  (ECF Nos. 74-83).  It is also further described within this Memorandum.

(ECF Doc. 82 ¶ 5, Ex. 7 at Bates D 038686, *filed under seal*).

**B.      C&G Construction of Clearbrook, Inc. Year Ended December 31, 2013.**

|                                      | Revenues Earned |
|--------------------------------------|-----------------|
| Vermont Gas-St. Albans (Vermont)     | 6,977,978       |

(*Id.*).

**C.      Alpha Oil & Gas Services Inc. Year Ended December 31, 2013.**

|                                                  | Revenues Earned |
|--------------------------------------------------|-----------------|
| ONEOK-Bert/Gabbert/Ernie/Zorro (ND)              | 293,435         |
| Hiland Partners-CLR Antelope  (ND)               | 480,251         |
| Hiland Crude-XTO Pod 7 & 8  (ND)                 | 31,713          |
| Hiland Partners-Helix CTB  (ND)                  | 63,399          |
| Hiland Crude-King 1-5H (ND)                      | 29,569          |
| Bakken Pipline-Bakken Centerpoint Tie-In  (ND)   | 28,060          |
| Caliber Midstream-Hay Butte  (ND)                | 6,395,958       |
| Oasis Petroleum-Sage Brush  (ND)                 | 431,839         |
| Enable Midstream-Bear Den Tank Farm (ND)         | 1,399,788       |
| ONEOK-Highland Interconnect (ND)                 | 1,446,739       |

(*Id.*; Declaration of Edward Charpentier ("E. Charpentier Decl.") ¶ 6).

These financial records and related pay information substantiate the fact that the revenue for the separate entities, in fact, was generally derived from different geographic regions, performing different types of work for different types of companies.  While shown

here from the 2013 Financial Statements, the same general trends apply across the years in question.

In addition, there is a significant difference in the type of work performed for Enbridge as compared to the work performed by the non-union entities.  ECF 75, ¶¶ 3-7; ECF 76, ¶¶ 3 & 8-10; ECF 77, ¶¶3 & 11-12; ECF  78, ¶¶16-18; ECF 79, ¶¶ 5-9, 19-20 & 25-27).  Ken Charpentier in his deposition in the unrelated matter (upon which the Plaintiffs rely) actually testified as follows regarding those differences:

| | |
|---|---|
| **Q** | **Other than Charp's was a business wholly owned by you and your wife and Alpha was a business where you both had some other partners, did Charp's and Alpha, were they the same, doing the same kinds of business, same kind of pipeline work?** |
| A | No. Charp's was doing kind of like anomaly work for Enbridge, which is maintenance. |
| **Q** | **Did you say anomaly?** |
| A | Anomaly, yes. |
| **Q** | **So maintenance. Describe for me what that means?** |
| A | I could go on and on and on. Maintenance. Whenever they find an anomaly, you go there and repair whatever the company wants you to do on their line. |
| **Q** | **When you say "maintenance", are we talking about a pipeline that has already been installed underground?** |
| A | Correct. It has to be. When it's maintenance it's used. |
| **Q** | **And in contrast, am I correct that Alpha is involved in the, what I might say, the construction or installation of new pipelines?** |
| A | Yes, in the oil field.<br>    I mean up to this time. They are in the oil field, smaller lines, you know, for gathering systems for the oil companies. |

| Q | And that's Alpha you were just talking about? |
|---|---|
| A | Yes. |
| Q | I want to focus you in on talking about right now as a period of time and I'm interested in who Alpha considers its customers to be.<br>    So who are Alpha's customers right now? |
| A | The producers. |
| Q | When you say "producers", what does that mean? |
| A | People that drill. |

(ECF No. 172-9, Ex. EEE at 21-24).

This testimony describing the important differences between Alpha and Charps businesses predates this alter ego dispute. Mr. Charpentier's deposition testimony in this prior case was not tailored to fit a particular situation, this is reality. The types of work these entities performed historically were quite distinct. This is further supported by the Declarations on the record in this case from the earlier Motions. (ECF Nos. 75-81).

**D.    The Defendants Differed in Work Performed and in Customers.**

From 2008 through 2016, the various Defendant entities had the following rounded revenue from Enbridge:

| Charps | C&G | Alpha |
|---|---|---|
| 2008 Charps:   $5,847,00 | 2008 C&G:        $      - | 2008 Alpha:     $     - |
| 2009 Charps:   $7,901,000 | 2009 C&G:        $      - | 2009 Alpha:     $     - |
| 2010 Charps:   $14,832,000 | 2010 C&G:        $2,717,000 | 2010 Alpha:     $     - |
| 2011 Charps:   $25,890,000 | 2011 C&G:        $76,000 | 2011 Alpha:     $     - |

| 2012 Charps: | $27,945,000 | 2012 C&G: | $532,000 | 2012 Alpha: | $      - |
|---|---|---|---|---|---|
| 2013 Charps: | $63,320,000 | 2013 C&G: | $2,152,000 | 2013 Alpha: | $486,000 |
| 2014 Charps: | $57,498,000 | 2014 C&G: | $5,529,000 | 2014 Alpha: | $      - |
| 2015 Charps: | $65,103,000 | 2015 C&G: | $4,678,000 | 2015 Alpha: | $      - |
| 2016 Charps: | $44,906,000 | 2016 C&G: | $16,628,000 | 2016 Alpha: | $      - |
| Total: | $313,242,000 | Total: | $32,312,000 | Total: | $486,000 |

(Declaration of Joe Van Vynckt ("Van Vynckt Decl.") ¶ 5).

These revenue figures highlight both the different customer bases and the differing types of work performed by the respective entities as set forth elsewhere in this Memorandum.

To further demonstrate this point, Charps' overall revenue for the Susquehanna Project was $123,760,000. Charps' General Ledger for 2012 reflects that there were charges for labor performed by C&G for Charps, noting a labor charge of $469,182.00 at line 152,932. (Van Vynckt Decl. ¶ 8). Plaintiffs' attempts to misconstrue this as evidence of alter ego must be rejected when viewed in the appropriate context given the overall size of the project.

## II.    Entity-Specific Facts Against Summary Judgment.

### A.    Charps

1.    Charps was incorporated and filed with the Minnesota Secretary of State on April 13, 2001. (ECF  29-1 at pp. 146-64; ECF 81-1 at pp.1-4).

2.      Charps always maintained separate bank accounts and never commingled funds with another Defendant.  (ECF No. 97-1 at 2-24; ECF No. 97 ¶ 7; ECF No. 82 ¶¶ 6, 15; ECF No. 78 ¶ 19: ECF No. 77 ¶ 9).

3.      Charps held its own board and shareholder meetings and took its own written actions.  (K. Charpentier Decl. ¶ 6, Ex. 1; ECF No. 81-1 at 21-24; ECF No. 82 ¶ 20).

4.      Charps had separate federal and state identification numbers.  (K. Charpentier Decl. ¶¶ 7, 23, Exs. 2, 18 at 3-4).

5.      Charps filed federal and state income tax returns as required.  (*Id.*).

6.      Charps purchased its own tools, equipment and materials.  (K. Charpentier Decl. ¶¶ 9-10, 47-48, Exs. 4-5, 39-40; ECF No. 82 ¶ 9; ECF No. 77 ¶ 15; ECF No. 76 ¶ 12).

7.      Charps maintained its own separate financial records (including accounts receivable, accounts payable, and general ledgers) and payroll records.  (K. Charpentier Decl. ¶¶ 9-11, 47-48, Exs. 4-6, 39-40).

8.      Charps filed its own state and federal payroll tax returns; paid its own unemployment tax withholdings; and procured its own local, state, and federal licenses. (K. Charpentier Decl. ¶¶ 7-8, 23, Exs. 2-3, 18 at 3-4 ; ECF No. 82-2 at 17-19; ECF No. 82 ¶¶ 16-18).

9.      Charps made Fringe Fund contributions from its own account.  (K. Charpentier Decl. ¶ 12, Ex. 7; ECF  No. 82 ¶ 19; ECF No. 77 ¶ 19).

10.     Charps' management team had the authority to act on behalf of Charps only. Charps' management was able to submit bids for work, enter into service agreements, and

sign contracts for Charps.  (K. Charpentier Decl. ¶ 13, Ex. 8; ECF No. 77 ¶ 14; ECF No. 76 ¶ 11).

11.    Charps' management and personnel made hiring, firing, disciplinary and management decisions for Charps.  (ECF No. 77 ¶ 16).

12.    Charps entered into its own Master Servicing Agreements ("MSAs") with its customers.  (K. Charpentier Decl. ¶ 13, Ex. 8).

13.    Charps was the only signatory to a series of CBAs for the Builders Division of the Associated General Contractors of Minnesota and the International Union of Operating Engineers, Local #49.  (ECF No. 25-4 at 1-140; ECF No. 25-6 at 1-43; ECF No. 25-5 at 1-174; ECF No. 80-1 at 13-15; ECF No. 81 ¶¶ 8-10; ECF No. 81 ¶ 10; ECF No. 77 ¶ 4).

14.    Charps previously serviced the transmission pipeline segment of the oil and gas supply chain and focuses on assessing and maintaining existing pipelines.  It tests and repairs large, steel, cross-country transmission lines for oil transporters, almost exclusively for Enbridge.  (ECF No. 82 ¶ 37; ECF No. 172-9, Ex. EEE at 21-22).  The exception was that in 2012 and 2013 Charps was involved in a single significant union project in Pennsylvania for a customer similar to Enbridge.  (Declaration of Joseph D. Kenyon ("Kenyon Decl.") ¶ 3, Ex. A at 4; Van Vynckt Decl. ¶ 6 ).  This is different than the services provided by the other Defendant companies.

15.    Charps had its own employees.  (K. Charpentier Decl. ¶¶ 11, 34, 41, Exs. 6, 29, 31, 36).

16.     The hours worked by Charps employees for the years 2008-2015 were as follows:

| Year | Hours Worked |
|------|--------------|
| 2008 | 122,729 |
| 2009 | 111,653 |
| 2010 | 123,937 |
| 2011 | 184,841 |
| 2012 | 496,767 |
| 2013 | 777,598 |
| 2014 | 418,667 |
| 2015 | 498,770 |
| **Total** | **2,734,962** |

(Kenyon Decl. ¶ 3, Ex. A at 15).

**B.     C&G Construction**

1.     C&G Construction was incorporated and filed with the Minnesota Secretary of State on November 1, 2005.  (ECF No. 29-1 at 93-144; ECF No. 81-1 at 5-14).

2.     C&G Construction always maintained separate bank accounts and never commingled funds with another Defendant.  (ECF No. 97-1 at 25-48; ECF No. 97 ¶ 8; ECF No. 82 ¶¶ 6, 15).

3.     C&G Construction held its own board and shareholder meetings and took its own written actions.  (K. Charpentier Decl. ¶ 14, Ex. 9; ECF No. 82-2 at 4-6; ECF No. 81-1 at 15-16, 24-30; ECF No. 29-1 at 95; ECF No. 82 ¶ 20).

4.     C&G Construction had separate federal and state identification numbers.  (K. Charpentier Decl. ¶¶ 15, 23, Exs. 10, 18 at 7-9).

5.      C&G Construction filed federal and state income tax returns as required. (*Id.*).

6.      C&G Construction purchased its own tools, equipment and materials.  (K. Charpentier Decl. ¶¶ 16-18, 48, Exs. 11-13, 40; ECF No. 82 ¶ 9; ECF No. 79 ¶ 29; ECF No. 75 ¶ 9).

7.      C&G Construction maintained its own separate financial records (including accounts receivable, accounts payable, and general ledgers) and payroll records.  (K. Charpentier Decl. ¶¶ 17-18, 50, 52, Exs. 12-13, 42, 52; ECF No. 82 ¶¶ 12-14, 22; ECF No. 75 ¶ 13).

8.      C&G Construction filed its own state and federal tax payroll tax returns; paid its own unemployment tax withholdings; and procured its own local, state, and federal licenses.  (K. Charpentier Decl. ¶¶ 23, 52, Ex. 18 at 7-9, 44; ECF No. 75 ¶ 11).

9.      C&G Construction management and personnel made hiring, firing, disciplinary, and management decisions for C&G Construction. C&G Construction also processed its own payroll; and determined wages and benefits for C&G Construction employees.  (ECF No. 75 ¶ 11).

10.     C&G Construction management had the authority to act on behalf of C&G Construction only.  C&G Construction management had the authority to submit bids for work, enter into service agreements, write checks, and sign contracts.  (K. Charpentier Decl. ¶ 19, Ex. 14; ECF No. 79 ¶ 28).

11.     C&G Construction entered into its own MSAs with its customers.  (K. Charpentier Decl. ¶ 19, Ex. 14).

12.     Initially, C&G Construction primarily built poly pipelines transporting gas produced by oil wells in North Dakota and Montana.  (ECF No. 29 ¶ 6-9).  Later in its existence, C&G Construction primarily built and laid gathering and mid-stream lines for oil and gas producers like Oneok and Hess.  (ECF No. 75 ¶ 3).  C&G Construction's customers and work was different than Charps'.  (*Id*.  *See also* ECF No. 172-9, Ex. EEE at 21-24).

13.     C&G had its own employees who work on C&G projects.  (K. Charpentier Decl. ¶¶ 35, 40, 52, Exs. 30, 35, 44).

**C.     Alpha**

1.     Alpha was incorporated with the North Dakota Secretary of State on January 19, 2011.  (ECF No. 29-1 at 87-91; ECF No. 81-3 at 1-2).

2.     Alpha had maintained separate bank accounts and never commingled funds with another Defendant.  (ECF No. 97-1 at 49-60; ECF 97 ¶ 9; ECF No. 78 ¶ 19; ECF No. 82 ¶¶ 6, 15).

3.     Alpha held its own board and shareholder meetings and took its own written actions.  (ECF No. 81-3 at 6-62; ECF No. 82-2 at 1-2; ECF No. 82 ¶ 20).

4.     Alpha had separate federal and state identification numbers.  (K. Charpentier Decl. ¶¶ 20, 23, Exs. 15, 18 at 5-9).

5.     Alpha filed federal and state income tax returns as required.  (K. Charpentier Decl. ¶¶ 20, 23, Exs. 15, 18 at 5-9; ECF No. 82 ¶ 16).

6.      Alpha purchased its own tools, equipment and materials.  (K. Charpentier Decl. ¶¶ 21-22, 41, Exs. 16-17; ECF No. 82 ¶ 9; ECF No. 79 ¶ 30; ECF No. 78 ¶ 21; ECF No. 75 ¶ 5).

7.      Alpha maintained its own separate financial records (including accounts receivable, accounts payable, and general ledgers) and payroll records.  (K. Charpentier Decl. ¶¶ 22-23, 25, 37-38, 49, Exs. 17, 18 at 5-9, Exs. 20, 32-33, 41; ECF No. 75 ¶ 13; ECF No. 78 ¶ 23; ECF No. 82 ¶¶ 12-14, 22).

8.      Alpha's management and personnel made hiring, firing, disciplinary, and management decisions for Alpha. Alpha's management determined wages and benefits for Alpha.  (ECF No. 75 ¶ 13; ECF No. 82 ¶¶ 16,17).

9.      Alpha filed its own state and federal payroll tax returns; paid its own unemployment tax withholdings; and procured its own local, state, and federal licenses. (K. Charpentier Decl. ¶¶ 20, 23-24, 51, Exs. 15, 18 at 5-9, Exs. 19, 43).

10.      Alpha management had the authority to act on behalf of Alpha only.  Alpha management had the authority to submit bids for work, enter into service agreements, write checks, and sign contracts.  (K. Charpentier Decl. ¶ 26, Ex. 22; ECF No. 79 ¶ 28).

11.      Alpha entered into its own MSAs with its customers.  (K. Charpentier Decl. ¶ 26, Ex. 21).

12.      Alpha was primarily in the business of pipeline services, roustabout services, and land stewardship and performs work in North Dakota and Montana.  (ECF No. 80-1 at 1).  Alpha's customers and work was different than Charps.  (ECF No. 75 ¶¶ 3-7; ECF No.

76 ¶¶ 3, 8-10; ECF No. 77 ¶¶ 3, 11-12; ECF No. 78 ¶¶ 16-18; ECF No. 79 ¶¶ 5-9, 19-20, 25-27).

13.    Alpha had its own employees working on its projects.  (K. Charpentier Decl. ¶¶ 37-38, 51, Exs. 32-33, 43).

**D.    Clearwater**

1.    Clearwater was incorporated and filed with the Minnesota Secretary of State on November 8, 2005.  (K. Charpentier Decl. ¶ 27, Ex. 23.  *See also* ECF No. 29-1 at 93-144; ECF No. 81-1 at. 5-14).

2.    Clearwater always maintained separate bank accounts and never commingled funds with another Defendant.  (ECF No. 97-1 at 62-74; ECF No. 97 ¶ 10; ECF No. 82 ¶ 15).

3.    Clearwater held its own board and shareholder meetings and took its own written actions.  (ECF No. 82-2 at 7-16; ECF No. 82 ¶ 7).

4.    Clearwater had separate federal and state identification numbers.  (K. Charpentier Decl. ¶¶ 23, 28, Ex. 18 at 1-2, Ex. 23).

5.    Clearwater filed federal and state income tax returns as required.  (K. Charpentier Decl. ¶¶ 23, 28, Ex. 18 at 1-2, Ex. 23; ECF No. 82 ¶ 16).

6.    The executives for Clearwater had final authority to sign contracts and write checks but only for Clearwater.  (ECF No. 82 ¶ 10).

7.    Clearwater had final authority over its workforce and employees. Among other things, it made its own hiring, firing, disciplinary and management decisions; process its own payroll; and sets its own wages and benefits.  (ECF No. 82 ¶ 11).

8.      Clearwater maintained its own separate financial records, including general ledgers, customer and account receivables, and vendor and accounts payable. (K. Charpentier Decl. ¶¶ 29-30, 49, Exs. 24-25, 41; ECF No. 82 ¶¶ 13, 22).

9.      Clearwater maintained its own separate payroll records, filed its own state and federal payroll tax returns and paid its own unemployment tax withholdings.  (K. Charpentier Decl. ¶¶ 23, 28, Ex. 18 at 1-2, Ex. 23; ECF No. 82 ¶¶ 16-17).

10.     Clearwater served as a holding company and provides management support to the operating entities, Charps, C&G Construction and Alpha, and performed administrative services.  (Kenyon Decl. Ex. 2 at 5).

11.     Clearwater had its own employees.  (K. Charpentier Decl. ¶¶ 36, 39, 53, Exs. 31, 34, 45).

III.    **Additional Material Facts against Summary Judgment for All Defendants.**

   A.    **The Defendants Were Not Undercapitalized.**

Based upon the Defendant Companies' consolidated financial statements contained in audited financial statements, the individual companies had initial capitalizations ranging from $2,000 (Alpha) to $19,137.  (Kenyon Decl. ¶ 4, Ex. B at 22).  Debt to equity ratios vary by industry and differences can result from a number of different legitimate reasons. For example, Appendix III to the Defendant's expert report sets forth actual debt to equity statistics for companies similar to the Defendant Companies.  (*Id*. at 26, 51).  Debt to equity ratios vary widely for companies of different sizes and companies within the same size range.  Notwithstanding the above, the large ranges for the debt to equity for the Defendant Companies used by the Plaintiffs' Report (negative (90.44) to a high of 838.26) are outliers.

(*Id*. at 23).  Most of the debt to equity ratios range from 0.00 (virtually no debt) to 3.79. (*Id*.).  Any debt to equity ratios outside of this range principally results from operating losses causing negative equity, changes in financing activities between the Defendant Companies or shareholder dividends principally needed to pay taxes.  (*Id*.).

**B.     The Operating Entities Were Solvent.**

The Plaintiffs have at times claimed that the Defendants were insolvent.  (ECF No. 86 ¶ 5).  Plaintiffs' Schedule 3 indicates that most of the individual Defendant Companies had positive equity balances during the period of 2008 to 2014.  (ECF No. 86 ¶ 5, Ex. C, *filed under seal* at 309).  The exceptions were Clearwater, which had negative equity balances in 2013 and 2014 due to significant cash distributions to shareholders principally to pay income taxes and Alpha, which had negative equity balances in 2011, 2013 and 2014 due to operating losses.  The solvency of the Defendant entities again demonstrates a robust and profiting union entity, Charps, which runs directly contrary to Plaintiffs claim that work was being poached from Charps to the benefit of the non-unionized entities. (Kenyon Decl. ¶ 4, Ex. B at 23).

**C.     Intercompany Loans Were Properly Recorded.**

There were intercompany loan transactions made between the Defendant Companies during the ordinary course of business.  (Kenyon Decl. ¶ 4, Ex. B at 26). Companies that had cash or access to credit transferred funds through intercompany loans to other companies that needed cash and those loans were repaid when the companies receiving the loans could repay them.  (*Id*.).  This is oftentimes easier and cheaper than obtaining outside bank financing for all companies.  These intercompany loans were

accounted for on each of the respective Defendant Companies' books.  (*Id.  See also* ECF No. 82-2 ¶ 5, Ex. B, *filed under seal* at 16).  No formal loan documents were prepared nor interest charged between companies.  The Defendants' expert's report notes that this is not unusual for smaller closely-held companies.  (Kenyon Decl. ¶ 4, Ex. B at 26).

### D.  There was not Siphoning By Dominant Shareholders or Improper Cash Advances to Shareholders.

There is no evidence of siphoning of funds by dominant shareholders.  (Kenyon Decl. ¶ 4, Ex. B at 26).  Based upon an analysis of the Defendant Companies' audited financial statements for the years 2008 to 2014, there was a note receivable from shareholders of approximately $160,000 as of December 31, 2008 that was paid back in 2010 and an advance of $1,500,000 made in 2014 which was repaid in the subsequent year. There were no other significant cash advances to shareholders.  (*Id.*).

### E.  The Varying Profitability of the Companies Does Not Support Plaintiffs' Alter Ego Claims.

Charps went from under-capitalized and unprofitable at the start of the audit period to robustly capitalized and profitable as of 2014, while C&G and Alpha had the opposite trajectory.  (ECF No. 84 at 20).  Any group of companies can have some individual companies making a profit and others that do not. This can result from many different reasons including, but not limited to, difference in industries, markets, geographic location, customers, quality of management and circumstances affecting any given construction project.  (Kenyon Decl. ¶ 4, Ex. B at 28).  The fact that Charps became much more profitable over the course of the period from 2008 to 2014 and employed more and more

union employees is fatal to Plaintiffs' claims the Defendants perpetuated a fraud to the disadvantage of the Funds.[3]

### F.   Equipment and Other Goods of the Individual Companies Were Separate.

The Defendants' expert reviewed the 2008 to 2014 financials and concluded there was not commingling of funds or assets.  (Kenyon Decl. ¶ 4, Ex. B at 29).  Clearwater recorded as rental income amounts paid to it by its subsidiaries for rental of equipment and other items that provided cash flow to Clearwater to fund its cash needs.  (*Id.*)  This was done from 2008 until 2013 and accounted for on the books of the respective Defendant companies and disclosed in the consolidating financial statements.  (*Id.*)

Plaintiffs appear to concede in that different entities owned their own equipment, providing an example of an equipment inventory document that identifies the equipment owner as well as the equipment user at the time. (*See* ECF No. 170 at 15).  The Plaintiffs' evidence actually highlights the separateness of the various entities by highlighting the fact that the equipment's ownership and use is tracked.

---

[3] The Plaintiffs' expert, Craig Siiro, recently testified in a Court trial for Plaintiffs' counsel in another alter ego fringe fund case.  The Court found his testimony "meets none of the criteria of Fed. R. Evid. 702" and excluded the testimony under *Daubert*.   The Court further concluded that Mr. Siiro's "conclusions make no sense" and "his figures become even more preposterous" after consideration of other evidence in the case.  *Nelson v. Frana Companies, Inc.*, 2017 WL 1193991, at *15 (D. Minn. Mar. 30, 2017) (Schiltz, J.).

G.     **Additional Employment-Related Facts.**

1.     Lack of Common Employees.

The Plaintiffs identify eight employees that they claim worked for more than one Defendant at the same time: Jamey Danielson, Gregorio Gallegos, Clayton Johnson, Thomas Maruska, Jason Paulson, Justin Perry, Lawrence Voll, and Bobby Watne.  The Plaintiffs identify these individuals for the first time in their Motion for Summary Judgment and base their contention on the information produced in response to the Defendants' responses to Interrogatory No. 1, which listed hundreds upon hundreds of employees for the different organizations.  A closer examination of the work history of these eight employees reveals that none of them worked for more than one entity at the same time. The following tables illustrate the employment history of these eight employees as gleaned from Defendants' payroll registers produced in discovery:

| DANIELSON, JAMEY | | | | | |
|---|---|---|---|---|---|
| Charps | | 1.8.2011-5.13.2011 | | | 7.16.2011 - 1.31.2017 |
| Alpha | | | | 7.9.2011-7.15.2011 | |
| C&G | 1.23.2010-12.31.2010 | | 5.14.2011-7.8.2011 | | |

| GALLEGOS, GREGORIO | | | | | |
|---|---|---|---|---|---|
| Charps | | 10.17.2009-12.25.2009 | | 10.23.2010-1.27.2012 | | 3.10.2012-1.31.2017 |
| Alpha | | | | | 3.3.2012-3.9.2012 | |
| C&G | 12.13.2008-10.16.2009 | | 4.3.2010-10.22.2010 | | | |

**JOHNSON, CLAYTON**

| | | | |
|---|---|---|---|
| Charps | 10.23.2010 - 12.31.2010 | | |
| Alpha | | | 7.9.2011 - 4.20.2012 |
| C&G | | 1.8.2011 - 7.8.2011 | |

**MARUSKA, THOMAS**

| | | | |
|---|---|---|---|
| Charps | | 5.21.2011 - 3.30.2012 | 9.28.2013 - 1.31.2017 |
| Alpha | | | 7.14.2012 - 9.21.2012 |
| C&G | 1.8.2011 - 3.18.2011 | | |

**PAULSON, JASON**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Charps | | 9.4.10- 2.18.11 | | 5.7.11- 2.3.12 | | 3.10.12- 4.20.12 | | 7.7.12- 1.31.17 |
| Alpha | | | | | 2.11.12- 3.9.12 | | 4.28.12- 7.6.12 | |
| C&G | 7.12.08- 8.7.09 | | 2.19.11- 5.6.11 | | | | | |

**PERRY, JUSTIN**

| | | | | |
|---|---|---|---|---|
| Charps | | 5.19.2012 - 5.3.2013 | | |
| Alpha | | | 5.4.2013 - 8.9.2013 | |
| C&G | 5.7.2011 - 5.18.2012 | | | 8.10.2013 - 6.20.2014 |

**VOLL, LAWRENCE**

| | | | | |
|---|---|---|---|---|
| Charps | | 10.17.2009 - 12.17.2010 | | |
| Alpha | | | | 7.9.2011 - 2.27.2015 |
| C&G | 8.30.2008 - 10.16.2009 | | 3.5.2011 - 7.8.2011 | |

**WATNE, BOBBY**

| | | | | |
|---|---|---|---|---|
| Charps | | | 6.8.2013 - 4.11.2014 | 5.17.2014 - 3.25.2016 |
| Alpha | | 7.9.2011 - 5.17.2013 | | |
| C&G | 1.8.2011 - 7.8.2011 | | | |

As illustrated in the tables above, Defendants' payroll registers prove that there were no overlapping terms of service for these eight employees; rather, each was employed by only one entity at a time.[4]  (Declaration of Andrew G. Chase ("Chase Decl.") ¶¶ 3-8, Exs. 1-3).

> ## 2.    The Bobby Watne Allegations Fail.

The Plaintiffs again refer to Bobby Watne's hearsay allegations as support for their Motion for Summary Judgment.  There is no declaration, deposition or other admissible evidence in the record from Mr. Watne.  Second, the fact that he had identification cards

---

[4] For simplicity, the timelines present each work stint as a continuous period of employment and do not reflect intermittent periods of recurring and seasonal unemployment that are common in the construction industry.  (Chase Decl. ¶ 9).  The timelines also omit instances in which an employee appears on a payroll register as a result of a record keeping adjustment but did not receive compensation from one of the entities. (Chase Decl. ¶ 10.  *See also* Declaration of Sandy Gray ¶¶ 2-11).

or credit cards from more than one entity should come as no surprise since he worked for the differing entities at different times. *Id.* The Plaintiffs appear to base their primary complaint on an employee who moved from a non-union company over to a union company. This again, runs counter to the Plaintiffs' narrative since it is not siphoning off union work, it is creating another gainfully employed union employee. *Id.*

### 3.     The Allegedly "Missing" Employees.

Plaintiffs have identified employee files, which generally consist of a W-4 form but are not on the list of employee files. (ECF No. 170 at 17). Defendants are investigating the alleged discrepancy. The fact that individuals have W-4s on file, but apparently never went to work for Alpha does not support an Alter Ego finding. Again, Plaintiffs fail to even identify the individuals at issue or state whether they compared those names to the provided payroll registers. It may all be explained by a mistaken list or individuals in the transient world of construction in the oil fields that filled out the initial paperwork, but never showed up to work because they found better work across the street. Regardless, the discrepancy provides no support for summary judgment on Plaintiffs' alter ego claim.

### 4.     Construction Industry Field Employees Frequently Change Employers and Follow the Work.

Plaintiffs' Memorandum attempts to claim the fact that some employees of one of the Defendants also worked for one of the other Defendants at a different time as sufficient support for their Motion for Summary Judgment. The Plaintiffs in that regard are attempting to mischaracterize the typical nature of the construction industry; transitory workers following the big projects and going to work for different employers who have

work available for them at the time.  Indeed, the very structure of the Plaintiff Funds is set up to facilitate employees' ability to move from employer to employer to follow the work.

It is common within the construction industry for employees to frequently move between companies. Glen Johnson, the first named Plaintiff in this case and the person whom Plaintiffs' rely upon for declarations supporting their motion for summary judgment, explained in his deposition that as an operating engineer he "had many jobs with many different companies."  (ECF No. 95-1 at 90).  When asked to list the companies over a time period encompassing less than ten years, he listed ten different companies and couldn't recall the others.  (*Id.*)

Similarly, the Plaintiffs' lead investigator into the inquisition of the Defendants and the current Local 49 Business Agent, Robert Chastin, is another perfect example of the fluidity of employees working between companies. Chastin, where the majority of his time as an operator occurred in the oil and gas industry, could not list all of his employers.  (ECF No. 87-3 at 13-15).  When asked about his work history Chastin explained, "I really cannot give you the exact companies I've been with.  There has been so many.  I can just tell you that I've been in the pipeline industry with many different companies from Michaels, you know, US, Murphy Brothers.  I did a lot of work with Murphy Brothers"  (*Id.* at 15).  This unequivocally demonstrates that the fact that some employees have terms of service for more than one Defendant is a red herring.

5.    <u>Plaintiffs' Claims Regarding Check-Signing Ignore Modern Business Realities.</u>

The Plaintiffs' claim that the presidents of the independent entities are not listed as signers on the checking accounts somehow undermines their claim that they are independent business leaders is deeply flawed.  (ECF No. 170 at 21).  First, the Plaintiffs' highlight the fact that lower level staff from the various entities do have check signing authority, which undermines their claim.  (*Id.*)  Second, they ignore the reality of the modern financial and business world.  The independent leaders of these entities can issue significant payments to be made. For example Greg Todavich authorized the payments to Bemidji Welders Supply, Inc. and AirGas.  (Declaration of Greg Todavich ("Todavich Decl.") ¶ 5).  Moreover, many of the items charged to jobs are approved by the Charps project managers or project coordinators on the specific jobs as the projects are ongoing. (*Id*.)  Being listed as a signer on the checking account is not indicative of the power of Todavich or the other former presidents of the operating entities.  (*Id.* ¶ 3).  The presidents of the other companies could do the same thing as Todavich.  (ECF Nos. 75, 77).

6.    <u>Plaintiffs' Improperly Conflate Interrelations between the Two Non-Union Entities as Equivalent to Interrelations between the Union and Non-Union Entities and Mischaracterize Lease Relationships.</u>

The Defendants have made clear from the commencement of this litigation that non-union Alpha was started with the intention that it would replace non-union C&G. Ultimately, in 2016, those two non-union entities finally merged.  The Plaintiffs allegations in the case are premised upon the claim that the non-unionized entities are alter-egos of Charps, not that they are alter egos of each other.

Plaintiffs' rely primarily upon lessor/tenant relationships between the two non-unionized entities to support their contention that "at least 40 percent of the leased space was occupied or contracted to more than one Defendant company." (ECF No. 170 at 10-11). The contention that the two non-union entities, Alpha and C&G, had lessor/tenant relations does not provide any evidence of Plaintiffs' alter ego claim, which must show that Charps is an alter ego of another, non-union entity.

Plaintiffs' attempt to illustrate joint occupancy of leased space is flawed. There were 26 written leases produced, not 15 as Plaintiffs allege. (*See* ECF No. 170 at 10). Below is a complete listing of property addresses where written leases were produced. The table demonstrates that there was only one location where union and non union defendants shared a business location. The prevalence of joint union and non-union occupancy is far less than Plaintiffs allege.

| Property Address | Contracting Tenant/ Lessee Per Written Agreement(s) | Occupying Tenant | Joint Union and Non Union Occupancy | Lease Term Per Written Agreement |
|---|---|---|---|---|
| 348901 East 4300 Road, Pawnee, OK 74058 | Alpha | C & G | No | May 2 , 2013-Apr. 30-2016 |
| 16284 SR 29 Montrose, PA | C & G | C & G | No | Sept. 1, 2011- Feb. 28, 2015 |
| 12 Hall Street, 2nd Floor Binghamton, NY | C & G/ Charps** | C & G | No | Oct. 8, 2012-Oct. 8, 2013 (C&G); Oct. 31, 2013-July 1, 2014 (C&G Construction/Charps) |

| | | | | |
|---|---|---|---|---|
| 11 Hall Street, 2nd Floor Binghamton, NY | C & G/ Charps** | C & G | No | Oct. 31, 2013- July 1, 2014 (C&G/Charps) |
| 22342 U.S. Route 11 (3 Lots) Hallstead, PA | Charps* | Charps | No | Apr. 1, 2012- Mar. 31, 2014 |
| Office Building and 2 lots, Rt. 11 Great Bend Township, PA | C & G | C & G | No | Apr. 1, 2015- Mar. 31, 2016 |
| 530 Gaylord Road Susquehanna, PA | Charps | Charps | No | Oct. 21, 2013- Jan. 21, 2014 |
| 21353 Rt. 11 Great Bend Township, PA | Charps | Charps | No | Feb. 1, 2013- Feb. 1, 2014 |
| 9425 Laguna Springs Dr. Suite 200 Elk Grove, CA | Charps | Charps | No | Jun. 1, 2013- Mar. 31, 2015 |
| 40 Taylor Lane Hallstead, PA | C & G | C & G | No | Apr. 1, 2012- Jun. 30, 2012; Mar.1, 2014- Feb. 29, 2016 |
| 3 Lots Located on Rt. 11 Great Bend Township, PA | Charps/ C & G | C & G | No | April 1, 2011- Mar. 31, 2012 (C& G); Apr. 1, 2012-Mar. 31, 2014 (Charps) |
| 4928 104R Lane Northwest Suite 101 Williston, ND | Alpha | Alpha | No | Sept. 1, 2013- Aug. 31, 2018 |

| | | | | |
|---|---|---|---|---|
| 4928 104R Lane Northwest Suite 101 Williston, ND | Alpha | Alpha | No | Sept. 1, 2013-Aug. 31, 2018 |
| 2217 126th Avenue NW Watford City, ND | Alpha | C & G | No | Aug. 1, 2013-July 31, 2014 |
| 270 South Main Street St. Albans, VT | Alpha | C & G | No | July 15, 2013-Oct. 15, 2013 |
| 453 Tower St NW 2nd Floor West Wing Clearbrook, MN 56634 | Clearwater | C & G | No | Jan. 1, 2014-Dec. 31, 2019 |
| 527 Tower St NW Clearbrook, MN 56634 | Charps/ Clearwater | Charps/ Clearwater | Yes | Jan. 1, 2014-Dec. 31, 2019 (Charps); Jan. 1, 2014-Dec. 31, 2019 (Clearwater); Oct. 7, 2015-Sept. 30, 2022 (Charps) |
| 453 Tower St NW 1st Floor North Wing Clearbrook, MN 56634 | Clearwater | Clearwater | No | Jan. 1, 2014-Dec. 31, 2019 |
| 505 Tower St NW Clearbrook, MN 56634 | Clearwater | Clearwater | No | Jan.1, 2014-Dec. 31, 2019 (Clearwater); Oct. 7, 2015-Sept. 30, 2022 (Clearwater) |
| 453 Tower St. NW Clearbrook, MN 56634 | Clearwater | Clearwater | No | Jan. 1, 2014-Dec. 31, 2019 |

| Lot 2, 84 Lumber Subd. Aux Sable Township Grundy County, IL | Charps | NA *** | No | Aug., 1, 2016-Nov.30, 2016 |
| --- | --- | --- | --- | --- |
| 69 Cemetery Rd, Lancaster, NY 14086 | C & G | C & G | No | Feb. 18-2015-Present |

* Plaintiffs list C&G Construction as the contracting party.  A copy of written agreement demonstrates the correct signing party is Charps.  (K. Charpentier Decl. ¶ 31, Ex. 26).

** Both C & G and Charps are listed as contracting parties; however, Charps did not occupy the property.  (ECF No. 80-1 at 1).

*** Lease was produced on March 20, 2017.

(K. Charpentier Decl. at ¶ 33, Ex. 28).

Plaintiffs again conflate various analyses regarding movement of employees between the non-union entities similarly as with the issue of the leases.  (*See* ECF No. 170 at 15-20.)  Again, movements between Alpha (which was always intended to replace C&G) and C&G (which ultimately merged together in 2016) do not support the Plaintiffs' alter ego claim.

### 7.   Plaintiffs' Documents Fail to Support Their Premise.

a.   Plaintiffs cite Exhibit FF in support of their contention that employees performed work for different companies in the same week.  (ECF No. 170 at 20).  Again, Plaintiffs' cite to random unsubstantiated without foundation, as they do repeatedly in their Memorandum.  Whatever evidentiary value that unsubstantiated piece of note paper can be claimed to have, the note relates to C&G and Alpha—the two non-union entities—not

Charps.  Likewise, in Exhibit HH several timecards have one name crossed out and replaced with another are from C&G to Alpha.  (ECF No. 172-8 at 14-16).

b.      Plaintiffs mischaracterize various relationships. During the 2008-2009 construction season, C&G had an abundance of work in North Dakota, including two large projects for Hess: the Red Sky project and the 34 Inch project.  At the same time, Charps held few contracts and had little work. (K. Charpentier Decl. ¶ 43; Declaration of Kris Munter ("Munter Decl.") ¶ 2).

c.      To help fulfill the work on its North Dakota projects, C&G subcontracted a few employees from Charps to work on the C&G projects on a temporary, subcontract basis.  (K. Charpentier Decl. ¶ 44; Munter Decl. ¶ 3; *see also* E. Charpentier Decl. ¶¶ 2-4). Following its busy 2008-2009 construction season and completion of the Red Sky and 34 Inch projects, C&G began phasing out subcontracted work to Charps.  (Munter Decl. ¶ 4).

d.      Although C&G had largely stopped subcontracting work to Charps by 2010, a limited number of Charps employees, including Ed Charpentier and Mark Kulzer, continued to work as subcontractors on C&G projects.  (Munter Decl. ¶ 5; *see also* E. Charpentier Decl. ¶¶ 2-4).  Likewise, Danny Churness had specialized experience with hydrotesting, a process in which completed lines are filled with water and put under pressure to verify everything is correct.  Aside from those few individuals, C&G generally did not subcontract work to Charps employees. (Munter Decl. ¶¶ 5-6).

e.      These subcontracting arrangements were accounted for in the financial records of each company for that subcontracting work.  (Munter Decl. ¶ 7).  Charps made the full and proper regular pension fund contributions to the Funds for Charps employees

who did subcontracting work on C&G projects, including for their time on C&G projects. (K. Charpentier Decl. ¶ 45; Munter Decl. ¶ 8; E. Charpentier Decl. ¶ 7).  Ken Brien, the business agent for the Operating Engineers Local 49, knew that Charps employees were performing subcontracted work for C&G in North Dakota.  (K. Charpentier Decl. ¶ 46). Likewise, the Funds were aware that Charps employees were performing subcontracted work in North Dakota because auditors would routinely audit Charps and Charps submitted contribution reports to the Funds for those workers.  (K. Charpentier Decl. ¶ 46; Munter Decl. ¶ 9).

> This relationship was further addressed in the Defendants' Expert Report as follows:
>
> Each of the Defendant Companies pays its own payroll and benefits. However, on  occasion one company may subcontract with another related company. When this is done: (1) employees' wages and benefits are still paid out of the same company and (2) the labor and materials used are accounted for as intercompany transactions and recorded  on each company's books to properly record the expense, just as with any other  subcontracting relationship. The Defendant Companies account for the time and materials using its job cost system to insure these subcontracting costs are accounted for.
>
> (Kenyon Decl. ¶ 4, Ex. B at 33).

f.      It is not uncommon in the industry to have subcontracts for labor with other companies.   For just two of many examples, Charps was a subcontractor to Boldt Construction on a Boldt Construction project with Enbridge in Wisconsin. (Todavich Decl. ¶ 7).   Charps was also a subcontractor for labor to another competitor, Burns and McDonnell, for a project for the Koch terminal near Clearbrook, Minnesota.  (Todavich Decl. ¶ 8).  The existence of subcontractor relationships between two contractors in the

construction industry does not undermine the individual existence.  Rather, it is common

practice in the industry.  (*Id*.)

        g.      Plaintiffs also mischaracterize the testimony related to Mark Olson and his

role.  (ECF No. 170 at 19).  First, they cite a Romeoville October 1, 2010, work order that

involved an emergency oil leak.  (*Id. citing* ECF No. 172-8 at 12-14).  While it references

Charps/C&G, the job was performed exclusively by Charps using union labor.

(Declaration of Mark Olson at ¶ 5).  Additionally, Plaintiffs mischaracterize (again) the

deposition testimony of Kenneth Charpentier.   The relevant testimony of Kenneth

Charpentier actually provides as follows:

> **Q**      **Before he became the director of HR a year ago, was there any such position?**
> A      Yes.
> **Q**      **And who titled it then?**
> A      Mark Olson.
>       But it wasn't titled as a director of human resources, just it grew into.
> **Q**      **So before Mr. Wilson had that position, there was no such official title.  Correct?**
> A      Well, I guess the guy kind of wore two different shoes, Mark did.
> **Q**      **Was Mark's official title director of HR?**
> A      No.
> **Q**      **Did anybody have that title?**
> A      No, nobody had a title of HR.
> **Q**      **Or director of personnel, did anybody have that title?**
> A      I can't remember what it was called. As we were growing we kind of put people into place.

(ECF No. 172-9, Ex. EEE at 39-40).

8.    The Defendant Entities Often Pay Their Own Service Provider
Expenses.

Plaintiffs claim the Defendants' have cited no evidence to support that the various Defendant entities pay their own costs to service providers.   Again, Plaintiffs mischaracterize the record. The Financial Statements clearly reflect that the costs for various service providers have been paid for by the respective Defendants.  For example, the 2014 Financials show that the various entities had incurred the following legal and accounting expenses: Clearwater Energy $925,633; Charps $50,253; C&G $71,019; Alpha $203,509.  (ECF No. 82 ¶ 5, Ex. 8, *filed under seal*, at 30).  These individually accounted-for legal and accounting expenses undermine Plaintiffs' claim that the entities do not pay for their own service providers.  This is another fact issue very much in dispute.

9.    Plaintiffs Mischaracterize the Record regarding Human Resources
and Administrative Services.

Plaintiffs claim all of Defendants' employees reported to Ken Charpentier and then claim that they have  proved this point by citing three documents. The first document they cite is a draft of an organization chart from an outside consultant.  Notably, the inaccurate organizational chart, (ECF No. 172-5 at 99), was not even included in the final draft.  (K. Charpentier Decl. ¶ 42, Ex. 37).  The second exhibit cited is Exhibit P, an unsupported series of unrelated documents, the significance of which Plaintiffs do not clearly set forth. (*See* ECF No. 172-5 at 100-114).  Finally, Exhibit T is merely a list of email addresses and titles that provides no support for Plaintiffs' contention that all employees of each Defendant reported to Ken Charpentier.  (ECF No. 172-6 at 23).  Finally, to the extent that Ken Charpentier signed the safety policies or handbooks cited by Plaintiffs, (*see* ECF No.

172-3 at 44-48), he did so as owner.  Again, these records simply do not support Plaintiffs' contention that all employees reported directly to Ken Charpentier.

Plaintiffs further misconstrue the April 20, 2013 email that in passing referenced that "Note that Dave [Vasilakes], Scott [Wilson], Katie [Sorgaard], Brent [Hall] and Brenda [Omang] work for all the companies (as do Ken and myself).  Sandy [Gray], Beth [Rogstad] and Debbie [Vigil] are exclusively Alpha." (ECF No. 172-8 at 58-60). First, it obviously states that certain employees work exclusively for Alpha, which counters Plaintiffs' contention.  Second, the other identified employees worked for the holding company and as such did necessarily have some duties work that benefited "all the companies."  Defendants have repeatedly emphasized this point previously and the document does nothing to counter Plaintiffs' contention that hiring and firing decisions were made in the field by the various Defendant entities.  (See No. ECF 77 ¶ 16; ECF No. 75 ¶ 11; ECF No. 75 ¶ 13; ECF No. 82 ¶¶ 16, 17: ECF No. 82 ¶ 11).

Plaintiffs further attempt to misconstrue the termination of one particular Charps employee. (ECF No. 172-5 at 108).  The facts of the situation show an entirely different situation.  That employee was in the area news for having been arrested for and later convicted of soliciting a child to have sex.  (K. Charpentier Decl. ¶ 32, Ex. 27).  The serious and public nature of the particularly heinous conduct justified an atypical direct employment response directly from Ken Charpentier.

33

# ARGUMENT

## I.  Legal Standard.

Summary judgment is determined based on properly executed supporting positions set forth by "citing to particular parts of materials in the record" such as depositions, documents, affidavits, or other materials.  Fed. R. Civ. P. 56(c)(1)(A); *Kassa v. Kerry, Inc.*, 487 F. Supp. 2d 1063, 1067 n.1 (D. Minn. 2007) (Schiltz, J).

## II.  Inadequacy of Plaintiffs' Evidence.

Facts supported by inadmissible evidence must not be considered.  Fed. R. Civ. P. 56(c)(2).  "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012); *Darke v. Lurie Besikof Lapidus & Co., LLP*, 550 F. Supp. 2d 1032, 1044 (D. Minn. 2008) (Schiltz, J).

Plaintiffs attempt to introduce documents and obtain summary judgment without foundation.  Specifically, Plaintiffs' supporting affidavit by Amy Court does not comply with Rule 56(c)(4)'s requirement that authentication be based "personal knowledge."  *See* Fed. R. Civ. P. 56(c)(4).  These exhibits include emails between third parties, Defendants' business documents and other such documents with neither foundation nor context.  (ECF No. 175-5 at 54-56).  Plaintiffs' counsel does not have the personal knowledge to properly authenticate these documents.  Because Plaintiff fail to authenticate these documents through either an affidavit based on personal knowledge or a deposition, the evidence should be disregarded as inadmissible or otherwise insufficient for the purposes of

obtaining summary judgment. *See Gansen v. Cnty. of Rice*, 2005 WL 3159675, at *6 (D. Minn. Nov. 28, 2005) (Doty, J.); *El Deeb v. Univ. of Minn.*, 60 F.3d 423, 429 (8th Cir.1995); *Darke*, 550 F. Supp. 2d at 1044.

## III.   Clearwater, C&G, and Alpha Are Not Alter-Egos of Charps.

The Parties agree that the Eighth Circuit uses a strict corporate law alter-ego test in ERISA cases like this one. *Kansas City Laborers Pension Fund v. Superior General Contractors, Inc.*, 104 F.3d 1050, 1055 (8th Cir. 1997). Under that test, Plaintiffs must prove C&G and Alpha are controlled by Charps "to the extent [they have] independent existence in form only," and that Charps uses them as "a subterfuge to defeat public convenience, to justify wrong, or to perpetuate a fraud." *Id.*

### A.   Facts Issues Exists Regarding Independent Existence.

"Alter ego liability [permits] trustees to recover delinquent contributions from a sham entity used to circumvent the participating employer's pension obligations." *Painters Dist. Council No. 2 v. Paragon Painting Co.*, LLC, 2010 WL 455227, at *8 (E.D. Mo. Feb. 3, 2010). It provides a narrow exception to the rule that double-breasted businesses are not jointly bound by the union shop's CBA. *Superior General*, 104 F.3d at 1055. Here, C&G and Alpha were independently profitable companies. They were neither alter-egos of Charps nor subject to its CBAs.

In an alter-ego claim, the "seminal inquiry is whether two or more coexisting employers performing the same work are in fact one business, separated by form only." *Roofers Local 149 Security Trust Fund v. Duane Smelser Roofing Co.*, 285 F. Supp. 2d 936, 941 (E.D. Mich. 2003) (quotation omitted). Eighth Circuit courts evaluate ERISA

claims "using the corporate law standard for alter ego liability, not the less stringent labor law standard."[5]  *Dakotas & W. Minn. Elec. Workers Health & Welfare Fund v. All Cty. Elec. Co.*, 2004 WL 231330, at *3 (D.N.D. Feb. 3, 2004) (citing *Superior General*, 104 F.3d at 1055)).  In this Circuit, a plaintiff must prove the alleged alter-ego "(1) is controlled by another to the extent that it has independent existence in form only and (2) is used as a subterfuge to defeat public convenience, to justify wrong, or to perpetuate a fraud." *Superior General*, 104 F.3d at 1055 (distinguishing corporate from "more lenient" labor law standard, holding "control by one company over its alleged alter ego is necessary under the corporate law standard").

Alter-ego cases require a holistic evaluation of many factors.  *See Crest Tankers, Inc. v. Nat'l Maritime Union of Am.*, 796 F.2d 234, 237-38 (8th Cir. 1986); *Superior General*, 104 F.3d at 1055; *Reed v. Greenworks, Inc.*, 2015 WL 364602, at *3-5 (D. Minn. Jan. 27, 2015 (Keyes, Mag. J.); *Local #49 Operating Engineers Health & Welfare Fund v. Swenke*, 2005 WL 1430315 (D. Minn. Mar. 7, 2005) (Tunheim, J.); *Trustees of Resilient Floor Decorators Ins. Fund v. A&M Installations*, 395 F.3d 244 (6th Cir. 2005); *Helm & Associates*, 2011 WL 4688784, at *4 (N.D. Ohio Oct. 4, 2011).

Courts are not looking for perfection, but instead only disregard a company's corporate integrity when it truly is little more than a shell for another entity.  *Pipe Fitters*

---

[5] Courts evaluate ERISA claims under federal common law, but "the test for 'alter ego' under ERISA does not differ significantly from the [Minnesota] test for piercing the corporate veil[.]"  *Trustees of Graphic Commc'ns Int'l Union Upper Midwest Local 1-M Health & Welfare Plan v. Bjorkedal ("Bjorkedal I")*, 2006 WL 3511767, at *16 n.6 (D. Minn. Dec. 6, 2006) (citation omitted), *aff'd sub nom.* ("*Bjorkedal II*"), 516 F.3d 719.

*Health & Welfare Trust, Pipe Fitters Pension Trust & Pipe Fitters Local Union No. 562 v. Waldo R. Inc.*, 872 F.2d 815, 816 (8th Cir. 1989). For example, in the seminal *Superior General* case, defendant Bohnert owned three construction firms: Superior General (union), and Old and New Bohnert (both non-union). 104 F.3d at 1052-53. On summary judgment, the district court held the companies were not alter-egos even though (i) they shared ownership, accounting services, and office space, and (ii) they transacted extensively with each other. *Id.* at 1052-54. It pointed to other indicia of corporate separation, such as their separate management, books, operations, and workforces, plus their arms-length separation in inter-company transactions. *Id.* at 1054. The Eighth Circuit affirmed, articulating the corporate alter-ego test as the proper legal standard and finding "control and management of Superior General and New Bohnert were distinct and separate and . . . transactions between the two companies were negotiated at arms-length." *Id.* at 1055-56.

Similarly, the Sixth Circuit affirmed summary judgment for defendants in *Trustees of Resilient Floor Decorators Ins. Fund v. A&M Installations*. There, a union flooring installation company and a non-union carpet sales company were separately owned by family members, worked for the same customers, subcontracted with each other, and shared office space, warehouse space, personnel, and administrative functions. 395 F.3d at 245. The court held all of these facts "still failed to demonstrate [the companies] have substantially identical management, business, purpose, operation, equipment, customers, supervision and ownership." *Id.* at 248-49 (quotation omitted). It further noted "pervasive intermingling of funds and operations [is] necessary to support a finding that two

37

companies are alter-egos." *Id.* at 249; *accord Duane Smelser*, 285 F. Supp. 2d at 941-42 (denying summary judgment for plaintiffs even though one company failed to repay informal $420,000 loan from another and both shared managers and payroll services).

These case highlight the formidable factual showing required for an alter-ego claim and the impossible task faced by the Plaintiffs' on Summary Judgment here. The Eighth Circuit set this high threshold because courts give corporate integrity substantial deference. *See Superior General*, 104 F.3d at 1055. The evidence in the Plaintiffs' Motion for Summary Judgment comes nowhere near that threshold.

**B.     Charps, C&G and Alpha do not share a common identity.**

Alter-ego status requires more than just moderate overlap between related businesses – the alter-ego must have no "independent existence." *Superior General*, 104 F.3d at 1055. In fact, courts have held some overlap is permissible (indeed, inevitable) in closely-held companies lacking robust corporate divisions. *Greenworks*, 2015 WL 364602, at *5; *accord Bjorkedal I*, 2006 WL 3511767 at *15 ("[I]t is a rare corporation – especially a small corporation – that can pass every one of the [veil-piercing factors] with flying colors"). Thus, they do not require defendants to prove total and complete separation; summary judgment is appropriate if the companies are not "one business, separated by form only." *Duane Smelser*, 285 F. Supp. 2d at 941-42 (quotation omitted); *see also Superior General*, 104 F.3d at 1055; *A&M Installations*, 395 F.3d at 249; *Helm*, 2011 WL 4688784, at *6; *Greenworks*, 2015 WL 364602, at *11; *Brick Masons Pension Trust v. Indus. Fence & Supply*, 839 F.2d 1333, 1337 (9th Cir. 1988). Here, C&G and

38

Alpha were not hollow shells; they were active independent businesses with different client bases working in different regions generating their own significant revenues.

In *Greenworks*, the Court ruled against the plaintiff funds on facts even more favorable to them than the undisputed facts here. 2015 WL 364602, at *2-6, 10-11. There, a married couple split their landscaping business into two double-breasted entities – GWI (union) and GLCI (non-union) – and a nursery (GWN), all owned by a holding company (GWM). *Id.* at *2-4. They did so because union work was declining and GWI could not compete for non-union jobs. *Id.* The funds had audited the business several times with no adverse findings against GLCI, and when GWI renewed its CBA there was no discussion of GLCI being subject to it. *Id.*

Following a bench trial, notable since these cases are no suitable for summary judgment, the court held the companies were not alter-egos despite significant overlap. It noted each company complied with corporate formalities, hired its own workforce, maintained its own payroll, kept its own books and records, filed its own tax returns, had its own office in the parent company's building, ran its own operations, bid on and executed its own contracts, and was always capitalized and solvent. *Id.* at *4-5. It also found "no evidence that GLCI . . . was operated as a ruse or mere façade to avoid paying fringe benefits to workers covered by the agreement," but rather was set up "for the legitimate business purpose of competing in the highly competitive market for landscaping jobs that did not require union labor." *Id.* at *4, 11.

On the other hand, the court noted the companies transferred substantial funds between them without repayment schedules, used the parent company's shared services

without agreements, paid little or no rent for their office space, had cross-collateralized loans, and shared employees and managerial expertise. *Id.* at *5-6, 11.  However, the court found this entirely reasonable, explaining: "As might be expected in a small family enterprise, this was not run like a Fortune 500 company with separate divisions, independently managed subsidiaries, and firewalls keeping the various parts of the business apart."  *Id.* at *5; *accord Bjorkedal II*, 516 F.3d at 731 (declining to pierce veil despite inconsistent compliance with formalities).  Thus, the court assessed the facts holistically and concluded "none of this amounts to a showing that GLCI lacked an independent existence and was used as a subterfuge to perpetuate a wrongdoing or fraud." *Greenworks*, 2015 WL 364602, at *11.  Like the *Greenworks* companies, the Clearwater Companies are closely-held entities that maintain formal and substantive separations with some inevitable but outlier instances of overlap and imperfection.

Viewed in the context of the rapid growth of the businesses at issue here, the limited nature of the evidence cited by the Plaintiffs highlights the weakness of their case and comes nowhere near the standard necessary to obtain summary judgment.  While not total strangers to each other, these businesses were real, separate and existed for a legitimate business purpose.

## IV.  Defendants Existence Was Not a Subterfuge to Defeat Public Convenience, Justify Wrong or Perpetuate a Fraud.

### A.    C&G and Alpha Were Not Being Used for Any Improper Purpose.

Plaintiffs also must prove there are no genuine issues of material fact in dispute that C&G and Alpha were used "as a subterfuge to defeat public convenience, justify a wrong,

or to perpetuate a fraud." *Superior General*, 104 F.3d at 1055; *Greater St. Louis Const.*

*Laborers Welfare Fund v. Symmetry Landscaping, Inc.*, No. 2012 WL 1070097, at *11

(E.D. Mo. Mar. 29, 2012) (rejecting alter-ego claim where plaintiffs proved "control" but

not "subterfuge").  As *Greenworks* explained:

> [The alter-ego doctrine's] requirements of (1) loss of an independent
> existence to another's control, and (2) an element of wrongdoing, are best
> viewed together, with particular emphasis on the need to show some
> inequitable result from the arrangement between the two alter-ego entities.
> In this context, there is nothing wrong, in and of itself, with one company
> controlling another. It is only when the control of the puppet company by the
> puppet master is used as a subterfuge to defeat public convenience, to justify
> wrong, or to perpetuate a fraud that liability can arise.

2015 WL 364602, at *10 (quoting *Superior General*, 104 F.3d at 1055); *accord Flynn v.*

*Interior Finishes, Inc.*, 425 F. Supp. 2d 38, 53 (D.C. Cir. 2006) (holding alter-ego is "an

equitable doctrine [that] should not be invoked in the absence of inequity").  Here, as in

*Greenworks*, there is significant evidence that C&G and Alpha were created and existed

for legitimate business purposes, not as a subterfuge for any wrongdoing.

The crux of the "wrongdoing" inquiry is "whether an employer is using a non-union

company in a sham effort to avoid collective bargaining obligations." *Indus. Fence &*

*Supply*, 839 F.2d at 1336 (discussing labor law standard); *see also Slack v. Int'l Union of*

*Operating Engineers*, 83 F. Supp. 3d 890, 899 (N.D. Cal. 2015) (same).  In labor law cases,

the "Eighth Circuit[] [has] clearly stated that 'the focus of the alter ego doctrine . . . is on

the existence of a disguised continuance of a former business entity or an attempt to avoid

the obligations of a collective bargaining agreement[.]'" *Todd-Ford Mgmt.*, 2005 WL

354050, at *3 (*citing Iowa Exp. Distribution, Inc. v. N.L.R.B.*, 739 F.2d 1305, 1311 (8th

Cir.), *cert. denied*, 469 U.S. 1088 (1984)); *see also Crest Tankers*, 796 F.2d at 237 ("A critical part of the inquiry into alter ego status . . . is whether the employers acted out of anti-union sentiment or to avoid a labor contract.").

Plaintiffs cannot prove C&G and Alpha were used as a subterfuge for an improper purpose. Indeed, the Plaintiffs concede that Charps, the union entity, became successful and employed more and more union workers and paid more and more to the pension funds. There were numerous previous audits of Charps that found no material problems. (ECF No. 112 at 4; ECF No. 87-6 at 19, 67). *Brick Masons Pension Trust v. Indus. Fence & Supply, Inc.,* 839 F.2d 1333, 1337 (9th Cir. 1988) (holding evidence that "the number of union members employed by Industrial increased during the relevant period, notwithstanding the ffsimilaract that some Harris employees performed some work on Industrial jobs" supported finding of no alter-ego); *Greenworks*, 2015 WL 364602, at *2-3 (noting funds audited but made no adverse findings as to non-union company).

There was no wrongdoing here and the Plaintiffs' purported smoking gun email regarding Kris Munter actually runs counter to their argument. That email highlights work flowing from the non-union entity to the union entity, Charps. In spite of their having reviewed nearly a million documents, emails and detailed financial records, Plaintiffs have no compelling evidence. C&G and Alpha pursued legitimate business objectives: they bid on non-union contracts to build new oil field pipelines. *See Greenworks*, 2015 WL 364602, at *11; *accord Bjorkedal I*, 2006 WL 3511767, at *15 (declining to pierce veil because entity was a "real corporation" rather than a "façade," noting "[i]t is important in . . . veil piercing cases not to lose sight of the forest for the trees"). Neither siphoned money from

42

Charps such that it could not meet its obligations.  *See Bjorkedal I*, 2006 WL 3511767, at

*16 (finding no evidence of fraud where "[f]ar from siphoning corporate money that could

have been used to pay the Funds," owner used personal funds to support union company).

Indeed, the "forest" of Clearwater's history shows C&G and Alpha were not intended to

and did not serve as fronts for Charps.

## V.     The Contract Language Does Not Support Plaintiffs' Motion.

Plaintiffs also quote the language of Article I ("Coverage"), Section H of the

National Pipeline Agreement.  Plaintiffs make no meaningful argument concerning this

language, but to the extent they contend this provision supports an additional theory of

liability on summary judgment, such a theory is foreclosed by Section 8(e) of the National

Labor Relations Act.  Section 8(e) provides, in pertinent part:

> It shall be an unfair labor practice for any labor organization and any
> employer to enter into any contract or agreement, express or implied,
> whereby such employer ceases or refrains or agrees to . . . cease doing
> business with any other person, and any contract or agreement entered into
> heretofore or hereafter containing such an agreement shall be to such extent
> unenforceable and void . . . .

29 U.S.C. § 158(e).

The National Labor Relations Board, charged with enforcement and interpretation

of the Act, has held that labor agreement language substantially the same as that quoted by

Plaintiffs, violated Section 8(e).  In *Local 520, International Union of Operating Engineers*

*(Massman Construction),* 327 NLRB 1257 (1999), the union, in negotiations, demanded

an agreement provision as follows:

> The Employer shall require as a condition for entering into any joint venture
> or joint work undertaking or arrangement that all parties to the contract for

such undertaking or arrangement accept and agree to be bound by this
Agreement.  The Employer shall be responsible for compliance with the
requirement of this provision.

*Id.* at 1260.  The union subsequently engaged in a strike to force agreement to this language.

The Board found that the Union's demand for, and strike to obtain, such a provision

violated Section 8(e) of the Act because the clause attempted to control the signatory

employer's business relations even where the signatory employer had no control over the

labor relations of the joint venture.  *Id*. at 1257.  As such the clause placed unlawful

secondary pressure on non-signatory entities, and, further, was not covered by the

"construction industry" exception to Section 8(e), which is limited to subcontracting

agreements for work performed at jobsites.  *Id*.

In *The Blasters, Drillrunners and Miners Union Local 29 (RWKS Comstock)*, 344

NLRB 751 (2005), the Board affirmed an administrative law judge finding that the

following bargaining agreement provision violated Section 8(e):

To assure the maintenance of work opportunities, the Employer stipulates
that any firm engaging in Heavy Construction Work under Article VIII,
Section 1 and 2 of the Agreement, in which it has or acquires a financial
interest or is participating in a venture with other contractors or operators
shall be responsible for compliance with all of the terms and conditions of
this Agreement.

In that case the union, through arbitration, sought to require that a joint venture

partner of a signatory employer also be bound to the labor agreement based on this

language.  The ALJ, relying in part on *Massman Construction*, found the language violated

Section 8(e) because it sought to bind the non-signatory joint venturer to the agreement on

the sole basis of common ownership, in the absence of a showing that "the joint venture is not a separate person from the party having the labor agreement." *Id*. at 754.

Similarly, to the extent Plaintiffs contend the quoted language binds Charp's sibling businesses to the labor agreements based solely on common ownership, such an interpretation brings the language squarely within Section 8(e)'s prohibition on "hot cargo clauses," as reflected in the *Massman* and *Comstock* cases. Such an interpretation or application of this language is unlawful.

**VI.   Defendant Charpentier Should Not Be Held Personally Liable.**

   **A.   The Participation Agreements Do Not Provide a Basis for Personal Liability.**

Plaintiffs' claim against Mr. Charpentier individually cannot be sustained because the Trust Agreement under which the Health & Welfare Fund operates contains no provision for individual liability of corporate officers for the alleged delinquencies of corporate defendants. Furthermore, the Welfare Participating Agreement relied upon by the Plaintiffs to hold Mr. Charpentier personally liable does not evidence a clear intent to bind Mr. Charpentier to the purported obligations of Charps under that agreement. It should not be enforced against Mr. Charpentier.

Plaintiffs' argument for personal liability is that this Court previously "held" Mr. Charpentier is liable for any violations of the CBA that may ultimately be proven. (*See* ECF No. 107 at 5 n.3). However, the portion of the Court's Order that Plaintiffs are referring to is: (1) a footnote; and (2) was a denial of Defendants' Summary Judgment Motion, and not a grant of any motion brought by Plaintiffs. In fact, at the time of the prior

motions Plaintiffs argued nothing more than that Defendants should be denied summary judgment on this issue.  Therefore, on this issue, Plaintiffs have never previously even attempted to carry their summary judgment burden.

It is well established that Congress did not intend corporate officers to be liable under ERISA for the obligations of a corporation (absent the piercing of the corporate veil), though such officers could be held liable under ERISA if the fringe benefit plan imposes such liability on them.  *Rockney v. Blohorn*, 877 F.2d 637, 643 (8th Cir. 1989).  In the immediate case neither the Restated Agreement and Declaration of Trust for the Operating Engineers Local #49 Health and Welfare Fund, nor its amendments, contain any provision for the individual liability of corporate officers.  Plaintiffs have also produced no other plan documents or bylaws which they contend impose such individual liability.  As such there is no basis under *Rockney* for Mr. Charpentier's individual liability.  Furthermore, absent Trust Agreement or plan language authorizing such individual liability, its creation is simply beyond the authority of the Trustees.

Even if the Trustees, arguably, possessed such authority, the Participation Agreement language upon which Plaintiffs rely in alleging Mr. Charpentier's individual liability is insufficient.  As stated, a corporate officer is generally not liable for the corporation's debts.  *Trustees of the Minnesota Ceramic Tile and Allied Trades Retirement Fund v. His & Hers Ceramic Tile*, 2002 WL 507018, *1 (D. Minn. April 1, 2002) (citing *Haas v. Harris*, 347 N.W.2d 838, 840 (Minn. Ct. App. 1984)).  Extrinsic evidence may be admissible to show whether the parties understood the contract to bind the officer personally.  *Id.* (citing *Hubbs v. Leach*, 355 N.W.2d 470, 473 (Minn. Ct. App. 1985)).

46

Some courts require two signatures to show that the officer signed both on behalf of the corporation and also to assume personal liability. *Id.* at *2 (citing *Salzman Sign Co. v. Beck*, 176 N.E. 2d 74 (1961)).

In *Ceramic Tile,* an agreement requiring an employer to make contributions to certain funds did not evidence a clear intent to hold a corporate officer individually liable where the officer signed only on behalf of the corporation and the officer testified that she never intended to assume personal liability for the contributions. *Id.* The agreement purporting to bind the signing officer in *Ceramic Tile* contained language similar to that of the Local 49 Health & Welfare Participation Agreement, listing the identities of the parties bound: "[t]he Union, [t]he Undersigned Employer, and each of the Individuals, Partners, Officers, or Stockholders of the Employer of the Undersigned." *Id.* at *1. Also, the agreement *Ceramic Tile* did not contain a separate signature line whereby the signing officer would acknowledge individual liability. *Id.* at *2.

The facts are strikingly similar here. The Welfare Participating Agreement contains no separate signature line under which Mr. Charpentier separately agreed to assume individual liability. See Charpentier Declaration Ex..46. Rather, Mr. Charpentier executed the agreement under the caption "Employer Signatory," and noted his position as president of the company. Moreover, Mr. Charpentier had no communications with the Union or the Health & Welfare Fund regarding the assumption of personal liability, nor was it negotiated at the time of entering the Welfare Participating Agreement. In short, at no time did Mr. Charpentier agree to be bound personally by the terms of the Welfare Participating Agreement.

**B.      Even if Personally Bound, there Remains a Factual Dispute Regarding the Duration of the Personal Guaranty.**

The Plaintiffs also ignore the critical fact that even if the March 5, 2008, Participating Agreement establishes personal liability, that Participating Agreement, and therefore Mr. Charpentier's obligations under that Agreement, apply only to a small portion of the Audit Period.   The duration of that Participating Agreement corresponds to the durational period of the collective bargaining agreement referenced when the Participating Agreement states that the Employer "acknowledges receipt of copy of said collective bargaining agreement."  (K. Charpentier Decl. Ex. 46 at 3).  That collective bargaining agreement is the 2007-2008-2009 Builders Agreement, which Charps accepted on August 12, 2007, and which expired on April 30, 2010.  (K. Charpentier Decl. Ex. 47 at 1).  This is evidenced by the fact that it was the only applicable agreement existing at the time Mr. Charpentier signed the Participating Agreement on March 5, 2008.

Importantly, the Participating Agreement specifically states that contributions are to be made "under the same terms and conditions as are provided for in the collective bargaining agreement existing between the AGC and Local #49."  (K. Charpentier Decl. Ex. 46 at 3).   Thus, terms and conditions pertaining to contributions, including Mr. Charpentier's alleged personal liability obligations, are limited to the terms and period of the 2007-2010 CBA.  The critical fact, ignored by Plaintiffs, is that Mr. Charpentier never signed a successor Participating Agreement after the successor CBA was executed in 2010. Therefore, Mr. Charpentier's personal liability obligations cannot extend beyond the 2007-2010 CBA's contribution obligations.

History clearly illustrates that the alleged personal liability obligation of the Participating Agreement was confined to the period of each successive CBA. When Charps executed the 2001 Participating Agreement, that Participating Agreement incorporated the 2001-2004 CBA. (K. Charpentier Decl. Ex. 46 at 1). After executing the successor 2004-2007 CBA, Charps executed the 2005 Participating Agreement, which incorporated that CBA. (*Id.* at 2). Then, after executing the 2007-2010 CBA, Charps executed the 2008 Participating Agreement, which incorporated that CBA. (*Id.* at 3). The periods of the Participating Agreements, and thus of Mr. Charpentier's alleged personal liability obligations, correspond directly to the period of each CBA. But for the relationship between the Participating Agreements and the CBA's durational periods, there would have been no reason for the Fund to request execution of new Participating Agreements in 2005 and 2008.

The Fund's failure, for whatever reason, to request that Charps execute new Participating Agreements to correspond to the 2010-2013 CBA or the 2013-2016 CBA is therefore striking, and decisive as to the question of Mr. Charpentier's alleged personal liability for the period after 2010. Absent signed Participating Agreements for the periods corresponding to those CBAs, there can be no personal liability for Ken Charpentier for those periods.

## **CONCLUSION**

For the reasons stated above and the evidence in the record, the Court should deny Plaintiffs' Motion for Partial Summary Judgment.

Date:  April 7, 2017                     By:    s/Martin D. Kappenman
                                         Thomas R. Revnew (#295620)
                                         Martin D. Kappenman (#320596)
                                         Andrew G. Chase (#391935)
                                         SEATON, PETERS & REVNEW, P.A.
                                         7300 Metro Boulevard, Suite 500
                                         Minneapolis, Minnesota 55439
                                         Tel. (952) 896-1700
                                         Fax (952) 896-1704
                                         trevnew@seatonlaw.com
                                         mkappenman@seatonlaw.com
                                         achase@seatonlaw.com

                                         ATTORNEYS FOR DEFENDANTS, CHARPS
                                         WELDING & FABRICATING, INC.,
                                         CLEARWATER ENERGY GROUP, INC.
                                         F/N/A C & G HOLDING COMPANY OF
                                         CLEARBROOK, INC., C & G
                                         CONSTRUCTION INC. OF CLEARBROOK,
                                         ALPHA OIL & GAS SERVICES, INC., AND
                                         KENNETH CHARPENTIER