UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Glen Johnson, et al.,

               Plaintiffs,               Court File No. 14-cv-2081 (RHK/LIB)

     v.

                                       **REPORT AND RECOMMENDATION**

Charps Welding & Fabricating, Inc., et al.

               Defendants.

This matter came before the undersigned United States Magistrate Judge pursuant to an order of referral, [Docket No. 180], made in accordance with the provisions of 28 U.S.C. § 636(b)(1)(B), and upon Plaintiffs' Motion for Summary Judgment, [Docket No. 169]. The Court held a hearing on the Motion on June 8, 2017, and the motion was taken under advisement thereafter.

For the reasons set forth below, the Court recommends that Plaintiffs' Motion for Summary Judgment, [Docket No. 169], be **GRANTED in part and DENIED in part**.

## I.    BACKGROUND  AND STATEMENT OF ALLEGED FACTS

The parties to this case are familiar with the underlying facts and lengthy procedural history of the present case. Accordingly, this Court need not recite it in detail here. Generally speaking,

> This action [a]rises out of Defendants' alleged failure to make contributions to three multi-employer, jointly-trusteed fringe benefit plans (the "Funds") administered pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. § 1001 *et seq.* Plaintiffs are the trustees and fiduciaries of the Funds and have sued to recover the allegedly delinquent contributions and to conduct an audit of the books and records of Defendants Charps Welding & Fabricating, Inc. ("Charps"), Alpha Oil & Gas Services

("Alpha"), C&G Construction Inc. of Clearbrook ("C&G"), and Clearwater Energy Group, Inc. ("Clearwater"). Although only Charps signed the collective bargaining agreements ("CBAs") ostensibly giving rise to the obligation to contribute to the Funds, Plaintiffs also have sued Alpha, C&G, Clearwater, and their principal, Defendant Ken Charpentier, because, Plaintiffs allege, all are alter egos of one another and of Charps; alternatively, they argue all Defendants form a joint venture.

(Order, [Docket No. 107], 1).

Plaintiffs also allege Defendant Charpentier executed a Participating Agreement with Plaintiff Health and Welfare Fund (the "Welfare Participating Agreement") under the terms of which Charps and Defendant Charpentier individually agreed to contribute to the Health and Welfare Fund. (Compl., [Docket No. 1], 4-5). In addition, Plaintiffs allege that under the Welfare Participating Agreement, Defendants Charps and Charpentier were bound to contribute to the Health and Welfare Fund in accordance with the terms of Agreement and Declaration of Trust for the Health and Welfare Fund ("Welfare Trust Agreement") and to be held to the terms of the Welfare Trust Agreement. (Id. at 5).

Plaintiffs commenced this case on June 23, 2014. ([Docket No. 1]). Presently before this Court is Plaintiffs' Motion for Partial Summary Judgment, [Docket No. 169], which Plaintiffs filed on March 17, 2017. Plaintiffs seek summary judgment in their favor (1) "as to liability for their alter-ego claim" and (2) on their claim that Defendant Charpentier is personally liable for all contributions to the Operating Engineers Local #49 Health and Welfare Fund. (Mem. in Supp., [Docket No. 170], 1, 3-4). The Honorable Richard H. Kyle referred the Motion to the undersigned for report and recommendation on March 31, 2017. (Order, [Docket No. 180]). On April 7, 2017, Defendants filed their Memorandum in Opposition to the Motion, [Docket No. 184], and Plaintiffs filed their Reply Memorandum on April 14, 2017, [Docket No. 209].

## II.    STANDARDS OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A disputed fact is "material" if it might affect the outcome of the case, and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see, also, Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992).

The moving party bears the burden of offering sufficient admissible evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When deciding a motion for summary judgment, a court views the evidence before it in the light most favorable to the nonmoving party, and all reasonable inferences that may be drawn from the underlying facts in the record must be drawn in the favor of the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995); Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp., 950 F.2d 566, 569 (8th Cir. 1991). However, the "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007).

"'In general, only a party to a collective bargaining agreement is bound by its terms.'" (Citation omitted.) Trustees of the Graphic Comm's Intern. Union Upper Midwest Local 1M Health and Welfare Plan v. Bjorkedal, 516 F.3d 719, 727 (8th Cir. 2008). "[H]owever, in some instances, an employer which has not signed a labor contract may be so closely tied to a signatory employer as to bind them both to the agreement." Crest Tankers, Inc. v. Nat'l Mar.

<u>Union of Am.</u>, 796 F.2d 234, 237 (8th Cir. 1986). This closeness exists if the employer which is not a signatory is the alter ego of the signatory employer. <u>See</u>, <u>Id.</u>

The Eighth Circuit has held that in ERISA cases, application of the alter ego doctrine as developed in the arena of corporate law is appropriate. <u>See</u>, <u>Reed v. EnviroTech Remediation Servs., Inc.</u>, 834 F. Supp. 2d 902, 908 (D. Minn. 2011) (citing <u>Greater Kan. City Laborer's Pension Fund v. Superior Gen. Contractors, Inc.</u>, 104 F. 3d 1050, 1055 (8th Cir. 1997)). "[T]he alter ego doctrine as developed under corporate law provides that the legal fiction of the separate corporate entity may be rejected in the case of a corporation that (1) is controlled by another to the extent that it has independent existence in form only and (2) is used as a subterfuge to defeat public convenience, to justify wrong, or to perpetuate a fraud." (Citations omitted.) <u>Greater Kan. City Laborer's Pension Fund</u>, 104 F.3d at 1055.

However, whether a corporation is no more than an alter ego "'presents primarily an issue of fact' amenable to resolution at summary judgment 'when only one inference can be drawn from the' record. Because of the fact-intensive nature of the inquiry, [alter ego issues] 'should not normally be disposed of by summary judgment.'" <u>Twin City Carpenters Pension Master Trust Fund v. Phantom Const. Servs., LLC</u>, No. 13-cv-857 (RHK/TNL), 2014 WL 2213179, *6 (D. Minn. May 28, 2014) (citations omitted).

## III.    ANALYSIS

### A.  Alter-Ego Claim

In the present case, Plaintiffs argue that they are entitled to partial summary judgment on the issue of whether all Defendants are alter egos such that they are each bound to the CBAs. (Mem. in Supp., [Docket No. 170], 33-36). As set forth above, in order to be so entitled to partial summary judgment, Plaintiffs must show that there is no genuine dispute as to any fact material

to whether each Defendant company (1) was "controlled by another to the extent that it has independent existence in form only," and (2) was "used as a subterfuge to defeat public convenience, to justify wrong, or to perpetuate a fraud." <u>See</u>, <u>Greater Kan. City Laborer's Pension Fund</u>, 104 F.3d at 1055.

Initially, the Court notes that in their Memorandum in Support of their present Motion, Plaintiffs use citations to the record which do not specifically identify the corresponding entry number on the Docket at which the information can be found. Instead, Plaintiffs have provided a "Statement of the Record" at the beginning of their Memorandum in Support of their present Motion in which they list the abbreviations they use throughout the rest of the Memorandum. For example, the first item listed in the "Statement of the Record" is: "Defendants' Joint Memorandum of Law in Support of their Motion for Summary Judgment ("Def. Memo") Court Docket 74." (Mem. in Supp., [Docket No. 170], 4). Throughout the rest of Plaintiffs' Memorandum in Support of the present Motion for Summary Judgment, whenever Plaintiffs' counsel intends to cite to Docket No. 74, the citation reads, for example, "Def. Memo, pp. 3." (<u>See</u>, Mem. in Supp., [Docket No. 170], 6). This style of citation made analysis of Plaintiffs' citations to the record extremely cumbersome.

In addition, Plaintiffs often cited broadly and generally to multi-page Exhibits in the record without specific identification of the pages upon which support for Plaintiffs' assertion can be found or any explanation of how the Exhibit as a whole supports the assertion being made. For example, Plaintiffs assert: "[I]t is undisputed that, during the Audit Period, all Defendants operated out of three locations in Clearbrook, Minnesota: Highway 5 N Lot #4 Industrial Park, 453 Tower Street Northwest and 527 Tower Street Northwest. Court Decl., Ex. L, V, BBB, DDD." (Mem. in Supp., [Docket No. 170], 9). Exhibit L spans pages 1-53 of Docket

No. 172-5; Exhibit V spans pages 36 through 132 of Docket No. 172-6; Exhibit BBB is on page 5 of Docket No. 172-9; and Exhibit DDD is pages 23-48 through of Docket 172-9. Thus, Plaintiffs have cited to 175 pages in the record to support a single assertion, without further explanation. This style of citation also made analysis difficult.

Despite the foregoing, Plaintiffs acknowledged in their Reply Memorandum, "the Court 'is not required to speculate on which portion of the record [a] party relies, nor is it obligated to wade through and search the entire record for some specific fact that might support th[at] party's claim.[']" (Reply Mem., [Docket No. 209], 6 (quoting Mears v. Flint Hills Res., LLP, 16-cv-111 (RHK/KMM), 2017 WL 723895, *5 n.4 (D. Minn. Feb. 23, 2017). "'Judges are not like pigs, hunting for truffles buried in briefs.'" (Id.). Rule 56(c)(1) unequivocally states:  A party asserting that a fact cannot be . . . genuinely disputed must support the assertion by:  (A) citing to particular parts of the record . . . ." (Emphasis added.) When a party fails to cite the record with sufficient particularity, it fails to comply with Rule 56(c)(1)(A). See, Franklin v. Pinnacle Entertainment, Inc., 1 F. Supp. 3d 979, 984 (E.D. Mo. 2014).

As the moving party, Plaintiffs had the burden of supporting their Motion for Partial Summary Judgment with clear and precise citations to the record. See, Fed. R. Civ. P. 56(a). It is not the Court's duty to sift through this voluminous record to sua sponte search for evidence to support a Motion for Summary Judgment. See, Fed. R. Civ. P. 56(a), (e); See, also, Binion v. City of St. Paul, 788 F. Supp. 2d 935, 950 (D. Minn. 2011) ("This Court does not function as a research assistant for the parties. If [Plaintiff] is serious about her . . . claim, then it is her responsibility to brief it—and, in particular, to cite evidence in the record supporting it.").

Notwithstanding the Plaintiffs' failure to identify with sufficient specificity the portions of the record now before the Court which they believe support their Motion for Partial Summary

Judgment, the Court nevertheless has examined the extensive filings submitted in support of Plaintiff's Motion for Partial Summary Judgment and, as such, renders a Report and Recommendation on the merits of the Motion.

### i. Independent Existence (Prong One)

The Eighth Circuit has not established an exclusive list of factors for courts to consider when analyzing whether, under the first prong of the alter-ego test, one company "is controlled by another to the extent that is has independent existence in form only." Both the Eighth Circuit and District Courts within the District of Minnesota have found several relevant factors, including: commingling of funds or financial accounts, shared control and management of the companies, whether transactions between the companies were negotiated at arm's length, shared ownership of stock, observation of corporate formalities, shared officers, the timing of the establishment of the companies, shared insurance coverage, intercompany loans, and sharing of tools, equipment, and materials. See, e.g., Carpenters Dist. Council of Kan. City Pension Fund v. JNL Const. Co., Inc., 596 F.3d 491, 495-96 (8th Cir. 2010); Greater Kan. City Laborers Pension Fund, 104 F.3d at 1055-56; In re B.J. McAdams, Inc., 66 F.3d 931, 937 (8th Cir. 1995); Reed, 834 F. Supp. 2d at 908-09; Brady v. Borchart Indus., Inc., No. 5-cv-1386 (ADM/AJB), 2006 WL 3043138, *4-5 (D. Minn. June 6, 2011); Carpenters & Joiners Welfare Fund v. Wayne, No. 2-cv-779 (JNE/JGL), 2003 WL 21730105, *3 (D. Minn. July 21, 2003). The one constant in the case law is that courts take a holistic approach; recognizing that a determination of alter-ego status is very fact-specific. The Plaintiffs have not provided any authority which would suggest that any single factor is outcome determinative.

In the present case, Plaintiffs contend generally that a finding of alter ego status for all Defendants is supported by evidence showing:

During the Audit Period, Defendants (1) were jointly owned; (2) worked in the same locations; (3) performed the same type of work; (4) had the same customers; (5) shared physical space at their field and main office locations; (6) shared equipment and supplies; (7) had common management, field and office employees; (8) employees all reported to Charpentier who set compensation rates, titles, and classifications and who made hiring, firing, and payroll-related decisions for all; (9) paid each other's invoices and employees; (10) loaned each other significant sums of money with no arm[']s-length terms; (11) transferred tools, equipment and vehicles between themselves with no arm[']s-length terms; (12) performed services on each other's projects; (13) had centralized accounting and human resources; (14) were cross-collateralized; (15) had banking relationships with several of the same banks; (16) deposited funds made payable to one into another account; (17) shared service providers, including those relating to legal, accounting, tax, insurance, and investments; and (18) had common insurance policies.

(Mem. in Supp., [Docket No. 170], 33-34); (June 8, 2017, Motion Hearing, Digital Record, 1:48-2:21).

For ease of understanding, the Court has grouped Plaintiffs' main arguments as to the first prong of the alter-ego test into the following categories:  (a) Joint Ownership; (b) Same Work; (c) Shared Office Space, Office Supplies, and Equipment; (d) Shared Management and Administrative Services; (e) Shared Employees; (f) Shared Service Providers; (g) Intercompany Loans and Banking; and (h) Cross-Collateralization.[1] In addition, the Court need not individually address each and every one of the multitude of factual assertions Plaintiffs make to support their overarching argument that the Defendant Companies are independent in form only; instead, with regard to those factors about which a genuine dispute of material fact exists, the Court addresses only sufficient assertions to demonstrate the dispute of material fact.

---

[1] The Court further notes that Plaintiffs' Memorandum in Support of their Motion for Partial Summary Judgment contains many challenges to the veracity of assertions and allegations Defendants made in the course of the previous cross-Motions for Summary Judgment, filed in early 2016. (Mem. in Supp., [Docket No. 170], 6-27). However, Rule 56 does not allow the moving party to establish facts based upon contrary assertions of counsel within a memorandum in support of a previous motion. See, Casey v. Riedel, 195 F. Supp. 2d 1122, 1133 & n.2 (S.D. Ia. 2002) (noting that assertions of counsel without proper supporting affidavits are not sufficient basis upon which to grant summary judgment); see, also, FRCP 56(c)(1) (establishing ways in which to support an assertion that a fact cannot be or is genuinely disputed). The Court confines its consideration of the present Motion for Partial Summary Judgment to the evidence in the present motion record and the arguments now before it.

a.   Joint Ownership

As Plaintiffs argue, it is "undisputed that when each Defendant company was incorporated, [Defendant] Charpentier owned at least fifty percent." (Mem. in Supp., [Docket No. 170], 6). This assertion is supported by the admissible evidence in the record and is not controverted by Defendants. (See, Court Dec., Exh. L, [Docket No. 172-5], 9; Id. at Exh. A, [Docket No. 172-1], 2-4 (information produced in discovery by Defendants in response to Plaintiff's Interrogatory No. 9, which asked for identification of respective ownership interests at incorporation of each Defendant Company)). Similarly, Plaintiffs' assertion "that [Defendant] Charpentier and his wife equally own all voting stock of the holding company of which Charps, C&G, and Alpha are (or were) subsidiaries," (see, Mem. in Supp., [Docket No. 170], 6), is supported by undisputed evidence in the record and is not challenged by Defendants. (See, Court Dec., Exh. A, [Docket No. 172-1], 1-8).[2]

b.   Same Work

Plaintiffs assert:  "[I]t is undisputed that Alpha, Charps, and C&G all perform mainline pipeline construction, and fabrication, that Alpha and Charps both perform valve replacements, Charps and C&G both perform station and facility construction, emergency response work, facility and systems maintenance, and that C&G and Alpha both perform roustabout services." (Plf. Mem. in Supp., [Docket No. 170], 13). However, the only citation to the record Plaintiffs provide to support this assertion is to a November 8, 2010, email from Kris Munter (who, at the time, was Charps' Financial Manager) that explains different rates between work done by C&G's non-union crews and Charps' union crews on a single particular project. (Id.; see, also, Court

---

[2] However, Plaintiffs' assertion that it is "further undisputed that during the Audit Period, Charpentier and his wife [only] jointly owned each defendant," is not supported by the record, as the record shows additional owners—for example, when Alpha was incorporated in January 2011, Kris Munter owned 24.50% of the Alpha stock. (Court Dec., Exh. A, [Docket No. 172-1], 7).

Dec., Exh. M, [Docket No. 172-5], 55). This email provides no support for Plaintiff's broader assertion regarding the type of work done by all other Defendant Companies.

Plaintiffs further argue that in some instances where different Defendant Companies performed work on the same project shows that the Defendant Companies universally engaged in the same type of work. (June 8, 2017, Motion Hearing, Digital Record, 1:52-2:03). In support of this assertion, Plaintiffs cite again to Exhibit M. (Id. at 1:53-54). The email states:

> Originally Charps' sister company, C&G Construction (non union), was providing the 2 digging crews and welding crew in MI. Being non union we were able to offer a better price to Enbridge. However, after being out in that area for a period of time we were finding it difficult to continue providing the non union crews due to continued questioning from other contractors regarding the status of our employees. In discussions with Joe Richardson we agreed to switch to all union crews for Enbridge. We further agreed to split the difference on our rate sheet between union/non union from Sept 1 2010 [sic] to Dec 31, 2010[,] at which time they will all be on the same rates.

(Court Dec., Exh. M, [Docket No. 172-5], 55). Similarly, Plaintiffs cite generally to Exhibit N, which contains an inventory (on Charps letterhead) of invoices related to the Susquehanna Gathering Company, to show that Charps and C&G worked on the same project, and according to Plaintiffs, therefore performed the same work. (Court Dec., Exh. N, [Docket No. 172-5], 57; June 8, 2017, Motion Hearing, Digital Record, 1:53-54). Some of the expenses documented in the inventory correspond to invoices addressed to C&G Construction, while others correspond to invoices addressed to Charps. (Id. at 57-58, 60). Plaintiffs also cite to an August 23, 2013, email from an administrative assistant at C&G to Terri Godtland (one of Charps' principal accountants), Mike Bessler (one of D&G's principal accountants), and Kris Munter. (June 8, 2017, Motion Hearing, Digital Record, 1:59-2:00; see, also, Court Dec., Exh. L, [Docket No. 172-5], 8 (identifying Godtland), 21 (identifying Godtland); Id. at Exh. DD, [Docket No. 172-8], 10-11). The email indicates that certain expenses should be "charged to Charp's [sic]" because

C&G's "guys worked up there for yall [*sic*] for 2 weeks." (Id. at 11).[3] Plaintiffs contend that this evidence supports a finding as a matter of law that all Defendant Companies are independent in function only, which in turns supports granting Plaintiff's Motion for Partial Summary Judgment presently before this Court.

There is an important distinction in the context of summary judgment between sufficient admissible evidence to establish that there are no genuine issues of material fact on an issue which must be resolved as a matter of law in the movant's favor, and admissible evidence which could lead to an inference in the movant's favor. See, Twin City Carpenters Pension Master Trust Fund, 2014 WL 2213179, *5 (noting that "some of [the] items could support the conclusion that [Defendant] was abusing the corporate form and utilizing his companies as mere alter egos[, b]ut in the Court's view, the record does not ineluctably lead to that conclusion" so that summary judgment was denied). Indeed, such a distinction has already been recognized even in the present case. (See, Order, [Docket No. 107], 4-5 (noting there was "a plethora of evidence in the record from which a reasonable jury could conclude all Defendants are alter egos of one another" but noting that the Court was "not in a position to conclude – *as a matter of law*, on the present record – that all Defendants are alter egos" (emphasis in original))).

Adopting Plaintiffs' argument that the limited evidence they cite establishes conclusively that all Defendant Companies engaged universally in the same work would require this Court to draw an inference in Plaintiffs' favor. As this Court noted at the June 8, 2017, Motion Hearing, doing so is not compatible with the standard by which motions for summary judgment are decided. (June 8, 2017, Motion Hearing, Digital Record, 1:56-57). Rather, when deciding a

---

[3] Plaintiffs also cite to Exhibit CC, which is a May 30, 2008, timecard which records work by an employee of Charps and work by an employee of C&G, also summarily asserting that this supports a finding that all the Defendant Companies universally engaged in the same work. (June 8, 2017, Motion Hearing, Digital Record, 1:59-2:00; Court Dec., Exh. CC, [Docket No. 172-8], 6). It is unclear how a shared timecard shows that employees performed the same type of work.

motion for summary judgment, the Court must view the evidence before it in the light most favorable to the <u>nonmoving</u> party and all reasonable inferences that may be drawn from the underlying facts in the record must be drawn in the favor of the <u>nonmoving</u> party. <u>Ludwig</u>, 54 F.3d at 470. Therefore, despite Plaintiffs' request, the Court cannot find that the evidence Plaintiff cites in relation to this factor establishes that it is an undisputed fact as a matter of law that all Defendant Companies perform the same type of work. [4]

In fact, whether the Defendant Companies perform the same type of work <u>is</u> a genuinely disputed issue of material fact. Although there is evidence in the record which could support an inference consistent with the position advocated by Plaintiffs, there is also evidence in the record which could support the opposite inference Defendants advocate. (<u>See</u>, Mem. in Opp., [Docket No. 184], 5; <u>see</u>, <u>e.g.</u>, Court Dec., Exh. EEE, [Docket No. 172-9], 55-56 (June 6, 2013, deposition of Defendant Charpentier in which he testifies that Charps and Alpha did not do the same kind of pipeline work; <u>Id.</u> at Exh. FFF, [Docket No. 172-9], 87-88 (March 20, 2013, deposition of Danny Churness, a foreman laborer with Alpha, in which he testifies that the "[d]ifference between Charps and Alpha is union, Alpha's nonunion").[5]

c.  Shared Office Space, Office Supplies, and Equipment

Plaintiffs also argue that Defendants shared office space, office supplies, and equipment in the field. (Mem. in Supp., [Docket No. 170], 8-9). As Plaintiffs contend, there is some

---

[4] Similarly, the Court rejects Plaintiffs' argument that evidence showing that the Defendant Companies worked in the same states and on occasion had the same customers is sufficient to establish as a matter of law that all Defendant Companies are alter egos. (June 8, 2017, Motion Hearing, Digital Record, 1:53-2:02; Mem. in Supp., [Docket No. 170], 7). Working within the same state (or even on the same project) and on occasion for the same customer is not necessarily evidence that companies perform the same type of work, nor is it necessarily evidence of alter ego. Again, Plaintiffs seek a conclusion by this Court which would necessarily require the Court to draw inferences in Plaintiffs' favor, which is improper given the current procedural posture of this case, on Plaintiff's Motion for Partial Summary Judgment.

[5] In the current procedural posture, it is not for the Court to weigh the competing evidence as to which party might ultimately prevail at trial; it is simply the Court's role at this stage to decide whether there are disputes of material fact that require a trial.

admissible evidence in the record (in the form of Defendants' Answers to Plaintiffs' Interrogatory No. 6) which shows that each Defendant Company operated for at least part of the Audit Period out of office space located at one of three addresses in Clearbrook, Minnesota; or 527 Tower Street Northwest, Clearbrook, Minnesota. (Id. at 9; see, Court Dec., Exh. L, [Docket No. 172-5], 6, 19, 32, 45; Id. at Exh. BBB, [Docket No. 172-9], 5; Id. at Exh. DDD, [Docket No. 172-9], 23-28, 31, 36, 40-44, 47). In addition, there is some admissible evidence in the record (in the form of Defendants' Answers to Plaintiffs' Interrogatory No. 14) which shows that the Defendant Companies shared with one another or rented/leased to or from one another copy equipment, a phone system, network switches, wireless access points, power supplies, and conference room displays. (Mem. in Supp., [Docket No. 170], 12; see, also, Court Dec., [Docket No. 172], 4; Id. at Exh. Q, [Docket No. 172-5], 114-15).[6] Defendants do not point to any admissible evidence in the record to dispute these material facts; thus, for purposes of summary judgment, these facts are undisputed.

Plaintiffs also assert that there is undisputed evidence that the Defendant Companies "shared" tools and equipment. (Plf. Mem. in Supp., [Docket No. 170], 14-15; June 8, 2017, Motion Hearing, Digital Record, 2:19-22). Exhibit UU to the Amy Court Declaration consists of "tools and equipment lists produced by Defendants in discovery," and Exhibit VV to the Amy Court Declaration is information produced to Plaintiffs by Defendants in response to Plaintiffs' Interrogatory No. 15, which asked for "amounts involved, reasons for, consideration given and dates of transfer of any funds, assets, equipment, and property between Defendants." (Court Dec., [Docket No. 172], 8). Both Exhibits UU and VV show that equipment was owned by one

---

[6] Plaintiffs also assert that the "shared office space is owned by another related [but non-party], Charpentier owned, entity," citing an Affidavit by Plaintiffs' expert, Craig Siiro. (Mem. in Supp., [Docket No. 170], 9). However, the portion of the Siiro Affidavit to which Plaintiffs cite does not make a conclusion regarding ownership of the shared office space, nor does it identify this "related corporate entity" or assert that the entity is in fact owned by Charpentier. (See, Siiro Aff., [Docket No. 86], 3).

Defendant Company and on occasion used by another. For example, Alpha and C&G both used backhoes owned by Alpha, and C&G and Alpha both used Telehandlers owned by Alpha. (Court Dec., Exh. UU, [Docket No. 172-8], 80-81). Exhibits UU and VV do not show any rental income or other consideration for the use of equipment by a company other than the company that owned the equipment. Plaintiffs contend that this supports a finding that the equipment was shared freely between the Defendant Companies, which in turn they argue establishes that all Defendant Companies were independent in form only.

Defendants dispute Plaintiffs' interpretation of Exhibits UU and VV, arguing that the equipment was owned separately by individual companies and that any equipment owned by one company was used by another and proper rental income amounts were recorded and disclosed. (Mem. in Supp., [Docket No. 184], 18-19). Rather, Defendants argue that the fact that the equipment's ownership and use is tracked supports a finding that the Defendant Companies are separate and independent. (Mem. in Opp., [Docket No. 184], 18). Moreover, Defendants cite to Declarations in the record which explicitly aver that each Defendant Company purchase and owns its own equipment and that the Defendant Companies "separately purchase (and do not share) tools, equipment, and materials." (Baker Dec., [Docket No. 75], 3; Olson Dec., [Docket No. 76], 3; Todavich Dec., [Docket No. 77], 3; Munter Dec., [Docket No. 78], 4; E. Charpentier Dec., [Docket No. 79], 5; Van Vynckt Dec., [Docket No. 82], 4).

Once again, the parties differ on the interpretation or inferences to be drawn from the evidence in the record.

Plaintiffs ask the Court to draw an inference in their favor and conclude that this evidence of shared office equipment, offices in the same buildings, and the inter-company use of some equipment by a Defendant Company other than the one that owns the equipment, weighs in favor

of a conclusion that the Defendant Companies were independent in form only and, thus, weighs in favor of entering partial summary judgment in Plaintiffs' favor on the alter-ego issue.

In Matson Logistics Servs., LLC v. Smiens, No. 12-cv-400 (ADM/JSM), 2014 WL 793708, *9 (D. Minn. Feb. 27, 2014), United States District Judge Ann D. Montgomery addressed a similar situation, in which parties filing cross-motions for summary judgment on an alter ego claim disagreed on how facts in the record should be weighed and considered. Id. Judge Montgomery noted that "[t]he parties vigorously debate all the factors for veil piercing" by arguing different interpretation of the facts. Id. For example, the plaintiff claims that the individual defendant's:

> use of corporate funds showed that [Defendant] abused [the alleged alter ego's] corporate form. [Plaintiff] claims [Defendant] wrote himself and his wife checks from the corporate account and debited personal purchases on the corporate account. [Plaintiff] argues that this shows siphoning of funds by the dominant shareholder. [Defendant] argues that these purchases were part of his compensation and were too small to be considered siphoning in any event. [Defendant] also claims this compensation was appropriately reflected on his tax returns.

Id. Noting that the prongs of the alter ego analysis "rel[y] largely on fact finders' decisions about which party is accurate in their characterizations of competing facts," Judge Montgomery denied both motions for summary judgment on the alter ego claim. Id. Other courts within this District have similarly held that where parties "disagree about how the facts of this case impact the outcome of the corporate law alter ego test," summary judgment on an alter ego claim should be denied. See, Siepel v. John Heinlein Const., Inc., No. 7-cv-4643 (DWF/JJK), 2009 WL 1405223, *5 (D. Minn. May 18, 2009).

Similarly, in the present case, the parties' disagreement on how the evidence in the record relevant to the Defendant Companies' use of office equipment and field equipment, as well as,

the close proximity of their office spaces, weighs against the Court granting Plaintiffs' Motion for Partial Summary Judgment.

### d.  Shared Management and Administrative Services

Plaintiffs assert that the record shows that Defendant Charpentier provides constant oversight of all of the Defendant Companies, which they contend further supports conclusively that the Defendant Companies are independent in form only. (June 8, 2017, Motion Hearing, Digital Record, 2:03-13, 2:17-18; Mem. in Supp., [Docket No. 170], 20-22, 24-25). In support of this assertion, Plaintiffs point to Exhibit P, which they allege show Defendant Charpentier's involvement with the Defendant Companies "on all types of fronts." (June 8, 2017, Motion Hearing, Digital Record, 2:17-18). More specifically, Plaintiffs assert that "Charpentier set base compensation rates, titles, and exemption classifications for Defendants' employees"; he "made payroll-related decisions for employees"; and he "made employee discipline and termination decisions for Defendants' employees." (Mem. in Supp., [Docket No. 170], 25).

Exhibit P includes several items:  two emails from September and October 2013, in which Kris Munter provides Defendant Charpentier with a summary of business events of the prior week and requesting advice about future decisions; an email memorializing a conversation with Defendant Charpentier in March 2013, regarding base compensation rates, titles, and exemption classifications for employees; a letter from C&G stating in part that any questions regarding payment on a contract could be directed to Defendant Charpentier or to Chris Norgaard, Manager of C&G; a handwritten note dated January 1, 2009, reiterating "Ken['s]" instructions regarding payment of an employee; a May 13, 2014, email from Clearwater Energy Group Risk Manager/Human Resource Director Scott Wilson noting an inquiry from Defendant Charpentier about company liability for employee injury; a November 30, 2010, letter from

16

Defendant Charpentier to a C&G employee instructing the employee to turn over all of his company property and asking the employee to call Defendant Charpentier; a June 14, 2010, letter from Defendant Charpentier on C&G Holding letterhead explaining to an employee the wage decrease on a certain paycheck; an October 29, 2012, email from Munter relating an agreement Defendant Charpentier had made regarding pay for welders; an "Overview of Week 2/10/14 through 2/14/14" which notes a meeting "to discuss moving forward with the changes [Defendant] Charpentier requested take place"; and a cover letter addressed to Defendant Charpentier from an individual applying for the position of Integrity Dig Foreman on an unnamed job. (Court Dec., Exh. P, [Docket No. 172-5], 100-13).

Defendants respond that the foregoing collection of communications does not support Plaintiffs' broad assertion that all employees of all Defendants reported to Charpentier. (Mem. in Opp., [Docket No. 184], 32-33).

In further support of their joint-management argument, Plaintiffs also point to evidence in the record now before the Court that each Defendant Company is managed by an independent executive, but these independent executives are not signators on the bank accounts used for payroll. (Mem. in Supp., [Docket No. 170], 21); See, Baker Dec., [Docket No. 75], 3; Todavich Dec., [Docket No. 77], 3-4; E. Charpentier Dec., [Docket No. 79], 5; Charpentier Dec., [Docket No. 81], 8; Van Vynckt Dec., [Docket No. 82], 4; Court Dec., Exh. L, [Docket No. 172-5], 8, 21, 34, 47).[7] Defendants do not dispute this evidence; instead, Defendants argue that "the reality of

---

[7] At the June 8, 2017, Motion Hearing, Plaintiffs' counsel asserted that this Court should not take into account the Mark Olson Declaration submitted by Defendants because it is inherently contradictory when compared with other affidavits submitted by Defendants. (June 8, 2017, Motion Hearing, Digital Record, 2:05-08). To explain this inconsistency, Plaintiffs asserted that the record reflects that in a 2016 deposition, Charpentier identified Scott Wilson as the HR Director of Alpha and testified that Mark Olson was the previous HR Director of Alpha. (Id. at 2:05-06). Plaintiffs then asserted that Olson's Declaration states that he had only been employed by Charp's and that he only has the ability to bind and/or represent Charps, but other evidence in the record before the Court shows Olson signing contracts on behalf of Charps and on behalf of C&G. (Id. at 2:07-10). Therefore, Plaintiffs contend that this contradiction should result in the Court's disregard of Olson's Declaration. (Id. at 2:11-12). However, a

the modern financial and business world" does not require the independent leader of each Defendant Company to be a signator on a checking account and such status is not indicative of the individual's authority within the Defendant Company. (Mem. in Opp., [Docket No. 184], 24).

Plaintiffs additionally assert that Defendants produced in discovery "a single contact list for all Defendant office staff, and they jointly track the office staff's vacation and sick time." (Mem. in Supp., [Docket No. 170], 19). Yet, the portion of the record to which Plaintiffs cite to support this assertion consists of documents entitled "Unpaid Bills Detail" for Charps, and does not on its face support this assertion. (See, Court Dec., Exh. TT, [Docket No. 172-8], 76-78).

However, Plaintiffs also accurately assert that the record reflects that the various Defendants used joint human resource forms, letter-head, direct deposit authorizations, employment verification forms, and safety checklists, an assertion which is borne out by the record. (Mem. in Supp., [Docket No. 170], 25; See, e.g., Court Dec., Exh. F, [Docket No. 172-3], 95 ("Inquiry to Previous Employer [sic]" form authorizing release of information to "Charp's Welding/C&G Construction"), 101 ("Driving Record Request Form" for "Charp's Welding/C&G Construction"), 102 ("Injury Report" form for "Charp's C&G Construction"). In their Memorandum in Opposition, Defendants do not point to any evidence in the record that places this assertion in dispute.

---

review of the record reveals that Plaintiff's characterizations of Olson's Declaration and Charpentier's 2013 deposition testimony are not entirely precise. In his 2013 deposition, Charpentier identified Scott Wilson as Alpha's Director of HR, but when asked whether there was such a position prior to Wilson being Alpha's Director of HR, Charpentier replied, "Yes." (Court Dec., Exh. EEE, [Docket No. 172-9], 60). When asked "who filled it then," Charpentier replied, "Mark Olson. But it wasn't titled as director of human resources, just it grew into." (Id.). This is not the same as testifying that Olson was the Director of Human Resources at Alpha prior to Wilson. In addition, although Olson's Declaration states that when he worked for Charps as a construction manager, he had "authority to act on behalf of Charps only," ([Docket No. 76], 3), the Exhibits to which Plaintiff cite to show that Olson signed contracts on behalf of C&G do not show this. (Court Dec., Exh. EE, [Docket No. 172-8], 12-13 (a contract Olson signed on behalf of "Charp's Welding and Fabricating/C&G Construction"); Id. at Exh. EEE, [Docket No. 172-9], 60 (cited by Plaintiffs as page 39, deposition of Charpentier). Plaintiffs have not cited to any contracts signed by Olson solely on behalf of C&G. (See, Mem. in Supp., [Docket No. 170], 19). Therefore, Plaintiffs' argument as to why this Court should entirely disregard the Declaration of Olson is not persuasive.

Similarly, the record now before the Court contains an email dated April 20, 2013, in which Munter states that five individuals in addition to himself and Charpentier "work for all of the companies," as the safety director, equipment manager, fleet assistant, and with regards to Human Resources "and all things insurance related." (Court Dec., Exh. PP, [Docket No. 172-8], 59). The email also, however, identifies certain employees who work solely for Alpha, which Defendants contend shows the separate identities and functions of the various Defendant Companies. (Mem. in Opp., [Docket No. 184], 33).

In short, the parties' arguments regarding this factor, like many of the others discussed above, boils down to the parties' opposing interpretations and inferences to be drawn from the evidence in the record now before the Court;  and each party proffers differing opinions on the portions of that evidence which should be given the most weight. This again illustrates why fact-intensive inquiries such as a determination of alter-ego status are generally inappropriate topics for resolution through summary judgment.

e.   Shared Employees

Plaintiffs contend that a significant employee overlap—meaning that multiple employees worked for more than one of the Defendant companies—strongly supports a finding that the Defendant Companies were mere alter egos of each other. (Mem. in Supp., [Docket No. 170], 15-20). Plaintiffs have provided the Court with Exhibit JJJ to the Amy Court Declaration, ([Docket No. 172-9], 111-25), which Plaintiffs allege lists over 185 employees who "have worked for more than one entity, so would have worked for Charps, then Alpha, then C&G, or some combination therein during the audit period." (June 8, 2017, Motion Hearing, Digital Record, 1:52-55). Plaintiffs acknowledged on the record at the June 8, 2017, Motion Hearing that

Defendants dispute Plaintiffs' characterization of these employees as shared employees. (Id. at 1:54-55).

Once again, both Plaintiffs and Defendants cite evidence in the record which supports their assertions, yet Plaintiffs and Defendants interpret that evidence differently and argue opposite positions on the weight that should be given to that evidence. (See, Mem. in Opp., [Docket No. 184], 19-21). For example, Plaintiffs contend that there is significant employee overlap in that multiple employees worked for more than one of the Defendant companies, which Plaintiffs contend strongly supports a finding that the Defendant companies were mere alter egos of each other. (Mem. in Supp., [Docket No. 170], 15-20). Defendants do not deny there were employees who worked for more than one Defendant company, although Defendants deny that the periods each employee worked for the different Defendant companies did not overlap—each employee worked for only one Defendant company at a time. (Mem. in Opp., [Docket No. 184], 19-21). The parties dispute whether there is evidence of employees who worked for multiple Defendants at the same time, whether the employees worked for various Defendants at different times, and what evidentiary significance should be assigned to either question. Once again, the parties' disagreement on the interpretation and weight which should be given to certain evidence is an indication that summary judgment as to the alter-ego status is not appropriate.

f.  Shared Service Providers

Plaintiffs contend that Defendant Companies' lack of functional independence may also be seen in their use of the same providers for accounting, insurance, banking, and other services. (June 8, 2017, Motions Hearing, Digital Record, 2:17-20). It is undisputed that the Defendant Companies all maintain bank accounts at the same bank and that the same five individuals are authorized signors on all the accounts at that bank. (Court Dec., Exh. L, [Docket No. 172-5], 8,

21, 34, 47). In addition, there is some overlap on the individuals who perform services for the Defendant Companies. (See, Id. at 8, 47 (Mary Jo Jackson is identified as one of Charps' principal accountants and as the payroll preparer for both Charps and Clearwater)). Moreover, Charps, C&G, and Clearwater use the same workers' compensation carrier, and the record reflects that Charps, C&G, and Clearwater are covered under the same policy number. (Id. at 9, 21, 47). Charps and Clearwater also use the same firm for auditing, tax preparation, and legal advice on 401k audits; the same law firm; and the same human resources consulting firm. (Id. at 9, 48).

Defendants, however, direct this Court to portions of the Defendant Companies' Financial Statements, which they assert "clearly reflect that the costs for various service providers have been paid for by the respective Defendants." (Mem. in Opp., [Docket No. 184], 32). The Defendant Companies' Financial Statements do reflect different amounts paid by each Defendant Company for "Legal and Accounting," and "Insurance," for example. (See, e.g., Van Vynckt Dec., Exh. 1, [Docket No. 193], 35). Defendants oppose Plaintiffs' interpretation of the fact that the Defendant Companies share some service providers as conclusively supporting the claim that the Defendant Companies are independent in form only; Defendants argue that the evidence showing that they independently paid those service providers discretely creates a question of fact on their independence.

Again, this is a dispute over the interpretation of the evidence in the record which is not appropriate for resolution by way of summary judgment.

### g.   Inter-company Loans and Common Banking

Plaintiffs argue that there is evidence that the Defendant Companies transferred money and assets between themselves without formal agreements or repayment plans, and that this is

evidence which supports the conclusion that the Defendant Companies are independent in form only. (Mem. in Supp., [Docket No. 170], 22-24; June 8, 2017, Motion Hearing, Digital Record, 1:48-53). Plaintiffs cite generally to Exhibit NN, which contains 5 documents showing a "Loan Advance" from an account in Charps' name in the amount of $110,000 on May 13, 2010, which was deposited in part into an account in C&G's name. (Court Dec., Exh. NN, [Docket No. 172-8], 51-55). At the June 8, 2017, Motions Hearing, Plaintiffs also emphasized the evidence found in Exhibit G, which consists of records of money transfers totaling $11,845,000 made between the various Defendant Companies in the time period from February 7, 2013, to June 27, 2013. (June 8, 2017, Motion Hearing, Digital Record, 1:49-51; Court Dec., Exh. G, [Docket No. 172-3], 106-44).

Plaintiffs also direct the Court's attention to checks which were made out to one Defendant Company but deposited into the bank account of another Defendant Company. (Mem. in Supp., [Docket No. 170], 22-24). The record now before the Court contains copies of six checks totaling $192,028.63. (Court Dec., Exh. R, [Docket No. 172-6], 1-13). The checks, which are dated between November 2008 and May 2012, are from different remitters and are made payable to C&G, but each check is stamped on the back for deposit into Charps' bank account. (Id. at 2-13).

In addition, Plaintiffs assert that evidence in the record shows that credit card bills issued to one Defendant Company were paid by another. (Mem. in Supp., [Docket No. 170], 22-24; June 8, 2017, Motion Hearing, Digital Record, 1:48-53). In support, Plaintiffs cite generally to Exhibits S and WW. Exhibit S contains "Credit Card Detail[s]"[8] for Charps and C&G and "C&G Construction of Clearbrook Reconciliation Detail" pages, which list and resolve certain charges

---

[8] These are forms which contain columns in which to indicate the date, the job, a description of the charge, and the amount. (See, Court Dec., Exh. S, [Docket No. 172-6], 15-18, 20-21).

made on the respective credit cards during March, April, May, and June 2011. (Court Dec., Exh. S, [Docket No. 172-6], 15-22). There are handwritten notations which appear to indicate that some of the charges were made on behalf of an individual other than the person named on the credit card or were made for a Defendant Company other than the one issued the card. For example, a page entitled "Charp's Inc. Credit Card Detail" includes an entry dated April 7, 2011, for $74.44. (Id. at 18). Under this entry is a handwritten note:  "On Jason Paulson[']s card[.]" (Id.). The page also includes a signature and the notation:  "BWG Mike Torgerson." (Id.). The following page in Exhibit S is entitled "C & G Construction of Clearbrook Reconciliation Detail Paulson-0880, Period Ending 4/11/2011," and it includes an entry on April 7, 2011, for $74.44, attributed to "Mike T." (Id. at 19). On another page, a "Charp's Inc. Credit Card Detail" has the name "Jason P." handwritten at the top of the page. (Id. at 21). Next to the column to identify the related job is a handwritten note—"Charps' job"—yet each charge entered also has a handwritten notation next to it which says "C+G Card." (Id.). Exhibit WW contains a credit card bill addressed to C&G Construction, with an unsigned handwritten note on it that says:  "over the phone pd 9725.41 Charps 1st Int'l 9/15/10." (Court Dec., Exh. WW, [Docket No. 172-8], 102).[9]

Again, Plaintiffs argued at the June 8, 2017, Motion Hearing that Defendants' failure to produce contracts or other formal documentation regarding the inter-Company loans, transfers of money, and payment of credit card bills shows that the Defendant Companies share monetary resources to the extent that they are independent companies in form only. (June 8, 2017, Motion Hearing, Digital Record, 1:51-53). Plaintiffs also asserted at the June 8, 2017, Motion Hearing that Defendants admit such documentation does not exist and that loans between the Defendant Companies were repaid when they could be repaid. (Id. at 1:52-53).

---

[9] The remainder of Exhibit WW are pages entitled "Charp's Welding & Fabricating, Inc. Transactions by Payroll Item January through December 2012," which bear no apparent relation to Plaintiff's argument regarding the Defendant Companies' credit card charging and payment practices.

However, Defendants assert that the same evidence shows that although no formal loan documents were prepared and no interest was charged, intercompany loans were properly recorded on the books of each involved Defendant Company, and therefore, this evidence does not support a conclusive finding of functional dependence. (Mem. in Opp., [Docket No. 184], 17). This assertion is supported by the Expert Report of Defendants' Expert, Joseph D. Kenyon. ([Docket No. 185-1], 69 ("These intercompany loans were accounted for on each of the respective Defendant Companies' books. No formal loan documents were prepared nor interest charged between the companies. Our experience has been that this is not unusual for smaller closely-held companies.").

For the reasons already stated above with respect to the other factors, in the current procedural posture, it is not appropriate for this Court to draw the inference in Plaintiffs' favor which is necessary to declare as a matter of law, based upon the record currently before it, that the intercompany loans between the Defendant Companies are conclusive evidence that all the Defendant Companies exist independently in form only.

h.  Cross-Collateralization

Plaintiffs also assert that "throughout the Audit Period, it is undisputed that Defendants' assets were cross-collateralized at their joint banks." (Mem. in Supp., [Docket No. 170], 24). This is not a precisely accurate statement, as the Declaration upon which Plaintiffs base this assertion states:  "In May 2013, as the Companies' need for financing grew, their bank at the time, BMO Harris, forced them to cross-collateralize their assets under BMO's umbrella. . . . When the Companies switched from BMO to Associated Bank in June 2014, Associated Bank imposed the same cross-collateralization requirement." (Van Vynckt Dec., [Docket No. 97], 2). As Plaintiffs are aware, the Audit Period in the present case has been determined to be January 1,

2008, through March 17, 2017. (<u>See</u>, Mem. in Supp., [Docket No. 170], 1 n.1). Although

Defendants do not dispute that some of their bank accounts have been cross-collateralized since

May 2013, Defendants argue that this is not conclusive evidence that supports a finding of alter

ego status. (Mem. in Opp., [Docket No. 184], 38-40). The cases upon which Defendants rely

found that a defendant corporation was not the alter ego of another defendant corporation despite

cross-collateralization of their loans where the banks holding the loans required cross-

collateralization across the various defendant entities. <u>See</u>, <u>Reed v. Greenworks, Inc.</u>, No. 12-cv-

72 (JJK), 2015 WL 364602, *6-7 (D. Minn. Jan, 27, 2015) (noting, after bench trial, that

defendant businesses "had separate loan obligations . . . , but the bank required that the loans be

cross-collateralized across the [defendant] entities," and ultimately finding as a matter of law that

the defendant entities were not alter egos); <u>see</u>, <u>also</u>, <u>United Paperworks Int'l Union, AFL-CIO,</u>

<u>CLC v. Alden Corrugated Container Corp.</u>, 901 F. Supp. 426, 430, 437-38 (D. Mass. 1995)

(noting, after bench trial on stipulated facts, that upon restructuring on loans to various corporate

defendants, the issuing bank required cross-collateralization of the loans, and ultimately finding

that the facts of the case did not support a conclusion that corporate defendants were alter egos).

Like the other factors discussed above, the parties present different interpretations and

proposed applications of the evidence in the record now before the Court, and to choose between

those competing evidentiary conclusions or interpretations is not appropriate for resolution by

summary judgment.

### ii.  Use of Companies as a Subterfuge (Prong Two)

As to the second prong of the alter-ego test, Plaintiffs argue that the Court should grant

summary judgment because the Defendant Companies have failed to do more than deny that the

Defendant Companies were not used "to perform an end run around [the] CBA's contribution

requirements." (Mem. in Supp., [Docket No. 170], 36). However, in the present procedural posture, it is initially Plaintiffs' burden to offer sufficient admissible evidence to establish that there is no genuine dispute as to any material fact and [Plaintiffs are] entitled to judgment as a matter of law. See, Celotex Corp., 477 U.S. at 322. Therefore, it is Plaintiffs' burden initially to offer sufficient evidence to establish as a matter of law that the Defendant Companies are being "used as a subterfuge to defeat public convenience, to justify wrong, or to perpetuate a fraud." See, Greater Kan. City Laborer's Pension Fund, 104 F.3d at 1055.

Plaintiffs offer only a single email by Kris Munter in November 2010, which states that union crews from Charps took over work originally being done by non-union crews from C&G. (Mem. in Supp., [Docket No. 170], 36; June 8, 2017, Motion Hearing, Digital Record, 1:40-43; see, also, Court Dec., Exh. M, [Docket No. 172-5], 55).[10]

This is insufficient to show that the record contains conclusive admissible evidence to establish the second prong of the alter-ego test. As this Court noted at the June 8, 2017, Motion Hearing, this is a single email. (June 8, 2017, Motion Hearing, Digital Record. 1:43-44). Extrapolating improper use such as would justify granting summary judgment from a single email regarding union and non-union crews' work on a single project would require the Court to draw a questionable inference in Plaintiffs' favor, which, as stated above, would be improper in the context of the present Motion for Partial Summary Judgment. Moreover, despite Plaintiffs' focus on their assertion that Defendants have failed to produce sufficient credible evidence to

---

[10] Plaintiffs also summarily state, without any citation to the record, that "Defendants do not dispute in this litigation that they did not submit contributions on behalf of their non-union employees that performed work of the type covered by the CBAs." (Mem. in Supp., [Docket No. 170], 36). This argument by Plaintiffs is based on circuitous logic and is meaningless at this time. The parties dispute whether the non-signatory Defendants are even required to make contributions under the CBAs. Therefore, unless and until Plaintiffs obtain a final judgment that the non-signatory Defendants were required to make contributions to the Funds, the apparent lack of contributions to date serves to prove nothing. If Plaintiffs at trial are unable to convince the fact finder by a preponderance of evidence that the non-signatory Defendants were subject to the CBAs at issue, then their lack of contributions thereunder was entirely proper.

show that C&G and Alpha were <u>not</u> created for an improper purpose, (<u>see</u>, Reply Mem., [Docket No. 209], 6-7), <u>Celotex</u> clearly places the initial burden on Plaintiffs, as the moving party. <u>See</u>, 477 U.S. at 322. Plaintiffs have failed to meet that burden with respect to the second prong of the alter-ego test.

### iii.  Conclusion

In summary, viewing the evidence in the record currently before the Court in the light most favorable to Defendants and drawing all reasonable inferences in Defendants' favor, there are genuine disputes as to material facts which preclude the Court from granting Plaintiff's Motion for Partial Summary Judgment on the issue of the Defendant Companies' alter-ego status.[11] Plaintiffs have not met their burden of establishing conclusively as a matter of law that all the Defendant Companies have "independent existence in form only" and that they are being "used as a subterfuge to defeat public convenience, to justify wrong, or to perpetuate a fraud." <u>See</u>, <u>Greater Kan. City Laborer's Pension Fund</u>, 104 F.3d at 1055.

Moreover, even where some of the facts are undisputed, the parties nevertheless assert different interpretations of those facts. Both Plaintiffs and Defendants cite to evidence in the record which supports their assertions, yet Plaintiffs and Defendants interpret that evidence differently. These interpretational disputes render summary judgment inappropriate. <u>See</u>, <u>Matson Logistics Servs., LLC</u>, 2014 WL 793708, at *9 (noting that the prongs of the alter ego analysis "rel[y] largely on fact finders' decisions about which party is accurate in their characterizations of competing facts" and denying cross-motions for summary judgment on an alter ego claim).

In contrast, the few cases in which plaintiffs have prevailed upon motions for summary judgment on an alter ego claim are distinguishable and were extremely clear-cut. For example, in <u>Brady v. Swenke</u>, No. 3-cv-6381 (ADM/AJB), 2004 WL 2697282, *4 (D. Minn. Nov. 24, 2004),

---

[11] <u>See</u>, footnote 5, p. 12.

Judge Montgomery granted summary judgment on plaintiff's alter ego claim. In that case, however, the defendants <u>did not contest</u> that the first prong of the alter ego test was met. <u>Id.</u> at *3. Additionally, one company had "identical ownership and management, employ[ed] and pa[id] all employees, and share[d] office space with" the alleged alter ego. <u>Id.</u> The only issue for summary judgment was whether the second prong of the alter ego test was met and the defendant companies' only argument was that the arrangement between the two companies "was never concealed." <u>Id.</u>

The case most relied on by Plaintiffs in the present case to support their Motion for Partial Summary Judgment is <u>Twin City Pipe Trades Serv. Ass'n, Inc. v. S&S Thermo Dynamics, Inc.</u>, No. 12-cv-1417 (PAM/JJG), 2013 WL 3989945 (D. Minn. Aug. 2, 2013). (Mem. in Supp., [Docket No. 170], 33). That case does not control here, however, because it arose in a materially different procedural posture. Contrary to Plaintiffs' counsel's representation at the June 8, 2017, Motion Hearing, in <u>Twin City Pipe Trades Serv. Ass'n, Inc.</u>, United States District Judge Paul A. Magnuson <u>denied</u> the defendants' motions for summary judgment dismissing the Plaintiffs' alter ego claims. <u>Id.</u> at *1; (<u>see</u>, <u>also</u>, June 8, 2017, Motion Hearing, Digital Record, 2:21-23). Defendants, as the moving parties, were required to show that the plaintiff's alter ego claims would fail as a matter of law. Judge Magnuson found that the evidence in the record was sufficient to support a possible finding of alter ego, he did <u>not</u> find that the defendant companies <u>were</u> alter egos as a matter of law. Judge Magnuson <u>denied</u> the defendants' motion for summary judgment because there were genuine issues of material fact. <u>Id.</u> at *4-6. <u>Twin City Pipe Traders Serv. Ass'n</u>, <u>supra</u>, more accurately is consistent with this Court's Recommendation.

More comparable to the present case is <u>Siepel v. John Heinlein Const., Inc.</u>, No. 7-cv-4643 (DWF/JJK), 2009 WL 1405223, *2 (D. Minn. May 18, 2009), in which the two defendant companies the plaintiff asserted were alter egos used the same office space (which one company "rented" from the other in exchange for the services of that company's bookkeeper), shared equipment, and shared vehicles. However, the defendant companies also purchased materials separately, separately bid on and entered into contracts, held separate bank accounts, held separate insurance policies, and filed separate tax returns. <u>Id.</u> United States District Judge Donovan W. Frank held, in that case, that summary judgment on the alter ego claim was inappropriate because of the disputes of material fact on the record before him. <u>Id.</u> at*5.

Similarly, in <u>Moore v. Advantage Office Servs., Inc.</u>, No. 9-cv-2463 (SRN/JJK), 2011 WL 2193848, *2 (D. Minn. June 6, 2011), certain facts (shared office space, common ownership, and use of one person to schedule employees) weighed in favor of finding the companies had no independent existence, but other facts (separate books, separate payroll, separate tax filings, separate mailing addresses and checking accounts, no shared tools, and different services offered) weighed in favor of finding independence. United States District Judge Susan Richard Nelson cited <u>Siepel</u>, <u>supra</u>, and she similarly concluded that summary judgment on the issue of whether or not the defendants were alter egos was inappropriate due to genuine disputes of material fact. <u>Id.</u> at *3.

There are genuine disputes of fact material as to various factors which influence the determination of alter-ego status, along with the parties' differing interpretations or inferences to be drawn from even those facts which are undisputed. Accordingly, the Court recommends that Plaintiffs' Motion for Partial Summary Judgment be **DENIED** to the extent that it seeks a ruling in Plaintiffs' favor on the issue of the Defendant Companies' alter-ego status.

### B.  Defendant Charpentier's Personal Liability

Plaintiffs additionally assert that they are "entitled to partial summary judgment [on] their claims that Charpentier personally guaranteed his companies' liability to the Operating Engineers Local #49 Health and Welfare Fund." (Mem. in Supp., [Docket No. 170], 36).

At the June 8, 2017, Motion Hearing, Plaintiffs' counsel clarified that Plaintiffs are seeking an Order from the Court finding that, regardless of the Court's finding on the alter ego issue, Defendant Charpentier is personally liable—based on contract principles and the language of the participating agreement—for all contributions to the Health & Welfare Fund which are due and owing for Defendant Charps. (June 8, 2017, Motion Hearing, Digital Record, 2:54-56). Also at the June 8, 2017, Motion Hearing, Defendants argued that there is case law both in support of and against a finding that the language in this agreement binds Defendant Charpentier as a signor of the participating agreement such that he is personally liable for contributions owed by Charps. (Id. at 2:49-50).

As Plaintiffs note, United States District Judge Richard H. Kyle appears to have already addressed and resolved the issue of whether the participating agreement at issue in the present case renders Defendant Charpentier personally liable for contributions to the Health and Welfare Fund owed by Defendant Charps. (See, Mem. in Supp., [Docket No. 170], 36). In an Order entered in this case on June 27, 2016, Judge Kyle stated:

> Plaintiffs argue that Charpentier, the owner and incorporator of each corporate Defendant, is personally liable for unpaid contributions based on a document entitled "Participating Agreement," which Charpentier signed on behalf of Charps several times. (Doc. No. 80 at 13 ("If this Agreement is signed for and [on] behalf of a corporation, the officer [] signing for such corporation by the execution of this Agreement not only binds the corporation but individually binds himself to the full and faithful performance of the Agreement stated herein.").) Defendants argue that while Charpentier signed the Agreement, he should be dismissed because "there is no evidence he understood and intended to be personally bound by [the Agreements]." Yet, a corporate officer may be liable

30

> under ERISA if he contractually agrees to liability. Moreover, a party's *outward* manifestation of intent is determinative—subjective intent is irrelevant. <u>Here, the Participating Agreement unambiguously imposes personal liability on Charpentier for any alleged CBA violation yet to be proven.</u>

(Emphasis added.) (Citations omitted.) (Order, [Docket No. 107], 5 n.3).

It is apparent to the undersigned that Judge Kyle has already ruled upon the issue once again presented by the parties. (<u>Id.</u>). In addition, as Judge Kyle noted in his June 27, 2016, Order, there are at least two other cases within the District of Minnesota in which identical contract language has been found to impose personal liability upon an individual signing a participating agreement on behalf of a corporation. <u>See</u>, <u>Id.</u> (citing <u>Operating Engineers Local #49 Health & Welfare Fund v. Arrowhead Indus. Serv., Inc.</u>, No. 10-cv-624 (MJD/LIB), 2011 WL 1456781, *2 (D. Minn. Apr. 15, 2011), and <u>Malcolm v. Harden & Harden, Inc.</u>, No. 3-cv-5211 (JRT/FLN), 2004 WL 2203407, *2 (D. Minn. Sept. 23, 2004)). Moreover, since the June 27, 2016, Order, identical contract language in a participating agreement has been similarly interpreted in yet another case. <u>See</u>, <u>Johnson v. Allied Excavating, Inc.</u>, No. 15-cv-3237 (JRT/DTS), 2017 WL 1194196, *6 & n.8 (D. Minn. March 30, 2017).

The record before this Court further reflects that neither party timely sought the Court's permission to file a motion to reconsider Judge Kyle's June 27, 2016, Order pursuant to Local Rule 7.1(j). However, despite the language quoted above, the June 27, 2016, Order, ultimately denied the cross-Motions for Summary Judgment at issue before the Court, and it did not formally grant Plaintiffs partial summary judgment on the question of Defendant Charpentier's personal liability under the Participating Agreement for contributions to the Health and Welfare Fund due by Defendant Charps. (Order, [Docket No. 107], 6).

In light of the language of the June 27, 2016, Order and the multiple other cases within the District of Minnesota which have reached the same conclusion regarding the contract

31

language at issue, the undersigned recommends that the Court **grant** Plaintiffs' Motion for Partial Summary Judgment to the extent that Plaintiffs request a finding that the Participating Agreement imposes personal liability upon Defendant Charpentier for any CBA violation of the Health and Welfare Fund by Defendant Charps as may ultimately be proven.

## IV.    CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiffs' Motion for Summary Judgment, [Docket No. 169], be **GRANTED in part** and **DENIED in part**, as set forth above.

Dated: July 26, 2017                                       s/Leo I. Brisbois
                                                          The Honorable Leo I. Brisbois
                                                          United States Magistrate Judge

## N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).