UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Glen Johnson, Timothy Gillen,
Kyle Jones, Steven Hall, Clayton
Johnson, Mark Hubbard, Steve Piper,
and Bill Patt, Trustees of the Operating
Engineers Local #49 Health and
Welfare Fund; Michael R. Fanning,
Fiduciary of the Central Penson Fund of
the International Union of Operating
Engineers and Participating Employers;
Joseph Ryan, Bruce Carlson, Glen
Johnson, Frank Frattalone, Lee Hiller,
Tony Phillippi, Greg Waffensmith, and
Mark Ryan, Trustees of the Local #49
International Union of Operating
Engineers and Associated General
Contractors of Minnesota Apprenticeship
and Training Program; The Operating
Engineers Local #49 Health and Welfare
Fund; The Central Pension Fund of the
International Union of Operating
Engineers and Participating Employers;
and The Local #49 International Union
of Operating Engineers and Associated
General Contractors of Minnesota
Apprenticeship and Training Program,

      Plaintiffs,

v.

Charps Welding & Fabricating, Inc.;
Clearwater Energy Group, Inc. f/k/a
C & G Holding Company of Clearbrook,
Inc.; C & G Construction Inc. of
Clearbrook; Alpha Oil & Gas Services,
Inc.; and Kenneth Charpentier,

      Defendants.

Civ. No. 14-2081 (PAM/LIB)

**MEMORANDUM AND ORDER**

This matter is before the Court on the parties' cross-Motions for Summary Judgment and Defendants' Daubert Motion. For the following reasons, Plaintiffs' Motion is denied, Defendants' Motion for Summary Judgment is granted, and Defendants' Daubert Motion is denied as moot.

**BACKGROUND**

This lawsuit stems from Defendants' alleged failure to make contributions to three multi-employer, jointly trusteed fringe benefit plans (the "Funds") administered pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. Plaintiffs are the trustees and fiduciaries of the Funds, and they brought this action to audit Defendants and recover contributions that Defendants allegedly owe to the Funds. Plaintiffs sued Defendants Charps Welding & Fabricating, Inc. ("Charps"), Alpha Oil & Gas Services ("Alpha"), C&G Construction Inc. of Clearbrook ("C&G"), and Clearwater Energy Group, Inc. ("Clearwater"), claiming that they formed a joint venture or joint enterprise or, in the alternative, that Alpha and C&G were alter egos of Charps. Plaintiffs also claim that Defendant Kenneth Charpentier is personally liable for any delinquent contributions to the Funds.

Charpentier founded Charps in 2000. (Parker Decl. (Docket No. 279) Ex. 1 (Charpentier Dep.) at 14.) Charps originally focused on miscellaneous welding repairs in Minnesota, but its work eventually shifted to maintaining oil and gas pipelines. (Id. at 18; Olson Decl. (Docket No. 76) ¶ 3.)

Charps signed three collective bargaining agreements ("CBAs"), which ostensibly give rise to Charps' obligation to contribute to the Funds. (Johnson Decl. (Docket Nos.

270-1, 270-2, 270-3) Exs. 1-3; see also Charpentier Dep. at 19-20.) Charps and its principal, Charpentier, also executed a Participating Agreement with the Operating Engineers Local #49 Health and Welfare Fund. (Johnson Decl. (Docket No. 270-4) Ex. 4.) Plaintiffs aver that Charpentier's personal liability to the Funds stems from this agreement. In total, Charps made contributions on 92% of its hours reported, or more than 2.9 million hours, to various union funds during the audit period, including the Funds at issue here. (Parker Decl. Ex. 8.)

In 2005, Charpentier and a partner, Greg Grensteiner, founded C&G in order to find new work outside Minnesota. (Charpentier Dep. at 21-22.) Grensteiner ultimately found non-union work for C&G installing polyethylene pipelines for the gas industry in North Dakota. (Id. at 22, 34-35, 38; Parker Decl. Ex. 2 (Charps Dep.) at 10-11.) And Charpentier founded Clearwater as a holding company for Charps and C&G around the same time. (Charpentier Dep. at 24-27.)

In 2011, Kristopher Munter, Charpentier, and Charpentier's brother established Alpha. (Charpentier Decl. (Docket No. 81-3) Ex. 14; Munter Decl. (Docket No. 78) ¶ 8.) Alpha and C&G performed the same work, and until Alpha could obtain a competitive safety rating, the two companies essentially operated "side-by-side." (Charpentier Dep. at 28-29; Ed Charpentier Decl. (Docket No. 79) ¶ 21.) Ultimately, C&G absorbed Alpha in 2016. (Parker Decl. Ex. 4 (C&G Dep.) at 27.)

As affiliated companies, Charps, C&G, and Alpha had similarities. Charps worked primarily in Minnesota, Wisconsin, and Illinois. (Munter Decl. ¶¶ 6-7.) The majority of C&G's and Alpha's work came from two customers in North Dakota. (See, e.g., C&G

3

Dep. at 29.) However, as discussed below, Defendants all performed work in the oil and gas industry, sometimes shared employees, and occasionally worked in the same locations. They also shared office space for at least part of the audit period, although each Defendant had separate field offices. Additionally, Munter served as the financial manager for Charps, C&G, and Alpha. (Lawrie Decl. (Docket No. 281-4) Ex. 7 (Munter Dep.) at 8-11.) And the Defendant companies shared phones, power supplies, conference room displays, and Internet services. (Docket No. 218 at 13.) Finally, each Defendant maintained its own bank account and financial records, but the record contains evidence that Defendants freely exchanged funds and shared a common line of credit.

By February 2017, C&G's assets had been sold to two different companies; it no longer performs work and has no employees. (2d Charpentier Decl. (Docket No. 197) ¶ 2.) Clearwater and Charps were also sold to a non-party, Charps, LLC. (Id. ¶¶ 3-4.)

Plaintiffs commenced this lawsuit on June 23, 2014, claiming breach of contract/right to audit, alter ego, joint venture/joint enterprise, and ERISA damages pursuant to 29 U.S.C. § 1132. (Compl. (Docket No. 1).) Discovery was initially bifurcated, and after the parties' first cross-Motions for Summary Judgment on June 27, 2016, the Court concluded that Plaintiffs were entitled to additional discovery. (Docket No. 107.) After that period of additional discovery, Plaintiffs moved for partial summary judgment on their alter-ego claim and on the issue of Charpentier's personal liability to the Funds. (Docket No. 169.) The Court granted in part and denied in part Plaintiffs' Motion, concluding that factual disputes precluded summary judgment on the alter-ego claim and

4

that the Participating Agreement imposed personal liability on Charpentier for any violations of the CBAs. (Docket No. 218 at 27-28, 31-32; Docket No. 231.)

Following a status conference on November 21, 2017, the Court reopened discovery and allowed the parties to file renewed dispositive motions. (Docket No. 239.) Discovery is now complete, and the parties again filed cross-Motions for Summary Judgment. (Docket Nos. 247, 269.) Defendants also moved to exclude Plaintiffs' expert, Mr. Craig Siiro. (Docket No. 273.)

**DISCUSSION**

**A.     Summary Judgment**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must view the evidence and inferences that "may be reasonably drawn from the evidence in the light most favorable to the nonmoving party." Enter. Bank v. Magna Bank of Mo., 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). A fact is material if it might affect the outcome of the case, and a dispute is genuine "if the evidence is such that a reasonable [fact-finder] could return a verdict for the nonmoving party." Id. at 248.

As an initial matter, the parties each contend that their opponent has not adequately supported or cited to their factual allegations. At summary judgment, a party's factual assertions must be cited with sufficient particularity to the record. Fed. R. Civ. P. 56(c)(1)(A). Plaintiffs argue that Defendants' opposition brief "contains hundreds of factual assertions" that rely "almost exclusively on uncorroborated after-the-fact Declarations." (Pls.' Reply Mem. (Docket No. 306) at 6.) But Plaintiffs do not identify the specific factual assertions to which they refer. Without specifics, the Court will not reject Defendants' factual averments. Defendants contend that Plaintiffs' briefs contain inadequate citations to the record. The Court agrees that Plaintiffs' citations to the record are at times inadequate.

The Court has previously criticized Plaintiffs' citations to the record. (Docket No. 218 at 5-6; Docket No. 149 at 12 n.3.) In their memoranda on the present Motions, Plaintiffs again fail to cite the record with sufficient particularity. For example, Plaintiffs broadly referenced 11 exhibits, each containing numerous multi-page documents, to support their assertion that Defendants intentionally misreported work performed by their employees. (See Pls.' Opp'n Mem. (Docket No. 297) at 39 (citing Lawrie Decl. (Docket No. 282) Exs. 71-75; Lawrie Suppl. Decl. (Docket No. 296) Exs. 116, 118, 129, 131, 154, 156).) "A district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the . . . party's claim." Gilbert v. Des Moines Area Cmty. Coll., 495 F.3d 906, 915 (8th Cir. 2007) (quotation omitted); see also Fed. R. Civ. P. 56(e). And "summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would

convince a trier of fact to accept its version of the events." Steen v. Myers, 486 F.3d 1017, 1022 (7th Cir. 2007) (citation and quotations omitted). Thus, the Court addresses Plaintiffs' arguments to the extent that they cited to the record with sufficient particularity.

1.  **Plaintiffs' Claims**

Plaintiffs claim that Defendants are obligated to contribute to the Funds because the CBAs cover work Defendants performed as a joint venture or a joint enterprise, or that C&G and Alpha are alter egos of Charps. Defendants argue that they are affiliated but separate companies.

The Court begins by examining the CBAs' language. Anderson v. Alpha Portland Indus., Inc., 836 F.2d 1512, 1517 (8th Cir. 1988). Here, the CBAs state:

> If and when Employer shall perform work covered by this Agreement under its own name, under the name of another, as a corporation, company, partnership, enterprise, or any combination, including a joint venture, this Agreement shall be applicable to all such work performed under the name of Employer or the name of any other corporation, company, partnership, enterprise, combination or joint venture.

(Johnson Decl. Ex. 2, art. 1(H), Ex. 3 art. 1(C).) Thus, Plaintiffs must establish that the Defendants are in fact—or functionally—the same entity; in other words, Plaintiffs must establish that Defendants are alter egos of Charps or that Defendants operated a joint venture or joint enterprise. The Court addresses each in turn.

2.  **Joint Enterprise**

Plaintiffs' Complaint contains a combined cause of action for joint enterprise and joint venture. (Compl. ¶¶ 54-61.) Because these two causes of action "ha[ve] somewhat

7

different elements," the Court will analyze the two legal theories separately. Hansen v. St. Paul Metro Treatment Ctr., Inc., 609 N.W.2d 625, 628 (Minn. Ct. App. 2000).

"A joint enterprise requires (1) a mutual understanding for a common purpose, and (2) a [legal] right to a voice in the direction and control of the means used to carry out the common purpose." Mellett v. Fairview Health Servs., 634 N.W.2d 421, 424 (Minn. 2001) (quotations omitted). Plaintiffs argue that joint enterprise applies because Defendants have no legal relationship to each other.

But the joint-enterprise theory does not generally apply to affiliated companies and business relationships. Joint venture—not joint enterprise—"arises in business transactions." Delgado v. Lohmar, 289 N.W.2d 479, 482 n.2 (Minn. 1979); see Mellett, 634 N.W.2d at 424; Rehnberg v. Minn. Homes, Inc., 52 N.W.2d 454, 456 (Minn. 1952) (stating that a joint enterprise relationship forms if certain elements are satisfied and "assuming that a corporation has not been organized and the circumstances do not establish a technical partnership"). And typically, a joint enterprise is "for a more limited purpose, [or] for a more limited time." Weber ex rel. Sanft v. Goetzke, 371 N.W.2d 611, 615 (Minn. Ct. App. 1985) (quotation omitted); see, e.g., Dang v. St. Paul Ramsey Med. Ctr., Inc., 490 N.W.2d 653, 657 (Minn. Ct. App. 1992) (summarizing application of joint enterprise theory in tort-liability cases). Here, Plaintiffs claim that Defendants' single common purpose throughout the audit period "was to maximize the success of Defendants as a whole through joint financing, staffing[,] and decision making." (Pls.' Supp. Mem. (Docket No. 269) at 28.) This claim simply does not apply to a joint enterprise theory.

And even if joint enterprise applied, the parties to a joint enterprise must have a "legal right to control the means used to carry out the common purpose." Olson v. Ische, 343 N.W.2d 284, 288 (Minn. 1984) (emphasis omitted). As discussed below, "at least some level of joint control is required . . . [for] both joint enterprise and joint venture." Powell v. Trans Global Tours, Inc., 594 N.W.2d 252, 256 (Minn. Ct. App. 1999) (citing Wilson v. Am. Trans Air, Inc., 874 F.2d 386, 392 (7th Cir. 1989)). Here, Alpha and C&G had no legal right to jointly control the alleged scheme, and Plaintiffs' joint enterprise claim therefore fails.

### 3. Joint Venture

To establish a joint venture, Plaintiffs must satisfy four elements: "(1) contribution by all parties, (2) joint proprietorship and control, (3) sharing of profits but not necessarily of losses, and (4) a contract." Rosenberg v. Heritage Renovations, LLC, 685 N.W.2d 320, 332 (Minn. 2004) (quotation omitted). Although the existence of a joint venture is generally a factual issue, it may be a matter of law "where no competent evidence will support a finding of joint venture." Duxbury v. Spex Feeds, Inc., 681 N.W.2d 380, 389-90 (Minn. Ct. App. 2004). And summary judgment is proper if Plaintiffs fail to satisfy any one element. See, e.g., Dorsey & Whitney LLP v. Grossman, 749 N.W.2d 409, 416 (Minn. Ct. App. 2008) (rejecting joint venture argument for lack of evidence as to two elements). Although Plaintiffs have established issues of fact as to two of the elements, the Court can determine that no joint venture existed as a matter of law here because Plaintiffs have produced no competent evidence as to the formation of a contract or joint proprietorship and control.

9

### a. Contribution

The first element requires that each party make "a contribution of money, property, time, or skill" towards the undertaking. Id. Defendants argue that Charps, C&G, and Alpha were entirely separate entities and did not agree to contribute towards any undertaking. But this record contains some evidence of contribution, albeit minimally so.

During the audit period, Defendants allegedly employed mixed-crew teams on more than 230 projects, but 11 of those projects employed crews only from Alpha and C&G, neither of which is a signatory to the Funds. In any event, mixed crews on the remaining projects did include Charps employees. (See Lawrie Decl. Ex. 15; Suppl. Lawrie Decl. Ex. 132.) And Charps told one of its customers that it "has had employees working jointly with [its] sister company." (Lawrie Decl. (Docket No. 282) Ex. 30 at 9.)

Additionally, at least 244[1] employees allegedly performed work for a Defendant other than the one from which that employee was paid. (See Lawrie Decl. Ex. 44; Suppl. Lawrie Decl. Ex. 123.) But 109 of those employees have no connection to Charps—they either performed work for Alpha and were paid by C&G, or vice versa. Thus, Plaintiffs identified only 135 employees—out of more than 5,500 during the audit period—who performed work for a Defendant other than the one from which that employee was paid. (See Parker Decl. ¶ 2-3.)

---

[1] Plaintiffs' brief mentions 249 employees, but the exhibits to which they cite contain five duplicative employees.

Finally, as discussed below, Defendants' use of a zero-balance account and intercompany fund transfers also creates sufficient factual issues that preclude summary judgment as to this element.

### b. Joint Proprietorship and Control

Plaintiffs must also establish that Defendants "hav[e] a proprietary interest and a right of control over the subject matter." Krengel v. Midwest Automatic Photo, Inc., 203 N.W.2d 841, 847 (Minn. 1973). This element requires "at least some level of joint control." Powell, 594 N.W.2d at 256 (citing Wilson, 874 F.2d at 392); see also Seipel v. Arrowhead Indus. Serv., Inc., No. 07-cv-3864, 2010 WL 605722, at *3 (D. Minn. Feb. 11, 2010) (Schiltz, J.) (concluding that joint proprietorship and control existed because two Defendants "shared control" over work on a construction project); Krengel, 203 N.W.2d at 847 ("All defendants had some control and direction over the placement and operation of the photo booth.").

Plaintiffs claim that Defendants frequently used Charps-paid supervisors to oversee C&G and Alpha projects. Even if this were true, it does not prove that Alpha or C&G shared control in the alleged joint venture. Similarly, Plaintiffs argue that Charpentier controlled every Defendant, but again Plaintiffs do not present any argument that all Defendants had joint control in the alleged venture.

Plaintiffs have failed to establish joint proprietorship and control, because there is no evidence in the record that all Defendants shared control over the alleged venture.

### c. Sharing of Profits

Under this element, Plaintiffs must establish that Defendants "have an express or implied agreement to share the profits, but not necessarily the losses, from the enterprise." Grossman, 749 N.W.2d at 416. Profits need not be shared equally. See Duxbury, 681 N.W.2d at 390.

From May 2008 to June 2013, each Defendant had a separate bank account with First International Bank, as well as separate lines of credit. (Munter Dep. at 93-95.) During this period of time, Defendants allegedly transferred more than $83 million between each Defendant company to satisfy that company's financial obligations. (Id. at 105-06, 119-21; Lawrie Decl. (Docket No. 282) Ex. 77.) Munter testified that "the companies all had access to the lines of credit, but it—it went through each appropriate step to keep track of who actually borrowed it, and if it was borrowed from one company to another company, that was recorded as well." (Id. at 106.) He also stated that there was no formal agreement for this arrangement, but that Defendants' accountants advised that it was "the normal standard practice for smaller companies." (Id. at 119.) Defendants' evidence shows that each company had separate accounting practices and kept independent financial records. (See, e.g., Charpentier Decl. (Docket Nos. 197-2, 197-4, 197-6, 197-8) Ex. 5 (Charps' 2012 ledger), Ex. 12 (C&G's 2012 ledger), Ex. 20 (Alpha's 2012 ledger), Ex. 25 (Clearwater's 2012 ledger).) But there is no evidence that Defendants attempted to pay off the funds that each Defendant company borrowed.

In June 2013, Defendants transitioned their banking services to BMO Harris, enabling them to secure a combined $50 million loan with a $35 million operating line of

credit. (Munter Dep. at 131-32; Lawrie Decl. (Docket No. 281-6) Ex. 12 (Vynckt Dep.) at 50-52.) Defendants also used a zero-balance account with BMO Harris. (Vynckt Dep. at 55.) In this account, excess money from each Defendant's individual account was automatically swept up daily and used to pay down Defendants' common line of credit. (Id.) If any Defendant's individual account ended the day on a deficit, then an advance was automatically applied from the common line of credit to bring that account's balance to zero. (Id. at 55-56.) Munter testified that using a zero-balance account minimized Defendants' interest costs. (Munter Dep. at 137.) It also reduced administrative time and costs. (Vynckt Dep. at 56.) But Defendants transferred a substantial amount of money through this account; Charps alone allegedly transferred more than $6.5 million in and out of this account in December 2013. (See Lawrie Suppl. Decl. (Docket No. 296) Ex. 142.)

Plaintiffs argue that Defendants operated together with the singular purpose of increasing each Defendants' collective profits and that Defendants "received a measurable benefit" by using a zero-balance account. (Pls.' Opp'n Mem. at 42 (citing In re: The Brown Publ'g Co., No. 8-10-73295, 2014 WL 1338102, at *2 (Bankr. E.D.N.Y. Apr. 3, 2014)).) But Brown is an inapposite decision that addressed a constructive fraudulent conveyance claim under bankruptcy law—not profit-sharing for purposes of a joint venture. Defendants argue that their intercompany fund transfers do not satisfy the profit-sharing element because the transfers were not specifically for the purpose of profit sharing, citing Grossman and Duxbury. But those cases conclude that transferring funds between two defendant companies cannot be profit-sharing "[i]f the amount that one party receives is

13

fixed." Duxbury, 681 N.W.2d at 390; see also Grossman, 749 N.W.2d at 417. Defendants do not raise the same fixed-amount argument here.

Nevertheless, the facts here could support either parties' assertions, and summary judgment on this element is therefore unwarranted.

### d. Contract

Finally, Plaintiffs must present evidence of "a contract, express or implied, showing that a joint venture was entered into." Powell, 594 N.W.2d at 256.

Although less than clear, it appears that Plaintiffs' evidence of a contract is only that Defendants insist that they "always observed corporate formalities and documented the transactions between themselves." (Pls.' Opp'n Mem. at 42.) But a contract, either express or implied, requires an agreement to enter into a joint venture. Cf. Seipel, 2010 WL 605722, at *3 (concluding that contract element of a joint-venture claim was satisfied because two defendants had a verbal agreement regarding their arrangements on contribution, joint control, and profit-sharing). The mere fact that Defendants documented their transactions and observed corporate formalities is insufficient evidence of a contract. And Plaintiffs' failure to produce evidence of a contract, either written or verbal, is fatal to their claim. See Liberty Lobby, 477 U.S. at 256 (stating that, at summary judgment, the plaintiff must produce evidence to support a verdict in plaintiff's favor).

Plaintiffs' joint venture claim is therefore dismissed.

### 4. Alter Ego

In ERISA cases, the Eighth Circuit Court of Appeals applies the alter-ego doctrine under a strict corporate law standard. Greater Kan. City Laborers Pension Fund v. Superior

14

Gen. Contractors, Inc., 104 F.3d 1050, 1055 (8th Cir. 1997). Under the corporate law standard, a defendant corporation is an alter ego if it "(1) is controlled by another to the extent that it has independent existence in form only and (2) is used as a subterfuge to defeat public convenience, to justify wrong, or to perpetuate a fraud." Id. Typically in an alter-ego claim, "the Court considers whether the employers acted out of anti-union sentiment." Twin City Pipe Trades Serv. Ass'n, Inc. v. S&S Thermo Dynamics, Inc., No. 12-1417, 2013 WL 3989945, at *5 (D. Minn. Aug. 2, 2013) (Magnuson, J.) (quotation omitted). Here, the Court need not address whether Alpha and C&G independently existed in form only—though the record suggests they did not—because Plaintiffs have not established any subterfuge or anti-union sentiment.

Plaintiffs alter-ego claim encompasses two arguments: (1) that Defendants engaged in subterfuge by transferring and sharing work "to benefit from the expertise of union workers while cost-saving at the expense of non-union workers," and (2) that Defendants "intentionally reported the wrong number of hours, to the wrong benefit fund, for work performed for C&G and Alpha." (Pls.' Supp. Mem. at 30; Pls.' Opp'n Mem. at 39.) The record as presented simply does not support either argument.

First, as discussed above, the record contains some evidence that Defendants shared employees, but such evidence does not rise to the level of intentional subterfuge. Plaintiffs argue that Defendants' employee-sharing arrangement enabled Charps and Charpentier to benefit from the CBAs without paying their full costs. See Seipel, 2010 WL 605722, at *3. In Seipel, a defendant union company transferred all of its employees to an alter-ego payroll company, and then "'leased' back the same employees . . . to be 'subcontractors'"

15

of the union company in order to obtain favorable workers-compensation insurance rates. Id. at *1. Defendants' use of mixed-crew teams on some projects here is distinguishable and does not approach the level of subterfuge employed in Seipel. Further, Plaintiffs have not presented any facts regarding the potential cost-savings related to the alleged scheme.

Second, Plaintiffs claim that, "from 2008 through at least 2011, Defendants improperly reported employees" under the wrong CBA and as performing work for the wrong Defendant company. (Pls.' Reply Mem. at 4 (citing Lawrie 2d Suppl. Decl. (Docket No. 305) Ex. 183).) But the Exhibit to which Plaintiffs cite contains no information from 2008 or 2011. (Lawrie 2d Suppl. Decl. Ex. 183.) For 2009, the Exhibit includes only an Excel spreadsheet compiling data about work performed under Charps' payroll, but this data does not explain how Defendants misreported hours. (Id.) And for 2010, the Exhibit contains 2,488 pages of documentation, summarized only by employee name, project name, project location, and a "notes" section stating whether timecards exist for that project and identifying whether the project was performed by a "[m]ixed crew" or by a particular Defendant. (Id.) None of this information supports Plaintiffs' broad assertion that Defendants misreported hours for work performed by C&G and Alpha.[2] Even if hours

---

[2] Plaintiffs' citation to 11 other Exhibits to support this same assertion is similarly unhelpful. (See Lawrie Decl. (Docket No. 282) Exs. 71-75; Lawrie Suppl. Decl. (Docket No. 296) Exs. 116, 118, 129, 131, 154, 156.) For example, Exhibit 71 is 88 pages of unexplained C&G business records. Documents in Exhibit 72 suggest that Alpha paid an employee for working on a C&G project, which is irrelevant to whether Alpha or C&G were alter egos of Charps. Exhibit 75 is five documents in which Munter held himself out as a representative of both Charps and C&G—a fact that Defendants do not dispute and that does not demonstrate intentional misreporting of hours. Finally, Plaintiffs allege that Exhibit 118 documents Defendants' plan to minimize its reporting to the Funds, but Plaintiffs fail to elucidate how this one-page, hand-written document serves that purpose.

were misreported, Plaintiffs have not cited with particularity any evidence from which a reasonable factfinder could conclude that Defendants did so intentionally. Plaintiffs' evidence does not support a finding of subterfuge.

Finally, in determining whether subterfuge exists, the Court considers why an alleged alter-ego company was formed. See, e.g., S&S Thermo Dynamics, Inc., 2013 WL 3989945, at *6 (concluding that restructuring companies in order to avoid CBA obligations supported validity of alter-ego claim); Brady v. Swenke, No. 03-6381, 2004 WL 2697282, at *1, *3-4 (D. Minn. Nov. 24, 2004) (Montgomery, J.) (deciding that, because one defendant company was formed solely "to pay fringe benefits on behalf of Union members," summary judgment for defendants was inappropriate). Here, the formation of C&G and Alpha was entirely benign, and Plaintiffs do not direct the Court to any facts that could support an alternative explanation. Thus, Defendants' undisputed rationale for establishing Alpha and C&G supports a conclusion that they were not alter egos of Charps.

The record contains insufficient evidence to conclude that Charps and Charpentier intentionally used Alpha and C&G "as a subterfuge to defeat public convenience, to justify wrong, or to perpetuate a fraud." Superior Gen. Contractors, Inc., 104 F.3d at 1055. Therefore, Plaintiffs alter-ego claim must be dismissed.

**B.     Attorney's Fees and Defendants' Daubert Motion**

Both parties requested attorney's fees and costs under 29 U.S.C. § 1132(g)(1). The Court will not address those requests in this Order but will consider whether the award of fees and costs is appropriate only if a party files a separate, properly supported motion seeking such relief.

Finally, based on the disposition of this matter, the Court need not address Defendants' Motion to exclude Plaintiffs' expert, Mr. Craig Siiro. It is therefore denied as moot.

**CONCLUSION**

Plaintiffs have not presented sufficient evidence to support their claims, or they failed to cite with particularity the facts to support these claims. Accordingly, **IT IS HEREBY ORDERED that**:

1. Defendants' Motion for Summary Judgment (Docket No. 247) is **GRANTED**;
2. Plaintiffs' Motion for Summary Judgment (Docket No. 269) is **DENIED**;
3. Defendants' Motion to Exclude Expert Testimony of Craig Siiro (Docket No. 273) is **DENIED as moot**; and
4. The Complaint (Docket No. 1) is **DISMISSED with prejudice**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: August 20, 2018

*s/ Paul A. Magnuson*
Paul A. Magnuson
United States District Court Judge