```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
 2

 3    ------------------------------------------------------------
                                       )
      Glen Johnson, et al,             )   File No. 14-cv-2081
 4                                     )          (PAM/LIB)
              Plaintiffs,              )
 5                                     )
      vs.                              )   Saint Paul, Minnesota
 6                                     )   May 26, 2016
      Charps Welding & Fabricating,    )   9:00 a.m.
 7    et al,                           )
                                       )
 8            Defendants.              )
      ------------------------------------------------------------
 9
                 BEFORE THE HONORABLE RICHARD H. KYLE
10                UNITED STATES DISTRICT COURT JUDGE
                          (MOTIONS HEARING)
11
      APPEARANCES
12     For the Plaintiffs:        McGRANN SHEA CARNIVAL STRAUGHN &
                                  LAMB
13                                AMY L. COURT, ESQ.
                                  800 Nicollet Mall
14                                Suite 2600
                                  Minneapolis, Minnesota
15                                55402-7035

16     For the Defendants:        SEATON PETERS & REVNEW, PA
                                   THOMAS R. REVNEW, ESQ.
17                                 MARTIN D. KAPPENMAN, ESQ.
                                   7300 Metro Boulevard
18                                 Suite 500
                                   Minneapolis, Minnesota 55439
19
       Court Reporter:            CARLA R. BEBAULT, RMR, CRR, FCRR
20                                316 North Robert Street
                                  Suite 146 U.S. Courthouse
21                                Saint Paul, Minnesota 55101

22


23        Proceedings recorded by mechanical stenography;
      transcript produced by computer.
24


25
```

1                       **P R O C E E D I N G S**

2                        **IN OPEN COURT**

3

4              THE COURT:  Okay.  The matter on the Court's

5    calendar at this time is Justin Edward Wiley and others

6    against -- I got the wrong docket sheet, sorry.  Here we

7    are.  I'll get better after this -- Glen Johnson and others

8    against Charps Welding and Fabricating and others, civil

9    file number 14-2081.  Let's start with the appearances for

10   the Plaintiffs.

11             MS. COURT:  Good morning, Your Honor.  Amy Court

12   on behalf of the Plaintiffs.

13             THE COURT:  Good morning, Ms. Court.  You're

14   outnumbered, Ms. Court, do you realize that?

15             MS. COURT:  It seems to be the consensus today.

16   They're giving me a hard time.

17             THE COURT:  For the Defendants.

18             MR. REVNEW:  Good morning, Your Honor.  Tom Revnew

19   appearing along with my colleagues Martin Kappenman and Dan

20   Wollin (phonetically spelled).

21             THE COURT:  Good morning to all of you.

22             We're here on Motions for Partial Summary Judgment

23   filed by both the Plaintiff and the Defendant, and I think

24   I've sent out an e-mail to everybody saying we're going to

25   start with the Defendants' motion, and the timeframe so

1          everybody understands what the rules are in that regard.

2                    Okay.  Let's get underway.

3                    MR. REVNEW:  Good morning, Your Honor.

4                    THE COURT:  Counsel.

5                    MR. REVNEW:  On behalf of the Defendants we

6          respectfully request that the Court grant our Motion for

7          Summary Judgment and dismiss the complaint in its entirety.

8          By background, Your Honor, the complaint in this case was

9          filed on June 23rd, 2014.  There's been a couple scheduling

10         orders that have been issued.  There's been a few Motions to

11         Compel.  In fact, the last Motion to Compel was held in

12         December of 2015, December 9th, 2015, and at the time the

13         Plaintiffs filed that Motion to Compel, they waited four

14         months before filing that Motion to Compel to even complain

15         that they didn't get documents that they allegedly believe

16         that they were entitled to.

17                   There has been exhaustive discovery in this case,

18         exhaustive discovery with regard to documents that have been

19         produced, and those documents include general ledgers and

20         other documents that lay out a whole host of financial

21         information.  And despite all of the information, all the

22         documents that were produced by the Defendants in this case,

23         Your Honor, Plaintiffs took absolutely no depositions.  For

24         two years they didn't take a deposition, despite the fact

25         that in our interrogatory answers the Defendant identified

1   witnesses who would have information, despite an initial

2   disclosure that identified witnesses, despite correspondence

3   that identified witnesses that were available with

4   information.  In fact, Your Honor, they didn't even take the

5   deposition of the individual Defendant Ken Charpentier in

6   this case, nor did they take 30(b)(6) depositions of any of

7   the corporations at issue.

8           In sum, the Plaintiff fringe funds claims, they

9   lack merit, they lack substance, and they rely on

10  speculation, conjecture, and they misconstrue prior

11  deposition testimony from an unrelated case in North Dakota.

12          With respect to the claims that are at issue

13  before this Court, one claim that the Plaintiffs have

14  alleged is an alter-ego claim, and the Court should

15  summarily dismiss the alter-ego claim.  In order to

16  establish an alter ego, in essence what Plaintiffs have to

17  establish is that the alleged alter ego, in this case C & G

18  Construction and Alpha, they have to establish that those

19  alleged alter egos are controlled by another.  In this

20  instance that they are controlled by Charps, such to the

21  extent that they have independent existence in form only.

22          But in addition, Your Honor, to establish alter

23  ego they also have to establish that there was a subterfuge

24  here.  That it was designed to defeat public convenience, to

25  justify wrong, or in fact to perpetrate a fraud.  And with

1   regard to the alter-ego standard in the Eighth Circuit, the

2   Eighth Circuit is very clear that a corporation's existence

3   is presumed to be separate and may only be disregarded under

4   narrowly prescribed conditions, and the facts in this case

5   do not warrant setting aside the corporate existence of

6   Alpha or C & G or Clearwater Energy.  In fact, the Eighth

7   Circuit and the cases in this circuit have essentially said

8   it is only when the control of the puppet company; i.e., in

9   this case Alpha or C & G, it's only when the control of

10  those puppet companies by the puppet master is used as a

11  subterfuge to defeat public convenience, justify a wrong and

12  perpetrate a fraud that liability can arise under the

13  alter-ego standard for ERISA purposes.

14          But importantly in this particular case, Your

15  Honor, in paragraph 52 of the Plaintiff's complaint, they

16  essentially allege that Charps and Mr. Charpentier operated

17  Clearwater Energy, C & G and Alpha to perpetrate a fraud.

18  So their focus is only on the element of fraud, and yet they

19  have absolutely no evidence to establish that there was a

20  fraud being perpetrated in this case.

21          In essence, there's no material facts at issue

22  here, Your Honor.  With regard to the Plaintiffs, they

23  cannot establish the control element, nor can they establish

24  that Alpha, C & G, or Clearwater Energy lacked independent

25  existence.

1          The Plaintiffs' case essentially rests on a very

2     small amount of circumstantial evidence, and some of the

3     evidence that they rely on is so broadly painted it makes no

4     sense.  But, in essence, here are some of the things that

5     they allege:

6          They allege that, well, the companies are in the

7     same industry.  They are in the oil and gas industry.  Well,

8     that doesn't establish control, the fact that two companies

9     are in existence in the same industry.  In fact, if you

10    focus at what the companies actually do, they are distinctly

11    different.

12         With regard to Charps, Charps maintains and

13    repairs transmission pipelines.  And these are large steel

14    pipelines that go across states.  You have probably seen

15    them as you have driven on the expressways.  These pipelines

16    can be 24 to 48 inches in diameter.  Heavy steel pipelines.

17    And with regard to Charpentier or Charps, they work

18    primarily for one customer and that's Enbridge.

19         On the other hand, with regard to the alleged

20    alter egos, they work in a completely different segment of

21    the industry.  They work in the oil fields and they build

22    and lay fiberspar gathering lateral midstream lines, which

23    are smaller pipelines, actually in the oil fields

24    themselves.  And, in fact, much of their work is

25    polyurethane pipe and that polyurethane pipe can be a lot of

1    different dimensions, but 4 inches up to probably 36 inches

2    in diameter, but they are polyurethane versus steel.  And in

3    fact with regard to C & G and Alpha, they are performing

4    work for the producers and companies such as Hess.

5              You're likely to hear from the Plaintiffs that

6    customers were not identified in discovery, and that's not

7    accurate.  In fact, the documents that have been filed with

8    this Court specifically identify the customers with whom the

9    different entities performed work.  They are identified

10   within the financial records, the consolidated financial

11   records that have been presented through affidavit

12   testimony.

13             In addition, with regard to the different

14   entities, the different companies, they actually hire out in

15   the field.  So the hiring and firing takes plays out in the

16   field.  There's not centralized control of hiring and

17   firing, the centralized -- the hiring and firing is done by

18   the individual companies at the project sites.

19             The second issue that the Plaintiffs point to to

20   say, Well, look, Court, there's a lack of -- or there's

21   control over all the entities is the fact that Ken

22   Charpentier owns the different companies through his

23   ownership in Clearwater Energy.  The problem with that, Your

24   Honor, the problem with that particular argument is that if

25   that were the case, there would never be a double-breasted

1    company, and every case that came before this Court where

2    there was common ownership you would automatically establish

3    alter ego, and that's not case law in this circuit.

4         In fact, it's broader than that, Your Honor.  With

5    regard to the control, what the Courts are looking at is are

6    these companies separately managed.  Is there separate

7    administration, which is much more telling than common

8    ownership.

9         And in this instance, each of the companies have

10   separate leadership.  Greg Todavich runs Charps, Jeremy

11   Baker runs C & G and Alpha.  And with regard to the

12   companies, they have their own separate human resources

13   department, they have their own separate payroll, they have

14   their own separate tax returns, they have their separate

15   unemployment compensation filings, they have their own

16   separate licenses to do business.  All of that is separate.

17   And so focusing solely on common ownership is nonsensical.

18        Another factor that the fringe funds focus on in

19   this particular case is, well, the Clearwater companies have

20   headquarters in the same building up in Clearbrook,

21   Minnesota.  The problem with that argument is they ignore

22   the fact that the companies all have separate suites under a

23   lease arrangement.  They also ignore the fact that when you

24   start looking at the companies in a much broader sense, they

25   have a lot of different offices and job sites.

1          So as an example, Alpha, one of the Defendants,

2     leases office space in four different locations.  Charps

3     leases space in seven different locations.  C & G leases

4     space in eleven different locations.  Clearwater Energy

5     leases space in three different locations.  So they focus on

6     one scenario where they share space in a building in

7     Clearbrook and yet ignore that these companies have office

8     spaces in a lot of different states.

9          In fact, when we start looking at the specific

10    companies, Charps Welding performed work in eleven different

11    states.  Minnesota, Illinois, Michigan, North Dakota,

12    Wisconsin, Indiana.  They formerly did work in Kansas,

13    Pennsylvania, Ohio, New York, Oklahoma.  Alpha performed

14    work in two states, North Dakota and Montana.  And then

15    C & G is in Oklahoma, Pennsylvania, New York.  Kansas in the

16    past, Missouri in the past, Vermont in the past, Texas in

17    the past.  Seven different states.

18          And yet the Plaintiffs want to ignore the fact

19    that these companies are performing work in different

20    states.  They want to ignore the fact that not only are the

21    companies doing work in different states, when it comes to

22    the oil and gas industry, they are performing the work in a

23    different segment of the industry.

24          The other thing that the Plaintiffs point to is

25    that, Well, there have been a few people who have provided

1    services that have been shared across the company.  What

2    they can't dispute is that these are outlier scenarios where

3    it is the overwhelming evidence establishes that the

4    companies manage their own affairs.  They will point to,

5    Well, you know, some of the employees have worked for more

6    than one Clearwater company, but yet they can't dispute that

7    almost all of the employees who work for the companies at

8    different times actually terminated their employment, left,

9    and then went to work for another company.

10            In fact, Your Honor, it's no different than an

11    employee working for Krause Anderson Construction, quitting

12    their job at Krause Anderson Construction and then going to

13    work for Knutson Construction across the street.  Two

14    distinctly separate companies.  Just the fact that they had

15    employment at the two companies is not enough.

16            Additionally, Plaintiffs will argue, Gee, you

17    know, if you look at the companies, they shared equipment.

18    But the only thing that they can point to is the fact that

19    the companies shared some printers and some papers up at

20    corporate headquarters in Clearbrook, and that's di minimus

21    when you start to think about the tools and the equipment

22    that are used in the oil and gas industry with regard to the

23    big pieces of equipment that are being used on the job

24    sites.  In fact, they can't dispute that the companies

25    really do not share tools and equipment and materials to

1    perform the work.  In fact, one has to question how could

2    they share equipment when they are in different states

3    altogether.

4         You'll also hear some issues with regard to the

5    companies use some of the same banks.  In fact, I think

6    their briefs even say that they used the same bank accounts,

7    which is misleading.  There's absolutely no evidence to show

8    that the individual companies had the same individual bank

9    accounts.  They may have had accounts at the same bank but

10   they are separate accounts.

11        With regard to another argument that you will hear

12   that they will make is that the companies shared a worker's

13   compensation insurance policy and that for one year they

14   shared a vehicle insurance policy, and yet they can't

15   dispute that that was required by the insurers.  It wasn't

16   the company's decision; and regardless, it does not

17   establish control, whether directly or indirectly.

18        Going back to the customer issues, as I said

19   before, the companies performed work for different customers

20   in different segments of the industry.  C & G at one point

21   did a very miniscule portion of work for Enbridge, which

22   Plaintiffs' counsel will likely point out.  Except for the

23   fact that if you take a look at the 2012 financial report,

24   which is Exhibit 16 to Joe Van Vynckt's affidavit, it

25   indicates how miniscule the work C & G did for Enbridge was

1    as compared to the amount of work that Charps did.

2         Regardless, other than this one instance, they

3    can't dispute that Alpha never shared a customer with

4    Charps.  They can't dispute that C & G performs work for a

5    whole host of other clients.  They can't dispute that the

6    work that C & G and Alpha did does not compete with the

7    Charps work because they are in completely different

8    industries or segments of the industry.

9         In fact, Your Honor, they can't even dispute the

10    fact that when it comes to bidding for the work and

11    contracting for the work, that that is completely separate.

12    Each company has their own bidding department, bidding on

13    work.  And that's completely separate.  In fact, the signing

14    of the contracts is done separately by the presidents of the

15    different companies.

16         And they will say, Well, you know, Charps provided

17    a few loans to Alpha and C & G.  They can't dispute that

18    those loans were not regular occurrences and that the

19    companies do not share finances.  They can't dispute that

20    the loans were not risky, or that they were in fact

21    fraudulent.  In fact, they didn't leave Charps uncapitalized

22    and insolvent.  And the fact that there were loans simply

23    doesn't indicate that Charps controls Alpha or C & G.

24         In fact, there are cases in this district,

25    *GreenWorks* is one particular case, wherein the *GreenWorks*

1    case the Court even recognized that there were loans going

2    back and forth between the companies and that did not

3    establish alter-ego status.

4            The bottom line, Your Honor, when it comes to the

5    control factor, each of the companies are independent

6    businesses.  They service different areas of the industry.

7    They are in different supply chain segments.  One's in

8    production, one's in distribution.  They operate in

9    different regions of the country.  They operate performing

10   different work for different clients.  They bid for

11   themselves.  They buy their own tools and equipment.  They

12   do their own hiring and firing and discipline.  They have

13   separate financials.  And as a result, they cannot establish

14   that there's control amongst the alleged alter egos.

15           There's a second component, Your Honor, that they

16   need to establish, though, as well.  In addition, they have

17   to establish that there was some fraud that took place here.

18   And in the *GreenWorks* case the Court noted that it's best to

19   review the loss of independent existence to another's

20   control with an element of wrongdoing to show some

21   inequitable result.  And that's not what happened here and

22   the Plaintiffs cannot establish fraud.

23           By background, C & G and Alpha were in completely

24   different segments of the industry.  From a historical

25   standpoint, C & G got its name because there were two

1    individuals that decided to create C & G, Ken Charpentier,

2    which is the C, and then the G was Greg Todavich, and both

3    of those individuals contributed an equal amount of money to

4    set up C & G, $160,000.  And C & G when it was set up, it's

5    undisputed when they were set up it was set up to perform

6    work in North Dakota and Montana in the gas lines, which is

7    the polyurethane pipes.  There's no element of fraud of the

8    creation of C & G.

9            With regard to Alpha, Alpha was created by three

10   individuals: Kris Munter, Ken Charpentier and Ed

11   Charpentier.  And at the time that Alpha was coming into

12   existence, the original intent was that there were going to

13   be two owners, Kris Munter and Ed Charpentier.  And those

14   two individuals, when Alpha was created, gave personal

15   guarantees.  They mortgaged their homes.  They bought and

16   paid for a million dollar life insurance policy.

17           THE COURT:  That's sort of saying you're over your

18   time.

19           MR. JOHNSON:  Thank you, Your Honor.  I was

20   looking for the --

21           THE COURT:  We don't have lights here, so...

22           MR. JOHNSON:  Okay.  Thank you.

23           THE COURT:  Counsel.

24           MS. COURT:  Thank you, Your Honor.  The

25   Defendants' counsel spoke a lot about discovery in this case

1      and I think it's a relevant inquiry given some of the

2      discovery orders.  But with respect to the deposition

3      situation, cases like this are generally very fact specific

4      and in this case the Trustees were denied a specific amount

5      of documents at this stage of the proceedings.  The

6      Trustees' position is that depositions without documents are

7      not necessarily reliable because they don't have information

8      to impeach the witnesses.

9             Now, what we do have here is inconsistent written

10     discovery, and the Defendants have said, Well, if you would

11     have taken depositions you would have found out that that

12     discovery isn't consistent.  That violates the Federal Rules

13     of Civil Procedure and it violates Magistrate Brisbois'

14     orders in that the Defendants were ordered to provide

15     correct responses to some of the Trustees' discovery.

16            The Defendants in this case have taken

17     approximately eight or nine depositions.  They did not use

18     any in support of their motion.

19            In addition, if the Trustees are entitled to

20     proceed on their right to audit claim, the Trustees will

21     take depositions and it is not a financial -- a good

22     financial decision for the Trustees to take multiple

23     depositions at multiple times throughout the same

24     proceeding.

25            With respect to the alter-ego claim, the Trustees

1    believe if they are required to establish at this stage in

2    the proceeding the alter-ego claim, and the joint venture

3    claim on their dispositive motion, at minimum there are

4    multiple issues of fact.  The Defendants argue they have

5    completely different business purposes, but they all perform

6    pipeline installation work.  They all provide gathering

7    systems work.  They all provide restoration services,

8    emergency response work, facilities use, and systems

9    maintenance.

10          The Defendants admit that employees have worked

11   for one or more entities at a time.  If their business

12   purposes were so separate, it would be difficult for an

13   employee to go move around with the companies.

14          The employees or the corporate entities all

15   perform work in Minnesota.  Charps Welding and Alpha Oil

16   worked in North Dakota.  Charps and C & G worked in

17   Oklahoma, Kansas, Pennsylvania, New York, and Missouri.

18          In the Trustees discovery they requested

19   identification of all employees, together with their primary

20   job responsibilities, and all documents evidencing the type

21   of work that the employees for all corporate defendants

22   performed.  Magistrate Brisbois denied that discovery on the

23   basis that it was not related to the Trustees' right to

24   audit claim.  Without those documents the Trustees can't

25   test the veracity of Defendants' statement or impeach

1    testimony saying that is just a limited circumstance, or

2    they only worked at one company at a time.

3          The Defendants allege they didn't share any

4    customers, but they do admit that Charps and C & G both

5    worked for Enbridge, and Enbridge was Charps only customer.

6    I think it was actually usually their only customer, their

7    biggest customer.  And, C, the construction Alpha, both

8    performed work for Oneok and Hess and several other

9    companies.

10          Office space is shared.  With respect to the

11   management of the companies, the Defendants allege that

12   Mr. Charpentier delegates management to companies other than

13   Charps Welding, but it's true he does possess an ownership

14   interest in all of the corporate defendants, and

15   Mr. Charpentier has testified that he has final authority

16   with respect to Alpha.  And the Defendants take issue with

17   the context of that testimony.  But the Trustees submit that

18   that context is why it's reliable.  Mr. Charpentier had no

19   reason to lie in that deposition.

20          The Defendants agree that they all have bank

21   accounts at the same bank.  But what they didn't tell you is

22   these independent leaders of the other companies don't have

23   check signing authority on the accounts for the business and

24   payroll purposes, but Mr. Charpentier and his wife do.

25          The Trustees also requested identification

1    regarding supervisors for each of the corporate Defendants;

2    but again, Magistrate Brisbois denied that discovery request

3    on the basis that it wasn't related to the Trustees' right

4    to audit claim.

5           The Defendants have also -- or the Trustees also

6    requested employee files and employee information to

7    determine the extent to which the employees were being

8    transferred between companies.  That information was not

9    ordered to be produced.

10          One of the things that a Court is to look at when

11   construing an alter-ego claim is whether or not the

12   transactions between the companies are at arm's length, and

13   in this case we know employees were going back and forth.

14   We know there was shared equipment.  We know there were loan

15   transactions.  This is all set forth on their consolidated

16   financial statements.

17          What we don't know is whether or not these

18   transactions were at arm's length because no documents

19   evidencing the basis or the terms for such transactions were

20   produced in discovery.  The Defendants have represented that

21   they have produced all of their documents that they were

22   required to produce, so the fact that it hasn't been

23   produced leads to the conclusion that they don't exist.

24          Over the audit period at issue in this litigation,

25   Charps Welding equity increased over 8,000 percent while the

1    other corporate defendants decreased to a negative amount.

2    They're dependent on Charps Welding to remain financially

3    solvent.  That's evidenced by the significant outstanding

4    loan obligations that the other entities have with Charps

5    Welding; and again, there are no documents that support

6    these loans or identify the terms and whether they're at

7    arm's length.

8              And the Defendants admit that they

9    cross-collateralized all of their assets.  These things

10   relate to the first prong of the alter-ego test.  There is a

11   second prong to the alter-ego test, as this Court is aware.

12   Magistrate Brisbois did not permit discovery into this

13   prong.  Magistrate Brisbois did construe the discovery

14   request under the *General Contractor*'s test, which is the

15   test applied in the Eighth Circuit.  And if you look at his

16   initial order, he did not order any discovery as relevant to

17   the second prong of the alter-ego test.  So the Trustees

18   have not been able to do discovery on that particular prong.

19   Even so, the Trustees believe there are significant numbers

20   of issues of fact that would preclude summary judgment on

21   behalf of --

22             THE COURT:  Was there an appeal from that portion

23   of Judge Brisbois' --

24             MS. COURT:  We did appeal it.

25             THE COURT:  And what happened?

1          MS. COURT:  You affirmed it.

2          THE COURT:  That's behind us then.

3          MS. COURT:  It is.  I will also submit that the

4    Defendants' reliance on this *GreenWorks* case is inapposite.

5    The Charps companies are significantly larger and have very

6    complex corporate structures.  The GreenWorks companies were

7    a husband and wife company that operated out of their home,

8    and at this point all of the GreenWorks entities are in

9    Chapter 7 bankruptcy.

10         The Defendants didn't touch on this in their oral

11   argument, but it was brought up in their brief and so I will

12   just touch on it briefly.  It is the personal liability of

13   Mr. Charpentier.  They have moved for summary judgment

14   alleging that he has no personal liability.  The Trustees

15   dispute that.  The participating agreements that he signed

16   are clear, unequivocal personal guarantees.  I will also

17   point out that Judge Davis has construed the exact same

18   participating agreement at issue here and he found that it

19   was a valid personal guarantee.

20         And in that case -- that was in the *Arrowhead*

21   case, but he also found that employers, individual employers

22   have an interest in the performance of the principal

23   contract and so they are not a gratuitous guarantor.

24         THE COURT:  But you agree that I'm not bound by

25   Judge Davis's decision?

```
 1              MS. COURT:  I would agree, but I think his

 2     reasoning was very sound.

 3              Do you have any other questions?

 4              THE COURT:  No.

 5              MS. COURT:  Thank you.

 6              THE COURT:  I think you're up again, though.

 7              MS. COURT:  Oh, we're moving on.  I was ready to

 8     rest for a minute.

 9              THE COURT:  You got 30 seconds.  That should do

10     it.

11              MS. COURT:  All right.  On the Trustees' motion,

12     the Trustees have not moved for full summary judgment.  They

13     have moved for partial summary judgment on what has been

14     defined in this case as the threshold issue of whether or

15     not they have a right to conduct the audit of all of the

16     corporate defendants.

17              What Judge Brisbois did not say was that there has

18     to be a dispositive ruling on the alter ego and the claims

19     in order to proceed.  He said there must be a threshold

20     showing, and that threshold showing must be reviewed in the

21     context of ERISA and the governing documents, the CBAs and

22     the trust agreements.  The Trustees believe, based on the

23     evidence that we have been talking about, that there is a

24     threshold showing.  The Trustees had employees come forward,

25     identify the information leading to a potential alter-ego
```

1    joint venture claim.  In accordance with their fiduciary

2    duties and their governing documents, the Trustees filed

3    this lawsuit.

4           The Trustees have the right to audit as reasonably

5    required in the administration of the trust fund.  That's

6    under some of the contracts.  There are other contracts that

7    say that the Trustees had a right to audit under -- where an

8    employer is performing work under a joint venture or under

9    the name of another, all of that work is covered.

10          In this case the Trustees should have the right to

11   make basic determinations regarding whether the Defendants

12   are distinguishable as employers, as a matter of fact in

13   law, to make a determination of how much work between the

14   Defendants was covered by the CBAs, how much work was being

15   performed under the name of another.

16          There are also important policy reasons under

17   ERISA to permit these types of claims.  It requires

18   contributing employers to make their contractually defined

19   benefits contributions.  It stops employers from earning an

20   unearned competitive advantage, and it stops employers from

21   circumventing contribution obligations through use of other

22   entities.

23          I would also like to point out that at the initial

24   discovery stage, Magistrate Brisbois made a finding that

25   there was only the Builders Agreement in the record and the

1    Builders Agreement covers the State of Minnesota.  He

2    therefore denied discovery for any work performed outside

3    the State of the Minnesota.

4         All of the agreements that are in the record

5    before the Court here today were in the record before

6    Magistrate Brisbois.  The distribution and utilities CBAs

7    and the pipeline CBAs are nationwide, so the Trustees

8    request that they be permitted to conduct their audit based

9    on all work covered by all of the various Collective

10   Bargaining Agreements.  Thank you.

11        THE COURT:  Okay.

12        MR. KAPPENMAN:  Good morning, Your Honor.  Since

13   we have switched motions, you get a switch of attorneys.

14   I'm Martin Kappenman.

15        THE COURT:  You may want that podium up a little

16   bit.  Right on the front ledge there's a button someplace.

17   There you go.

18        MR. KAPPENMAN:  I think the most important place

19   to start is to remember why they would be enabled to audit

20   Alpha and C & G.  These are non-union entities.  So with

21   respect to Charps they have conducted audits.  Charps hasn't

22   resisted audits.  What they want is the right to audit

23   non-signatories.  Well, what Judge Brisbois reasonably

24   determined, and what you affirmed when it was appealed to

25   you, is, Well, if you want to audit, if you want to audit

1    non-signatory employers, you're going to have to show

2    threshold claims.  And what those threshold claims are are

3    the other counts of their complaint.  Alter ego and joint

4    venture.

5             So what that does is it puts us back in the

6    framework of, Well, did they show alter ego and joint

7    venture.  As Mr. Revnew pointed out in his oral arguments,

8    and as we've argued extensively in our briefs, they simply

9    haven't.  They don't have the basis for those claims.

10            So let's start with one of their favorite facts

11   that they point out repeatedly in their motion papers, and

12   again today at oral argument.  It's this 8,000 percent

13   increase in equity of Charps.  I'm glad they pointed it out

14   because had they not lead with it, I would have led with it

15   in our argument.  Because what are these alter ego and joint

16   venture cases about.  They are about unionized entities.

17   Unionized entities that let the unionized side of the

18   company wither on the vine while they shuttle work over to

19   the non-union companies.

20            Here there's no evidence of that.  That fact

21   alone, the huge increase in the equity of Charps totally

22   undermines all of their claims.  Because what we have here

23   is a robust, growing, profitable Charps who is employing

24   lots of union members.  It makes no sense that the pension

25   fund is trying to somehow squash that.  It goes contrary to

1      what any intent of an alter ego or joint venture analysis

2      for some fraud or improper purpose would find.

3            So let's talk -- shift over to some of the

4      discovery issues.  So with respect to the discovery,

5      Brisbois' order was clear.  They could look into and seek

6      discovery on alter ego and joint venture.  They simply chose

7      not to do so as fulsome -- take as fulsome discovery as they

8      could under those analyses.

9            Ms. Court points out today that these sorts of

10     inquiries are very fact specific.  Well, as the Court is

11     well aware, the way to determine to get really into the

12     details of a fact-specific inquiry is to hold depositions.

13     They took none.

14           I think the fact that they decided to use as one

15     of their primary sources of evidence upon which they base

16     their motions in this case, their resistance of our motion

17     and the affirmative insistence on their motion, was in fact

18     deposition testimony.  I think that highlights the fact that

19     what you have here are Plaintiffs who made an incorrect

20     strategic choice not to take depositions.

21           So what they do is they grab the depositions from

22     that old case, unrelated to the issues in this case.  But

23     what I want to point out is how wrong they get the facts in

24     those depositions.  So they point out time and time again,

25     Well, Mr. Charpentier in here says Alpha is nonunion, Charps

1    is union.  He did say that.  But on the, you know, when the

2    depositions are printed four on a single page, if you just

3    jump to the other side of the page he continues in response

4    to questions to highlight all of these distinctions that

5    we've pointed out today here.  How they really do different

6    types of work.  How they have these different origins.  All

7    of this is different.

8            Which leads me to another point.  They've claimed

9    that what we have here is self-serving affidavits and

10   declarations that the Court should ignore.  Well, what even

11   the cases they cite, and the understood case law in this

12   area is, Yeah, all declarations and affidavits are to some

13   extent going to be self-serving.  Why else would we submit

14   them?  You can only not use them if they directly contradict

15   sworn deposition testimony.  That's not the case here.  They

16   cite no deposition testimony that these declarations are

17   working against.

18           So then we get back into the interrogatories and

19   the basics of that discovery process.  First of all, they

20   were given a mountain of information.  They didn't get

21   everything they wanted but they got a mountain of

22   information with respect to documents and other financial

23   information.

24           With respect to the general ledger, in their

25   briefs they said, Well, they still didn't give us their

1    general ledger, but we did.  What they don't like is Judge

2    Brisbois' definition of what the general ledger is and the

3    language, we complied with his ruling.  Again, what you see

4    time and time again throughout these motion papers is an

5    attempt to relitigate those discovery issues and to say,

6    Well, because we lost that, that's really why we don't have

7    what we need here.  Almost a concession that they don't have

8    what they need to get their audit in this case.

9            With respect to the personal liability of

10   Mr. Charpentier which was referenced in Ms. Court's

11   arguments, first of all, necessarily, if the alter ego and

12   joint venture claims go our way, well, there's no personal

13   liability to be had because that's the basis of their

14   claims.  There's no claim in this suit that Charps failed to

15   pay the pension fund contributions that were due and owing.

16   It's all about these other companies.  So if those fail,

17   necessarily the personal liability claim fails, too.

18           I would also reference *Operating Engineers versus*

19   *Listful*, 220 F. Supp.2d 1042.  We've got the same sort of

20   language and it goes on to hold, Well, if it's intended to

21   be personally bound, he should have signed as an individual,

22   which we don't have here.  But again, Your Honor, since we

23   don't have alter ego and we don't have joint venture,

24   necessarily the personal liability claim also fails.

25           I want to talk about the depositions that we took.

1     While they are in the record, they are an attachment to our

2     declaration.  We made sure that they are still in there, so

3     if you'd like to take a look at them you can.

4          But why aren't they referenced heavily in our

5     motion papers?  Because we don't need to rely on those.

6     Because when it comes down to it, the Plaintiffs don't say,

7     Well, look, here are these people that had information that

8     shows that you should lose your claims.  They don't.  And

9     when we took those depositions, what was revealed through

10    those depositions is how little evidence the Plaintiffs

11    really had.  They just don't have evidence so they don't

12    bother to bring up anything from those people we deposed,

13    the people who might have had information, the union

14    business agents, the head of the union, the 30(b)(6)

15    representative.  They don't bring those up so we don't need

16    to talk about those at length.

17         So moving to Mr. Siiro, with Mr. Siiro's affidavit

18    as submitted in connection with this.  Again, he's never

19    identified as an expert witness.  Now, they cite, and

20    reasonably so, that we knew that he was involved beforehand.

21    But the key here is really the absence of an expert report.

22    There's no expert report from Mr. Siiro.

23         And then when we get to January, I sent a

24    correspondence to opposing counsel and I say, Hey, the

25    deadline passed.  I didn't get any expert report.  And they

1    say, Well, we think it's premature and that motion is still

2    pending.  Well, the motion was decided.  They did not get

3    the relief they wanted.  The scheduling order was not

4    changed, and there is no expert report in this case.

5            So they say, Well, Mr. Siiro, he is a lay witness.

6    Well, that's a funny kind of lay witness who doesn't have

7    any facts of what were actually happening at the time.  It's

8    also a funny kind of lay witness who works for pay.

9    Typically that's the realm of the expert witness.

10           But even if we were to consider what he has to

11    say, it actually supports our claims.  With respect to his

12    affidavit submitted in this case, what did he say?  Well,

13    you know, here's some financial records I looked over.  I

14    really can't come to any conclusion.

15           Again, just another example of the Plaintiffs not

16    having the evidence they need to survive our motions for

17    alter ego and to dismiss alter ego and joint venture, and

18    not having sufficient support to make their claim that these

19    nonunion entities should be subjected to the type of

20    intrusive audit that they are talking about.

21           I want to end with two things.  One is the

22    history.  As Mr. Revnew pointed out, when we're looking for

23    the motivations of these companies and whether they have met

24    what they need to meet -- and certainly they were able to

25    take discovery into alter ego and joint venture, it's right

1    within the orders -- what it shows is that it's not a

2    history intended to evade union obligations.  It's a history

3    of new people striking out with a new venture in a new part

4    of the country doing a different type of work.

5            Just to briefly describe, because it comes through

6    in the motion papers, Alpha and C & G, they are out there in

7    the oil fields.  They are constructing the new lines that

8    run right from the wells to the next point that then pumps

9    it on.  What's Charps doing?  Charps is taking the existing

10   lines, like the lines that run through Minnesota here that

11   are in the news, and they take those lines and they test

12   them.  They do integrity digs, and they test those existing

13   lines to see whether or not there are going to be leaks to

14   make sure that there aren't problems down the road.

15           Again, as Mr. Revnew pointed out, different types

16   of work for different types of customers, often in different

17   parts of the country.

18           Thank you, Your Honor.

19           MS. COURT:  Mr. Kappenman talked about traditional

20   alter-ego claims and how there can't be an alter-ego claim

21   if the union company isn't withering and dying and the

22   nonunion companies are thriving.  There is nothing in the

23   alter-ego test that requires that whatsoever.  What the

24   Court is to look at is whether or not the transactions

25   between the companies are at arm's length and the Trustees

1    submit to you that there's no evidence whatsoever that they

2    aren't.

3            It's clear from Magistrate Brisbois' orders that

4    additional discovery in this case is anticipated if the

5    Trustees prevail on their right-to-audit claim.  The

6    Trustees have not even been allowed to audit yet, so the

7    discussion about how Mr. Siiro doesn't have an expert

8    report, it makes sense.  Magistrate Brisbois said we can't

9    conduct the audit until we prevail on these threshold

10   claims.

11           Unless you have any questions, that's all I have.

12           THE COURT:  No.

13           Anything further from anybody?

14           MR. KAPPENMAN:  No, Your Honor.

15           MR. REVNEW:  No, Your Honor.

16           THE COURT:  I'll take the motions under advisement

17   and get an order out in due course.  I've quit predicting

18   times for it.

19           If it's all right with the lawyers and your

20   clients, I would like to just chat with the lawyers in the

21   back room here about some issues of scheduling and that sort

22   of thing.

23           MR. REVNEW:  Thank you.

24           THE COURT:  The rest of you are more than happy to

25   stay here or stay in the hallways, but we will be back in 10

1    or 15 minutes at the outside.

2                Why don't you just come back this way.

3                (Court adjourned at 9:43 a.m.)

4                              *       *       *

5

6

7          I, Carla R. Bebault, certify that the foregoing is

8    a correct transcript from the record of proceedings in the

9    above-entitled matter.

10

11

12              Certified by:    s/Carla R. Bebault
                                 Carla Bebault, RMR, CRR, FCRR
13

14

15

16

17

18

19

20

21

22

23

24

25